ACCEPTED
05-15-00279-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
5/28/2015 4:43:10 PM
LISA MATZ
CLERK

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
5/28/2015 4:43:10 PM
LISA MATZ
Clerk

5th Court of Appeals
FILED: 05/29/2015
13:16:45
Lisa Matz, Clerk

**NO. 05-15-00279-CR, NO. 05-15-00280-CR, NO. 05-15-00281-CR,**
**NO. 05-15-00282-CR, NO. 05-15-00283-CR, NO. 05-15-00284-CR,**
**NO. 05-15-00285-CR, NO. 05-15-00286-CR, NO. 05-15-00287-CR,**
**NO. 05-15-00288-CR, NO. 05-15-00289-CR, NO. 05-15-00290-CR,**
**NO. 05-15-00291-CR, NO. 05-15-00292-CR, NO. 05-15-00293-CR,**
**NO. 05-15-00294-CR, NO. 05-15-00295-CR, NO. 05-15-00296-CR,**
**NO. 05-15-00297-CR, NO. 05-15-00298-CR, NO. 05-15-00299-CR,**
**NO. 05-15-00300-CR, NO. 05-15-00301-CR, NO. 05-15-00302-CR,**
**NO. 05-15-00303-CR, NO. 05-15-00304-CR, NO. 05-15-00305-CR,**
**NO. 05-15-00306-CR, NO. 05-15-00307-CR, NO. 05-15-00308-CR,**
**NO. 05-15-00309-CR, NO. 05-15-00310-CR, NO. 05-15-00311-CR,**
**NO. 05-15-00312-CR, NO. 05-15-00313-CR, NO. 05-15-00314-CR,**
**NO. 05-15-00315-CR, NO. 05-15-00316-CR, NO. 05-15-00317-CR,**
**NO. 05-15-00318-CR, NO. 05-15-00319-CR, NO. 05-15-00320-CR,**
**NO. 05-15-00321-CR, NO. 05-15-00322-CR, NO. 05-15-00323-CR,**
**NO. 05-15-00324-CR, NO. 05-15-00325-CR, NO. 05-15-00326-CR,**
**NO. 05-15-00327-CR, NO. 05-15-00328-CR, NO. 05-15-00329-CR,**
**NO. 05-15-00330-CR, NO. 05-15-00331-CR**

————

# IN THE COURT OF APPEALS
# FOR THE FIFTH JUDICIAL DISTRICT
# OF TEXAS AT DALLAS

————

**STATE OF TEXAS,**

*Appellant,*

vs.

**FARHAD NAYEB,**

*Appellee.*

————

**APPELLANT'S BRIEF**

————

**LARRY R. BOYD**
**State Bar No. 02775000**
**lboyd@abernathy-law.com**
**ABERNATHY ROEDER BOYD & HULLETT, P.C.**
**1700 Redbud Blvd., Suite 300**
**McKinney, Texas 75069**
**Telephone: (214) 544-4000**
**Telecopier: (214) 544-4040**

**SPECIAL PROSECUTOR FOR**
**THE STATE OF TEXAS**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

APPELLATE COUNSEL
FOR THE STATE OF TEXAS:

LARRY R. BOYD
State Bar No. 02775000
lboyd@abernathy-law.com
ABERNATHY ROEDER BOYD &
HULLETT, P.C.
1700 Redbud Blvd., Suite 300
McKinney, Texas 75069
Telephone: (214) 544-4000
Telecopier: (214) 544-4040

TRIAL COUNSEL
FOR THE STATE OF TEXAS:

JOHN RICHARD ROLATER, JR.
State Bar No. 00791565
jrolater@co.collin.tx.us
ASSISTANT DISTRICT ATTORNEY
2100 Bloomdale Road, Suite 100
McKinney, Texas 75071
Telephone: (972) 548-4323
Telecopier: (972) 548-3622

APPELLEE:

FARHAD NAYEB

TRIAL AND APPELLATE
COUNSEL FOR THE APPELLEE:

THOMAS H. KEEN
State Bar No. 11163300
tom@keenlawfirm.com
LAW OFFICES OF THOMAS H.
KEEN, PLLC
555 Republic Drive, Suite 325
Plano, Texas 75074
Telephone: (469) 241-1467
Telecopier: (972) 499-2446

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . xiv

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

    Issue No. 1. Whether the City of Melissa, Texas' Comprehensive Zoning Ordinance No. 92-08 is unconstitutionally vague as determined by the Trial Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

    Issue No. 2. Whether the Trial Court failed to follow the established rules of statutory construction by not applying required constitutional presumptions, by ignoring prior determinations of this Court that Comprehensive Zoning Ordinance No. 92-08 is not vague, and by not properly construing the plain language of the ordinance.. xv

    Issue No. 3. Whether a party has standing to challenge an ordinance as unconstitutional when it has previously accepted the benefits of the same ordinance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     STANDARD OF REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    APPLICABLE PRESUMPTIONS AND BURDEN OF PROOF.. . . . . . . . . 7

    A.     The Required Presumptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.     The Burden of Proof.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    THE TRIAL COURT ERRONEOUSLY INVALIDATED THE CZO AS
      VAGUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.     The Determining Factors for Vagueness. . . . . . . . . . . . . . . . . . . . 9

    B.     The Trial Court's Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.     Failures of the Vagueness Challenge. . . . . . . . . . . . . . . . . . . . . . . 12

IV.    THE TRIAL COURT ERRONEOUSLY FOUND THE CZO TO BE
      UNCONSTITUTIONAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.     Application of Rules of Construction.. . . . . . . . . . . . . . . . . . . . . . 16

    B.     A Home-Rule City's Discretionary Powers.. . . . . . . . . . . . . . . . . 17

    C.     Nayeb's Failure to Carry His Burden of Proof.. . . . . . . . . . . . . . 21

    D.     Nayeb's Acceptance of the Benefits of the CZO Precluded the
         Constitutional Challenge For Lack of Standing.. . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# INDEX OF AUTHORITIES

CASES:

*Austin Police Ass'n v. City of Austin*,
71 S.W.3d 885 (Tex. App. - Austin 2002, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . 17

*Baird v. City of Melissa,* 170 S.W.3d 921
(Tex. App. - Dallas 2005, pet. denied). . . . . . . . . . . . . . . . 6, 13, 14, 16, 21, 24, 28

*Barshop v. Medina County Underground Water
Conservation Dist.*, 925 S.W.2d 618 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . 7, 14

*Bd. of Adjustment of the City of San Antonio v. Wende*,
92 S.W.3d 424 (Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bolton v. Sparks*, 362 S.W.2d 946 (Tex. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337,
72 S. Ct. 329, 96 L. Ed. 367 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Briggs v. State*, 740 S.W.2d 803 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . 11, 22

*Brookside Village v. Comeau*, 633 S.W.2d 790 (Tex. 1982). . . . . . . . . . . . . . 18, 19

*Bynum v. State*, 767 S.W.2d 769 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . 15

*Calvert v. Kadane*, 427 S.W.2d 605 (Tex. 1968). . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cambridge Production, Inc. v. Geodyne Nominee Corp.*,
292 S.W.3d 725 (Tex. App. - Amarillo 2009, pet. denied). . . . . . . . . . . . . . . . . . 27

*Cheatum v. Texas Workers' Compensation Comm'n & University of Texas System*,
2001 Tex. App. LEXIS 822 (Tex. App - Dallas 2001, no pet.). . . . . . . . . . . . . . . 25

*City of Alamo Heights v. Boyar*, 158 S.W.3d 545
(Tex. App. - San Antonio 2005, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of Chicago v. Morales*, 527 U.S. 41,
119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of College Station v. Turtle Rock Corp.*,
680 S.W.2d 802 (Tex. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*City of Dallas v. Blanton*, 200 S.W.3d 266
(Tex. App. - Dallas 2006, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*City of Dallas v. Haworth,* 218 S.W.2d 264
(Tex. Civ. App. - Dallas  1949, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . 13

*City of Garland v. Kaliney*, 1996 Tex. App. LEXIS 935
(Tex. App. - Dallas 1996, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*City of Houston v. Todd*, 41 S.W.3d 289
(Tex. App. - Houston [1st Dist.] 2001, pet. denied).. . . . . . . . . . . . . . . . . . . 20

*City of Mesquite v. Coltharp,* 685 S.W.2d 78
(Tex. App. - Dallas 1984, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*City of Richardson v. Responsible Dog Owners of Tex.*,
794 S.W.2d 17 (Tex. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425 (Tex. 1998). . . . . 8

*Doyle v. Harben*, 660 S.W.2d 586 (Tex. App. - San Antonio 1983, no writ). . . . . 8

*Duncantell v. State*, 230 S.W.3d 835
(Tex. App. - Houston [14th Dist]  2007, pet. ref'd). . . . . . . . . . . . . . . . . . . . . 11

*Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*,
176 S.W.3d 80 (Tex. App. - Houston [1st  Dist.] 2004, no pet.). . . . . . . . . . . . . . 27

*Eddins Enters., Inc. v. Town of Addison*,
280 S.W.3d 544 (Tex. App. - Dallas 2009, no pet.). . . . . . . . . . . . . . . . . . . . . 17

*Ellis v. City of West University Place,*
141 Tex. 608, 175 S.W.2d 396 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ely v. State*, 582 S.W.2d 416 (Tex. Crim. App. 1979). . . . . . . . . . . . . . . . . . . . . . . 8

*Engelking v. State*, 750 S.W.2d 213 (Tex. Crim. App. 1988).. . . . . . . . . . . . . . . 15

*Ex parte Granviel*, 561 S.W.2d 503 (Tex. Crim. App. 1978).. . . . . . . . . . . . . . . 8

*Ex parte Hood*, 211 S.W.3d 767 (Tex. Crim. App.),
*cert. denied*, 128 S.Ct. 48, 169 L. Ed. 2d 43 (2007). . . . . . . . . . . . . . . . . . . . . . . 20

*FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868 (Tex. 2000). . . . . . . . 8

*Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282 (Tex. 1948). . . . . . . . 17

*Fugate v. State*, 2015 Tex. App. LEXIS 1198
(Tex. App. - Dallas 2015, n. pet. h.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.,*
82 S.W.3d 869 (Tex. App. - Austin 2002, pet denied). . . . . . . . . . . . . . . . . . . . . 20

*Goode v. City of Dallas,* 554 S.W.2d 753
(Tex. Civ. App. - Dallas 1977, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Grayned v. City of Rockford*, 408 U.S. 104,
92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Haug v. Franklin*, 690 S.W.2d 646 (Tex. App. - Austin 1985, no writ). . . . . . . . 26

*Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593 (Tex. 1975). . . . . . . . . . . . . . . 7

*Lawrence v. State*, 211 S.W.3d 883 (Tex. App. - Dallas),
*affm'd* 240 S.W.3d 912 (Tex. Crim. App.),
*cert denied,* 553 U.S. 1007, 128 S. Ct. 2056, 170 L. Ed. 2d 798 (2008). . . . . . . . . 7

*Long v. State,* 931 S.W.2d 285 (Tex. Crim. App. 1996).. . . . . . . . . . . . . . . . . . . 10

*Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641 (Tex. 1975). . . 17

*Maloney v. State*, 294 S.W.3d 613
(Tex. App. - Houston [1st Dist.] 2009, pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). . . . . . . . . . . . . . . . . . . 11

*Mexico's Industries, Inc. v. Banco Mexico Somex, S.N.C*,
858 S.W.2d 577 (Tex. App. - El Paso 1993, writ denied). . . . . . . . . . . . . . . . . . 27

*Monsanto Co. v. Cornerstones Mun. Util. Dist.*,
865 S.W.2d 937 (Tex. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Papachristou v. City of Jacksonville*, 405 U.S. 156,
92 S. Ct. 839, 31 L. Ed. 2d 110 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pennington v. Singleton*, 606 S.W.2d 682 (Tex. 1980). . . . . . . . . . . . . . . . . . 9, 12

*Proctor v. Andrews*, 972 S.W.2d 729 (Tex.1998).. . . . . . . . . . . . . . . . . . . . . . . . . 17

*Quick v. City of Austin*, 7 S.W.3d 109 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . 19

*Render v. State*, 316 S.W.3d 846 (Tex. App. - Dallas 2010, pet. ref'd). . . . . . . . . . 7

*Rose v. Doctors Hosp.*, 801 S.W.2d 841 (Tex. 1990).. . . . . . . . . . . . . . . . . . . . . . . 8

*Santikos v. State*, 836 S.W.2d 631 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . 11

*Smith v. State*, 309 S.W.3d 10 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . 7

*Sonnier v. Crain*, 613 F.3d 436 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556 (Tex. 1985). . . . . . . . 8

*State v. Edmond*, 933 S.W.2d 120 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . 10

*State v. Public Util. Comm'n*, 883 S.W.2d 190 (Tex. 1994). . . . . . . . . . . . . . . . . 20

*State v. Rosseau*, 396 S.W.3d 550 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . 10

*State v. Wofford*, 34 S.W.3d 671 (Tex. App. - Austin 2000, no pet.). . . . . . . . . . 13

*Sullivan v. State*, 986 S.W.2d 708 (Tex. App. - Dallas 1999, no pet.). . . . . . . . . 13

*Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698 (Tex. 2014). . . . . . . . . . . . . . . . . 10

*Tex. Dep't of Transp. v. City of Sunset Valley*,
146 S.W.3d 637 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440 (Tex. 1993). . . . . 22

*Texas Boll Weevil Eradication Found. v. Lewellen*,
952 S.W.2d 454 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848 (Tex. 1995). . . . . . . . . . . . . . . . 8

*U.S. v. Escalante*, 239 F.3d 678 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. National Dairy Products Corp.*, 372 U.S. 29,
83 S. Ct. 594, 9 L. Ed. 2d 561 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . 10

*United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095,
95 L. Ed. 2d 697, 707 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Valero Ref. - Tex. L.P. v. State*, 203 S.W.3d 556
(Tex. App. - Houston [14[th] Dist] 2006, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). . . . . . . . . . . . . . . . . . 10

*Vuong v. State*, 830 S.W.2d 929 (Tex. Crim. App.),
*cert. denied*, 506 U.S. 997, 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992).......... 11

*Walker v. Gutierrez*, 111 S.W.3d 56 (Tex. 2003)............................. 7

*Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258,
138 L. Ed. 2d 772 (1997). .................................... 11

*Western Union Telegraph Co. v. State*, 62 Tex. 630 (1884)................... 8

*Williams v. National Mortgage Co.*, 1995 Tex. App. LEXIS 3398
(Tex. App. - Dallas 1995, no writ). ................................. 15

*Williams v. State*, 514 S.W.2d 772
(Tex. Civ. App. - Beaumont 1974, writ ref'd n.r.e). .................... 9

*Williams v. Williams*, 569 S.W.2d 867 (Tex. 1978). ..................... 26

STATUTES AND RULES:

Tex. Gov't Code § 311.011(a)..................................... 16

Tex. Gov't Code § 311.021...................................... 15

Tex. Gov't Code § 311.032(a)..................................... 13

Tex. Loc. Gov't Code § 51.001................................... 18

Tex. Loc. Gov't Code § 9.001 *et seq*. ............................ 17

CONSTITUTION:

Tex. Const. art XI, §5. ......................................... 17

MISCELLANEOUS:

Op. Tex. Att'y Gen. No. GA-0870 (2011)........................... 18

## STATEMENT OF THE CASE

In 2012, Farhad Nayeb ("Nayeb") acquired and began to operate an existing convenience store in the City of Melissa, Texas (the "City"), known as "Kim's Korner." Both before and after Nayeb's acquisition, these operations had been and remained subject to the City's Comprehensive Zoning Ordinance, Ordinance No. 92-08, as amended (the "CZO"). After acquisition, Nayeb sought to utilize this property for purposes of "check cashing" and "money transmission" neither of which constituted permitted uses under the CZO. After the City requested that these uses be terminated, Nayeb continued using the property for both "check cashing" and "money transmission." That conduct resulted in the City issuing 53 citations for CZO violations, one for construction without a permit, and one for failure to appear.

These citations were originally tried in the Municipal Court and resulted, after two trials, in fines totaling $92,240.00. Nayeb then appealed these convictions to the County Court at Law of Collin County, Texas (the "Trial Court"), which ultimately entered an Order on March 12, 2014, holding the CZO to be unconstitutionally vague "because it does not give fair notice to citizens accused of violating the ordinance by cashing checks or transmitting money allegedly contrary to the permitted uses of a premise covered by the ordinance." (CR 33, App. Tab 1). On February 19, 2015, the Trial Court dismissed all of the pending cases other than the failure to appear citation.

This Appeal results from the Trial Court's February 19, 2015 Orders (CR 40, App. Tab 2).

# STATEMENT REGARDING ORAL ARGUMENT

The State of Texas believes that oral argument would assist the Court in determining the issues presented based on the history of these proceedings, the prior decision of this Court concerning the constitutionality of the CZO being challenged, and the overall viability of the unconstitutionality claim advanced by the Appellee.

# ISSUES PRESENTED

**Issue No. 1.**      Whether the City of Melissa, Texas' Comprehensive Zoning Ordinance No. 92-08 is unconstitutionally vague as determined by the Trial Court.

**Issue No. 2.**      Whether the Trial Court failed to follow the established rules of statutory construction by not applying required constitutional presumptions, by ignoring prior determinations of this Court that Comprehensive Zoning Ordinance No. 92-08 is not vague, and by not properly construing the plain language of the ordinance.

**Issue No. 3.**      Whether a party has standing to challenge an ordinance as unconstitutional when it has previously accepted the benefits of the same ordinance.

**NO. 05-15-00279-CR, NO. 05-15-00280-CR, NO. 05-15-00281-CR,
NO. 05-15-00282-CR, NO. 05-15-00283-CR, NO. 05-15-00284-CR,
NO. 05-15-00285-CR, NO. 05-15-00286-CR, NO. 05-15-00287-CR,
NO. 05-15-00288-CR, NO. 05-15-00289-CR, NO. 05-15-00290-CR,
NO. 05-15-00291-CR, NO. 05-15-00292-CR, NO. 05-15-00293-CR,
NO. 05-15-00294-CR, NO. 05-15-00295-CR, NO. 05-15-00296-CR,
NO. 05-15-00297-CR, NO. 05-15-00298-CR, NO. 05-15-00299-CR,
NO. 05-15-00300-CR, NO. 05-15-00301-CR, NO. 05-15-00302-CR,
NO. 05-15-00303-CR, NO. 05-15-00304-CR, NO. 05-15-00305-CR,
NO. 05-15-00306-CR, NO. 05-15-00307-CR, NO. 05-15-00308-CR,
NO. 05-15-00309-CR, NO. 05-15-00310-CR, NO. 05-15-00311-CR,
NO. 05-15-00312-CR, NO. 05-15-00313-CR, NO. 05-15-00314-CR,
NO. 05-15-00315-CR, NO. 05-15-00316-CR, NO. 05-15-00317-CR,
NO. 05-15-00318-CR, NO. 05-15-00319-CR, NO. 05-15-00320-CR,
NO. 05-15-00321-CR, NO. 05-15-00322-CR, NO. 05-15-00323-CR,
NO. 05-15-00324-CR, NO. 05-15-00325-CR, NO. 05-15-00326-CR,
NO. 05-15-00327-CR, NO. 05-15-00328-CR, NO. 05-15-00329-CR,
NO. 05-15-00330-CR, NO. 05-15-00331-CR**

———

**IN THE COURT OF APPEALS
FOR THE FIFTH JUDICIAL DISTRICT
OF TEXAS AT DALLAS**

———

**STATE OF TEXAS,**

*Appellant*,

vs.

**FARHAD NAYEB,**

*Appellee.*

1

---

**APPELLANT'S BRIEF**

---

The State of Texas respectfully submits its brief in appeal of the Trial Court's

dismissal of Cause Nos. 002-82535-2013, 002-82536-2013, 002-82537-2013, 002-

82538-2013, 002-82539-2013, 002-82540-2013, 002-82541-2013, 002-82545-2013,

002-82546-2013, 002-82551-2013, 002-82553-2013, 002-82554-2013, 002-82555-

2013, 002-82557-2013, 002-82560-2013, 002-82563-2013, 002-82564-2013, 002-

82565-2013, 002-84704-2013, 002-84810-2013, 002-84811-2013, 002-84812-2013,

002-84813-2013, 002-84814-2013, 002-84815-2013, 002-84823-2013, 002-84824-

2013, 002-84825-2013, 002-84826-2013, 002-84827-2013, 002-84828-2013, 002-

84829-2013, 002-84830-2013, 002-84831-2013, 002-84832-2013, 002-84833-2013,

002-84834-2013, 002-84835-2013, 002-84836-2013, 002-84837-2013, 002-84838-

2013, 002-84839-2013, 002-84840-2013, 002-84841-2013, 002-84842-2013, 002-

84843-2013, 002-84844-2013, 002-84845-2013, 002-84846-2013, 002-84847-2013,

002-84848-2013, 002-84849-2013, and 002-84850-2013 dated February 29, 2015,

each styled *State of Texas vs. Farhad Nayeb* and consolidated solely for purposes of

trial with the failure to appear case under Cause No. 002-82534-2013. The failure to

appear case has not been appealed. This appeal is from County Court at Law No. 2, Collin County, Texas, the Honorable Barnett Walker presiding.

The Appendix will be referred to by tab reference. The Reporter's Record in this matter will be referred to by Volume Number followed by the page and line(s). The Clerk's Record will be referred to by "CR" followed by the relevant page number.

## STATEMENT OF FACTS

The City first adopted the CZO on August 25, 1992 as Ordinance No. 92-08. The CZO was thereafter amended on December 9, 1997, July 14, 1998, October 9, 2001, December 10, 2002, September 9, 2003, March 10, 2004, January 25, 2005, February 22, 2005, September 26, 2006, November 15, 2011, and March 27, 2012, by the City Council to fulfill the purposes set forth in the CZO (Supp. CR 38, App. Tab 3). Neither "check cashing" nor "money transmission" have ever been listed in the CZO as permitted uses within the C-2 (General Commercial) zoning district (the "C-2 Zoning District") the zoning classification of the Kim's Korner property. (RR Vol. 2 p. 8, l. 16 thorough p. 9, l. 8).

In the summer of 2012, Nayeb acquired Kim's Korner. (RR Vol. 3, p. 14, ll. 5-8). Kim's Korner had been in business since 1982. (RR Vol 3, p. 28, l. 15-18). After purchasing the convenience store, Nayeb sought a new certificate of occupancy (the "CO"), but was told an additional CO was unnecessary unless there was a change in the uses to which the property was placed. (RR Vol. 3, p. 14, l. 9-11). Nayeb reported no changes in use, that he was only going to do some paint and outside stucco work, and that no construction work would be done. (RR Vol. 3, p. 14, ll. 12-15). Then, without seeking approval from the City or obtaining a building permit, Nayeb constructed a booth within the convenience store, complete with

4

Kevlar glass, for the purpose of engaging in a check cashing enterprise. (RR Vol. 3, p. 15, ll. 9 - 20). After completion of construction, the City's Code Enforcement Officer observed check cashing-activities at the booth within the store. (RR Vol. 3, p. 16, l. 23 through p. 17, l. 5; p. 33, l. 7 - 11). Check cashing was not a previous use for the Kim's Korner property prior to Nayeb's acquisition. (RR Vol. 3, p. 15, l. 6 - 8). The City, through its City Manager, communicated with Nayeb as well as all similarly situated businesses, requesting that the check-cashing and money transfer activities be terminated. The other similarly situated business did cease their actions; however, Nayeb did not. (RR Vol. 3, p. 37, l. 22 through p. 38, l. 20).

Because Nayeb failed to comply with the City's written requests, the citations for CZO violations were issued. Additional citations were issued for construction of the check cashing booth without a permit and for failure to appear at the initial hearing on the CZO citations. The convictions by the Municipal Court on each of these citations led to the appeal to the County Court at Law.

In that appeal Nayeb sought consolidation of all of the citations. (CR 7, 12). The Trial Court consolidated each of the cases for purposes of trial under Cause No. 002-82534-2013, the failure to appear action. (CR10, 23). Also, during the appeal to the County Court, the CZO's constitutionality became an issue when Nayeb filed his Motion Challenging Constitutionality of the CZO (the "Motion"). (Supp. CR 26).

5

The Motion's essential arguments are that "Section 20 of the Ordinance is fatally vague because it fails to prohibit the particular accessory uses which are permitted and which are prohibited, or otherwise give any standards by which the code enforcement officer is to determine whether an accessory use is permitted." (CR 30).

At a hearing on the constitutionality issue, the Trial Court was made aware of this Court's prior opinion in *Baird v. City of Melissa*, 170 S.W.3d 921, 924 (Tex. App. - Dallas 2005, pet. denied) in which this CZO was reviewed and construed. That opinion stated that "[t]he plain language of the text of the ordinance prohibits uses that are not specified as 'permitted' under the schedule [of uses].'" *Id.* Notwithstanding this prior interpretation, the Trial Court's March 12, 2014 Order found the CZO to be unconstitutionally vague even though neither "check cashing" nor "money transmission" are identified as permitted uses within the ordinance, and, by their omission, are prohibited based on the express language of the *Baird* opinion. This Appeal follows the Trial Court's dismissal of each of the criminal cases based on the unconstitutionality ruling since the CZO provides the underlying basis for each of the citations resulting from multiple CZO violations. (CR 40).

**ARGUMENT**

## I.  STANDARD OF REVIEW.

The sufficiency of a charging instrument presents a question of law. *Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010). The standard of review is thus *de novo. Fugate v. State*, 2015 Tex. App. LEXIS 1198 * 3 (Tex. App. - Dallas 2015, n. pet. h.). The constitutionality of a criminal statute is a question of law which is reviewed *de novo. Render v. State*, 316 S.W.3d 846, 856 (Tex. App. - Dallas 2010, pet. ref'd).

## II.  APPLICABLE PRESUMPTIONS AND BURDEN OF PROOF.

### A.  The Required Presumptions.

When reviewing the constitutionality of a statute, including a municipal ordinance, a reviewing court must presume that the statute is constitutional. *Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003); *Lawrence v. State*, 211 S.W.3d 883, 890 (Tex. App. - Dallas), *affm'd* 240 S.W.3d 912 (Tex. Crim. App.), *cert denied,* 553 U.S. 1007, 128 S. Ct. 2056, 170 L. Ed. 2d 798 (2008). Further, courts must give a liberal interpretation in favor of constitutionality when legislation is challenged. *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 600 (Tex. 1975). Additionally, when analyzing the constitutionality of a statute, courts, if possible, interpret the statute in a manner that avoids constitutional infirmity. *Barshop v. Medina County*

7

*Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex. 1996); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000). Where, like here, a facial constitutional challenge to a statute is made, courts consider the statute only as it is written, rather than how it operates in practice. *Id.* Finally, if any provision of the statute is held to be invalid, that invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990)(citing *Western Union Telegraph Co. v. State*, 62 Tex. 630, 634 (1884)). To survive a vagueness challenge, a statute need not spell out with perfect precision what conduct it forbids. *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). A court will uphold the statute if it can determine a reasonable construction that will render the statute constitutional and carry out the legislative intent. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979).

**B.    The Burden of Proof.**

The burden of proof is on the party challenging the constitutionality of the statute. *Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848, 850 (Tex. 1995); *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex. 1985); *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978). The Court may not substitute its judgment for that of the legislative body. *Doyle v. Harben*, 660 S.W.2d

8

586, 589 (Tex. App. - San Antonio 1983, no writ). The invalidity must be apparent without reasonable doubt. *Williams v. State*, 514 S.W.2d 772, 773 (Tex. Civ. App. - Beaumont 1974, writ ref'd n.r.e).

**III.     THE TRIAL COURT ERRONEOUSLY INVALIDATED THE CZO AS VAGUE.**

**A.     The Determining Factors for Vagueness.**

The Texas Supreme Court has determined that "regulatory statutes governing business activity are allowed greater leeway than is allowed criminal statutes in applying the 'fair notice' test; no more than 'a reasonable degree of certainty can be demanded'; and that 'statutes are not automatically invalidated as vague simply because difficulty is found in determining whether marginal offenses fall within their language.'" *Pennington v. Singleton*, 606 S.W.2d 682, 689 (Tex. 1980) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S. Ct. 329, 96 L. Ed. 367 (1952); and *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963)). Generally, a criminal statute which does not deal merely with regulatory concerns is not vague if it (a) gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited; and (b) provides sufficient notice to law enforcement to prevent arbitrary

9

or discriminatory enforcement. *U.S. v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999)); see also *State v. Edmond*, 933 S.W.2d 120, 125 (Tex. Crim. App. 1996); *Long v. State,* 931 S.W.2d 285, 287 (Tex. Crim. App. 1996). However, a statutory provision need not be mathematically precise; it need only give fair warning in light of common understanding and practices. *Grayned v. City of Rockford*, 408 U.S. 104, 110-11, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).

Unless First Amendment freedoms are implicated, a facial vagueness challenge can succeed only if it is shown that the law is unconstitutionally vague in all of its applications. *State v. Rosseau*, 396 S.W.3d 550, 557-58 (Tex. Crim. App. 2013); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 1191, 71 L. Ed. 2d 362 (1982); *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014). Courts consider a facial challenge to a legislative act to be "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004). However, before a court may reach the question of whether a statute is impermissibly vague in all its applications, the party making the challenge must show that the statute was unconstitutional as applied to him. *Maloney v. State*, 294 S.W.3d 613, 629 (Tex. App. - Houston [1st Dist.] 2009,

10

pet. ref'd).  The fact that the statute may be, in its operation, unconstitutional as to others is not sufficient.  *Vuong v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App.), *cert. denied*, 506 U.S. 997, 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992).  Even if a statute might operate unconstitutionally under some circumstances, that fact alone is insufficient to render it invalid.  *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L. Ed. 2d 697, 707 (1987).  Additionally, a statute is unconstitutionally void for vagueness only when it specifies no standard of conduct or when it defines no core of prohibited activity.  *Briggs v. State*, 740 S.W.2d 803, 806 (Tex. Crim. App. 1987); *Duncantell v. State*, 230 S.W.3d 835, 845 (Tex. App. - Houston [14th Dist] 2007, pet. ref'd).  Finally, a facial challenge will fail when a statute has "a plainly legitimate sweep." *Sonnier v. Crain*, 613 F.3d 436, 443 (5th Cir. 2010) (citing *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997)).

The "over breadth" doctrine related to the constitutional analysis of legislative enactments has not been recognized outside the limited context of the First Amendment.  *Salerno*, 481 U.S. at 745; *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984); *Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992).  Here, no First Amendment rights are implicated.

11

## B. The Trial Court's Analysis.

In this case, the Trial Court ruled that the CZO was vague and ambiguous; however, it ignored the limitations imposed by *Pennington* on the interpretation of purely regulatory statutes governing business activities and only considered the first element of vagueness of general criminal statutes - the reasonable person standard. (RR Vol. 4, p. 40, l. 19-23; p. 41, l. 13-25). The Trial Court determined that the CZO was impermissibly vague in all of its applications and made no attempt to determine if any provisions could be merely severed from the ordinance to allow the balance to remain in effect. Essentially, the Trial Court found that no set of circumstances existed under which the CZO could be valid.

## C. Failures of the Vagueness Challenge.

The deficiencies of Nayeb's vagueness challenge are at least threefold.

First, the Trial Court held that the entirety of the CZO was unconstitutionally vague, not just the application of the term "accessory use." However, the March 12, 2014 Order specifically references the absence of fair notice when CZO violations are based on "check cashing" and "money transmission." That unconstitutionality determination therefore violates the principles that (a) the CZO must be vague in all of its applications and (b) those provisions which were unaffected by the term "accessory use" remain valid. Neither determination was made. (CR 33, App. Tab

12

1). Because Nayeb did not and cannot demonstrate that the CZO is vague in all of its applications, the vagueness challenge must fail. *Sullivan v. State*, 986 S.W.2d 708, 714 (Tex. App. - Dallas 1999, no pet.). Also, the Trial Court should have severed out those aspects of the CZO which it found to be unconstitutional and saved the balance. *State v. Wofford*, 34 S.W.3d 671, 681-82 (Tex. App. - Austin 2000, no pet.). Here, Section 36 of the CZO contains just such a severance provision and, pursuant to Section 311.032(a), Tex. Gov't Code, the offending provisions should have been severed. Nayeb did not seek to have any severance made and the Trial Court made none.

Second, the CZO specifically sets forth a schedule of permitted activities in a C-2 Zoning District. All other uses are prohibited. *Baird,* 170 S.W.3d at 925. This Court has determined, when construing other municipal ordinances, that uses not specifically allowed excluded other uses claimed to be incidental or accessory to a permitted use. *City of Dallas v. Haworth,* 218 S.W.2d 264 (Tex. Civ. App. - Dallas 1949, writ ref'd n.r.e.); *Goode v. City of Dallas,* 554 S.W.2d 753 (Tex. Civ. App. - Dallas 1977, no writ); *City of Mesquite v. Coltharp,* 685 S.W.2d 78 (Tex. App. - Dallas 1984, writ ref'd n.r.e.). The Trial Court, disregarding this Court's opinion in *Baird* as to the same ordinance, determined that the failure to list both "check

13

cashing" and "money transmission" as prohibited activities failed to provide fair notice to Nayeb as a reasonable person.

Third, Nayeb made no attempt to demonstrate with admissible evidence how the ordinance was unconstitutional as applied to him. To support his position, Nayeb merely argued, without any supporting evidence, that he received disparate treatment from the Code Enforcement Officer.

Notwithstanding the foregoing, Nayeb challenged the facial constitutionality of the CZO by arguing that no reasonable person could understand what was and was not a permitted use within the C-2 Zoning District. (RR Vol. 2, p. 6, l. 23 through p. 7, l. 2). To advance this position, Nayeb asserted that the term "accessory use" included every possible use if it was "subordinate to or a minor consequence of the general business." (RR Vol. 4, p. 33, l. 12 through p. 34, l. 5). Contrary to *Baird,* Nayeb argued that the omission from the grid of permitted uses does not mean the omitted use is prohibited. (RR Vol. 4, p. 35, l. 2-4). The Trial Court agreed with this challenge and declared the entirety of the CZO unconstitutional. (CR 33, App. Tab 1).

However, a statute is not facially invalid unless it could not be constitutional under any circumstances. *Barshop,* 925 S.W.2d at 631. This criteria was never addressed. Further, an ordinance is not facially invalid merely because the terms used

14

are not specifically defined. *Engelking v. State*, 750 S.W.2d 213, 215 (Tex. Crim. App. 1988). These principles were both ignored. Additionally, a statute is not unconstitutionally vague if, after the application of well-accepted canons of statutory construction, the statute can be given a clear meaning. *Bynum v. State*, 767 S.W.2d 769, 774 (Tex. Crim. App. 1989). For example, the Texas Code Construction Act required the Trial Court to (a) presume that compliance with the constitution of this state and the United States was intended; (b) the entire statute was intended to be effective; (c) a just and reasonable result was intended; and (d) a result feasible of execution was intended; and (e) public interest is favored over any private interest. Tex. Gov't Code § 311.021. No attempt was made to satisfy any of these standards. Finally, Nayeb merely argued in his Motion, without presentation of any supporting evidence, that he was being subject to disparate treatment from similarly situated "banks and other financial institutions, grocery stores, and other convenience stores within the C-2 district." (Supp. CR 35). However, neither motions nor argument constitute evidence. *Williams v. National Mortgage Co.*, 1995 Tex. App. LEXIS 3398 * 5 (Tex. App. - Dallas 1995, no writ). Without evidence, this argument within pleadings cannot support a determination that the CZO is unconstitutional as applied to Nayeb.

15

At the hearing on the State's Motion for Reconsideration (CR 33), the Trial Court was made aware of the fact the term "accessory use" was specifically used within the CZO only in connection with the definitions of "Farms", "Orchards", and "Schools, public" - the term "accessory use" has absolutely no application to convenience stores including Kim's Korner. (Supp. CR 38, App. 3, Sections 31.2 (37),(68), and (82)). (RR Vol. 4, p. 15, ll. 6-8, p. 17, ll. 8-14; p. 19, l. 5 -10). The Trial Court rejected this argument and stated that the CZO failed to give fair notice of "accessory use" restrictions. (RR Vol. 4, p. 41, l. 13 -25). However, the words or phrases of the ordinance must be read in the context in which they are used. Tex. Gov't Code § 311.011(a). The State, through the CZO, demonstrated that each of the activities, other than check cashing and money transmission, undertaken by Nayeb at Kim's Korner after his acquisition were permitted uses in a C-2 Zoning District. (Supp. CR 38, App. Tab 3, Section 20, p. 21-25). Finally, the Trial Court was provided a copy of this Court's opinion in *Baird.* (RR Vol. 4, p. 14, ll. 13 -22). Notwithstanding this evidence, controlling authority and argument, the Trial Court erroneously ruled the CZO to be unconstitutionally vague.

## IV.   THE TRIAL COURT ERRONEOUSLY FOUND THE CZO TO BE UNCONSTITUTIONAL.

### A.   Application of Rules of Construction.

The same rules applied to construe statutes are used to construe municipal ordinances. *Bd. of Adjustment of the City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Also, like statutory challenges, disputes regarding city ordinances begin with a presumption of constitutionality. *Eddins Enters., Inc. v. Town of Addison*, 280 S.W.3d 544, 547 (Tex. App. - Dallas 2009, no pet.). An ordinance is also presumed to be valid. *Austin Police Ass'n v. City of Austin*, 71 S.W.3d 885, 888 (Tex. App. - Austin 2002, no pet.). The challenging party is held to its "extraordinary burden" to establish that the ordinance is invalid. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex. 1984).

**B.     A Home-Rule City's Discretionary Powers.**

As a home-rule municipality, the City has broad discretionary powers. *City of Richardson v. Responsible Dog Owners of Tex.*, 794 S.W.2d 17, 19 (Tex. 1990). These powers are derived from the Texas Constitution and are limited only by the City's Charter or specific legislative action. Tex. Const. art XI, § 5; Tex. Loc. Gov't Code § 9.001, *et seq.* Home-rule cities have the full power of self-government and look to the Legislature, not for grants of power, but only for limitations of their powers. *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex.1998); *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex. 1975) (citing *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282 (Tex. 1948)). In *Forwood*, the Texas

17

Supreme Court summarized the home-rule doctrine set forth in Article XI, Section 5 of the Texas Constitution as follows:

> It was the purpose of the Home-Rule Amendment [to the Texas Constitution]... to bestow upon accepting cities and towns of more than 5,000 population full power of self-government, **that is, full authority to do anything the legislature could theretofore have authorized them to do. The result is that now its is necessary to look to the acts of the legislature not for grants of power to such cities but only for their limitations on their power.** (Emphasis added).

*Id*. at 286; see also, Op. Tex. Att'y Gen. No. GA-0870 (2011) (stating a home-rule city has all the powers of the state not inconsistent with the Texas Constitution and general laws of the state).

The Legislature has given the governing body of a municipality broad discretion in the exercise of its powers and authority, subject to the express provisions of the charter in instances where they are applicable. Tex. Loc. Gov't Code § 51.001. An ordinance is a valid exercise of a city's police power so long as the regulation was adopted to accomplish a legitimate goal, that is, it must be "substantially related" to the health, safety, or general welfare of the people. *Turtle Rock,* 680 S.W.2d at 805; *Ellis v. City of West University Place*, 141 Tex. 608, 175 S.W.2d 396 (1943). Zoning is an exercise of police power. As the Court stated in *Brookside Village v. Comeau*, 633 S.W.2d 790,792-93 (Tex. 1982):

18

> Zoning regulation is a recognized tool of community planning, allowing a municipality, in the exercise of its legislative discretion, to restrict the use of private property. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303(1926); *Lombardo v. City of Dallas*, 124 Tex. 1, 73 S.W.2d 475 (1934). Judicial review of a municipality's regulatory action is necessarily circumscribed as appropriate to the line of demarcation between legislative and judicial functions. As stated previously by this Court: 'A city ordinance is presumed to be valid … (and) … the courts have no authority to interfere unless the ordinance is unreasonable and arbitrary-a clear abuse of municipal discretion.'

The Court went on to say "[i]t is also equally well settled that zoning ordinances fall within the police power of municipalities." *Id.* at 793.

If reasonable minds may differ as to whether a particular ordinance has a substantial relationship to the public health, safety, morals, or general welfare, no clear abuse of discretion is shown, and the ordinance must stand as a valid exercise of the City's police power. *Quick v. City of Austin*, 7 S.W.3d 109, 117 (Tex. 1998). Therefore, the CZO must be "scrutinized under the aforementioned principles relating to a municipality's exercise of general police power." *Comeau,* 633 S.W.2d at 793. If the evidence reveals a fact issue in this respect, the ordinance must be upheld. *Id.* The Trial Court followed none of these principles.

The other rules of statutory construction which apply to the Trial Court's interpretation of the CZO are:

19

a.    every word, phrase, and expression is reviewed as if it were deliberately chosen and presume words excluded from a statute were excluded on purpose. *Ex parte Hood*, 211 S.W.3d 767, 773 (Tex. Crim. App.), *cert. denied*, 128 S.Ct. 48, 169 L. Ed. 2d 43 (2007); *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.,* 82 S.W.3d 869, 873 (Tex. App. - Austin 2002, pet denied);

b.    if the meaning of an ordinance is doubtful or ambiguous, the construction given by the body charged with its enforcement or administration is entitled to weight. *Calvert v. Kadane*, 427 S.W.2d 605, 608 (Tex. 1968); *State v. Public Util. Comm'n*, 883 S.W.2d 190, 195 (Tex. 1994); *City of Alamo Heights v. Boyar*, 158 S.W.3d 545, 551 (Tex. App. - San Antonio 2005, no pet.);

c.    the enactment as a whole, not isolated provisions, are construed. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *City of Houston v. Todd*, 41 S.W.3d 289, 298 (Tex. App. - Houston [1st Dist.] 2001, pet. denied);

d.    the primary objective is to carry out the intentions of the municipality's legislative body. *Bolton v. Sparks*, 362 S.W.2d 946, 952 (Tex. 1962);

*Monsanto Co. v. Cornerstones Mun. Util. Dist.*, 865 S.W.2d 937, 939 (Tex. 1993); and

e.      no meaning is assigned to a provision that would be inconsistent with other provisions of the enactment. *City of Dallas v. Blanton*, 200 S.W.3d 266, 277 (Tex. App. - Dallas 2006, no pet.); *Baird*, 170 S.W.3d at 925.

The Trial Court again failed to follow these rules of construction.

**C.      Nayeb's Failure to Carry His Burden of Proof.**

Here, Nayeb, as the party with the burden of proof, provided no evidence which demonstrated that (a) prohibition of "check cashing" and "money transmission" was a clear abuse of the City's discretion or, (b) alternatively, did not relate to the public health, safety, morals, or general welfare. Nayeb made no effort to rebut the State's evidence of how the term "accessory use" was construed by the City as the body charged with its enforcement or administration and therefore the proper construction to be applied to this provision of the CZO. Further, Nayeb did not attempt to demonstrate why the City chose to only employ the term "accessory use" in connection with the CZO's definitions of "Farms", "Orchards", and "Public, schools" and thereby exclude all other applications of that term. The State specifically argued that the application of "accessory use" was limited to those three definitions. (RR

21

Vol. 4, p. 14, l. 23-25; p. 15, l. 14-21; p. 17, l. 19-24). Additionally, Nayeb did not address why the CZO was not a lawful exercise of the City's police power. Finally, Nayeb and the Trial Court adopted a rationale that if a convenience store customer wrote a check for any amount over the cost of the goods being purchased such a transaction constituted "check cashing" even though no fee was charged for that service and the action was not being undertaken as a separate and identifiable business. (RR Vol. 4, p. 39, l. 2-18). This reasoning clearly assigned a meaning to that hypothetical transaction which was rebutted in its entirety by the City's Code Enforcement Officer's testimony. (RR Vol. 3, p. 29, l. 13 through p. 30, l. 5). This hypothetical ignores the plain language of the CZO and instead attempts to interject how the ordinance might operate in practice. However, a reviewing court cannot consider these hypotheticals but must determine if the statute is unconstitutional only when applied to a defendant's specific conduct. *Briggs*, 740 S.W.2d at 806. Further, courts do not engage in hypothetical analysis to determine whether the statute provides adequate notice since no actual or imminent harm is addressed thus rendering any decision based on the hypothetical merely advisory. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993); *Valero Ref. - Tex. L.P. v. State*, 203 S.W.3d 556, 563 (Tex. App. - Houston [14th Dist] 2006, no pet.). Finally, a statute cannot be facially invalid simply because it may be

22

unconstitutionally applied under hypothetical facts which have not yet arisen. *Texas Boll Weevil Eradication Found. v. Lewellen*, 952 S.W.2d 454, 463 (Tex. 1997).

Here, the CZO is clear that the term "accessory use" is specifically limited in its application to three defined instances, none of which are applicable to convenience stores. Notwithstanding the rebuttal by the City's Code Enforcement Officer to Nayeb's hypothetical, the Trial Court adopted Nayeb's faulty hypothetical as a basis for making its determination that the CZO was unconstitutionally vague.

In contrast to the State's evidence and argument, Nayeb merely chose to rely on a position that the term "accessory use," including everything he deemed to be incidental to the primary uses permitted for a convenience store, demonstrated the ambiguity of the CZO and thereby rendered it unconstitutionally vague. The Trial Court agreed. (RR Vol. 4, p. 41, l. 13 through p. 42, l. 7). Nayeb also argued that "accessory use" does not appear on the grid of permitted uses in the CZO. (RR Vol. 4, p. 34, l. 23-25). In support of these arguments, Nayeb set forth his uses as being convenience store, gas station, fudge factory, beverage sales, restaurant and food sales, each of which he describes as being accessory to the convenience store use. (RR Vol. 2, p. 6, l. 5 through p. 7, l. 8). What Nayeb ignored was that the CZO permits uses within the C-2 Zoning District assigned to Nayeb's property for (a) alcoholic beverage sales; (b) bakery; (c) grocery store; (d) meat market; (e) pharmacy;

23

(f) restaurant; and (g) service station. (Supp. CR 38, App. Tab 3, Section 20, p. 21 - 25). As a result, the CZO permits all of the uses Nayeb has undertaken on his property, other than "check cashing" and "money transmission." Nayeb failed to provide any evidence or to otherwise demonstrate, other than through his own Counsel's arguments, that "check cashing" and "money transmission" were accessory to the functions of a convenience store. In fact, notwithstanding Nayeb's argument of disparate treatment, the State's evidence was clear that no other convenience store in the City engaged in those allegedly "accessory uses." (RR Vol. 3, p. 30, l. 5 - 11). The City, exercising its statutory prerogatives, adopted the CZO and limited the uses of property within the C-2 Zoning District, including "accessory uses," to those specifically listed. This view is consistent with this Court's previous determination when interpreting this exact ordinance that "[t]he plain language of the text of the ordinance prohibits uses that are not specified as 'permitted' under the schedule [of uses]." *Baird,* 170 S.W.3d at 924. Therefore, even if a use is accessory to a primary use, if that additional "accessory" use is not permitted by the CZO it is, by definition, prohibited. The State specifically informed the Trial Court of this ruling. (RR Vol 4, p. 14, l. 13 - 16). Notwithstanding having this Court's interpretation of the CZO and the State's consistent argument that Nayeb had not demonstrated either that the CZO was vague or that he had been subjected to disparate treatment, the Trial Court

held contrary to both the *Baird* determination and the State's argument. (CR 33, App. Tab 1). By failing to follow both established rules of construction as well as this Court's opinion in *Baird,* the Trial Court failed to apply established law to properly interpret the CZO in the context of Nayeb's complaints.

Nayeb also argued that the CZO failed to define 105 of the 117 permitted uses listed within the ordinance. However, Nayeb has no standing to challenge any use to which he is not attempting to place Kim's Korner since he is unaffected by the lack of any definition of those permitted uses. To have standing to challenge a statute as unconstitutional, Nayeb (1) "must suffer some actual or threatened injury under the statute" and (2) "must contend that the statute unconstitutionally restricts [his] own rights," not someone else's. *Barshop,* 925 S.W.2d at 626. For all of the alleged deficiencies other than the "accessory use" argument, Nayeb cannot satisfy either test.

### D. Nayeb's Acceptance of the Benefits of the CZO Precluded the Constitutional Challenge For Lack of Standing.

This Court has determined that "[i]t is a fundamental rule of constitutional law that a court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits." *City of Garland v. Kaliney*, 1996 Tex. App. LEXIS 935 * 10 (Tex. App. - Dallas 1996, writ denied); see also *McElhaney v. City of Tyler*, 926 S.W.2d 597, 602 (Tex. App. - Tyler 1996, writ denied); *Cheatum v.*

25

*Texas Workers' Compensation Comm'n & University of Texas System*, 2001 Tex. App. LEXIS 822 * 5 (Tex. App - Dallas 2001, no pet.). Thus, the question is whether the party has standing to institute a constitutional challenge. This Court has previously determined that persons similarly situated to Nayeb do not. *Id.* at * 6. Here, Nayeb accepted the benefits of a CO issued under the CZO and then, unsatisfied with its breadth, sought a declaration of unconstitutionality for the entirety of the ordinance. The CZO defines a CO as "[a]n official certificate issued by the City of Melissa through the enforcing official indicating conformance with or approved conditional waiver from the zoning regulations and authorizing legal use of the premises for which it is issued." (Supp. CR 38, Tab 3, Section 31.2(20)). As a result of his acceptance of the benefits of the CO which authorized the uses which were permitted under the CZO, Nayeb has waived any claims based on use limitations imposed by the CZO for other uses of his property. *Haug v. Franklin*, 690 S.W.2d 646, 650 (Tex. App. - Austin 1985, no writ). A party waives its constitutional or statutory rights by intelligently, voluntarily, and knowingly relinquishing a known right or acting inconsistent with claiming that right. *Williams v. Williams*, 569 S.W.2d 867, 870 (Tex. 1978). The acceptance of the benefits derived from the CZO constitutes a waiver of any claim of unconstitutionality and Nayeb is estopped to take a contrary position.

Further, the principle of quasi estoppel forbids Nayeb from accepting the benefits of a law and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Mexico's Industries, Inc. v. Banco Mexico Somex, S.N.C*, 858 S.W.2d 577, 581 n. 7 (Tex. App. - El Paso 1993, writ denied); *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App. - Houston [1st Dist.] 2004, no pet.). It applies when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which he acquiesced, or from which he accepted a benefit. *Cambridge Production, Inc. v. Geodyne Nominee Corp.*,292 S.W.3d 725, 732 (Tex. App. - Amarillo 2009, pet. denied). Nayeb accepted the benefits of the CZO through his use and occupancy of the premises known as Kim's Korner. He is now estopped to assert that the ordinance, thru which his CO was issued, is unconstitutional.

Nayeb, by conducting business under the CO and profiting from that endeavor, cannot subsequently take a position inconsistent with the rights previously granted by the City and, without standing, challenge the constitutionality of the CZO through which he was permitted the privilege of using Kim's Korner to sell products to the citizens of the City.

27

## CONCLUSION

Nayeb failed to sustain his burden of proof to overcome the constitutional presumptions and the rules of statutory construction favoring the CZO's constitutionality. The State demonstrated by competent evidence the City's interpretation of the CZO's prohibitions against "check cashing" and "money transmission" which were being violated and resulted in the issuance of the citations. Nayeb's assertion that "check cashing" and "money transmission" were accessory uses in a C-2 Zoning District ignores this Court's determination in *Baird.* Nayeb provided no evidence that he was being subjected to disparate treatment. Nayeb both lacks standing to (a) assert that any provision of the CZO is unconstitutional; and (b) based on his acceptance of benefits under the ordinance is estopped and has waived any rights to contest the CZO's constitutionality. Therefore, the Trial Court's determination that the CZO was unconstitutionally vague generally or as applied to Nayeb fails to follow the established rules of statutory construction, fails to apply required constitutional presumptions, ignores the prior determinations of this Court, disregards both the arguments of estoppel and waiver, and avoids the standing issue.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State of Texas prays that this Court reverse the Trial Court's finding that the City of Melissa, Texas'

Comprehensive Zoning Ordinance No. 92-08 is unconstitutionally vague; direct the

Trial Court to vacate its March 12, 2014 Order; reverse the dismissals of the charging

instruments; remand this case to the Trial Court for reinstatement of the information

and trial of the various offenses; and for such other and further relief to which the

State of Texas may be entitled.

Respectfully submitted,

/s/ Larry R. Boyd
**LARRY R. BOYD**
State Bar No. 02775000
lboyd@abernathy-law.com
**ABERNATHY ROEDER BOYD &
HULLETT, P.C.**
1700 Redbud Blvd., Suite 300
McKinney, Texas 75069
Telephone: (214) 544-4000
Telecopier: (214) 544-4040

**SPECIAL PROSECUTOR FOR THE
STATE OF TEXAS**

**CERTIFICATE OF COMPLIANCE**

I certify that this petition was prepared with WordPerfect Version X5, and that, according to that program's word count function, the sections covered by TRAP 9.4(i)(1) contain 6,330 words.

/s/ Larry R. Boyd
Larry R. Boyd

## CERTIFICATE OF SERVICE

I certify that I served a copy of the Appellant's Brief on the following parties or their counsel via electronic mail or by hand delivery on the 20th day of May, 2015.

Thomas H. Keen
Law Offices of Thomas H. Keen, PLLC
555 Republic Drive, Suite 325
Plano, Texas 75074
tom@keenlawfirm.com

/s/ Larry R. Boyd
Larry R. Boyd

# APPENDIX

NO. 05-15-00279-CR, NO. 05-15-00280-CR, NO. 05-15-00281-CR,
NO. 05-15-00282-CR, NO. 05-15-00283-CR, NO. 05-15-00284-CR,
NO. 05-15-00285-CR, NO. 05-15-00286-CR, NO. 05-15-00287-CR,
NO. 05-15-00288-CR, NO. 05-15-00289-CR, NO. 05-15-00290-CR,
NO. 05-15-00291-CR, NO. 05-15-00292-CR, NO. 05-15-00293-CR,
NO. 05-15-00294-CR, NO. 05-15-00295-CR, NO. 05-15-00296-CR,
NO. 05-15-00297-CR, NO. 05-15-00298-CR, NO. 05-15-00299-CR,
NO. 05-15-00300-CR, NO. 05-15-00301-CR, NO. 05-15-00302-CR,
NO. 05-15-00303-CR, NO. 05-15-00304-CR, NO. 05-15-00305-CR,
NO. 05-15-00306-CR, NO. 05-15-00307-CR, NO. 05-15-00308-CR,
NO. 05-15-00309-CR, NO. 05-15-00310-CR, NO. 05-15-00311-CR,
NO. 05-15-00312-CR, NO. 05-15-00313-CR, NO. 05-15-00314-CR,
NO. 05-15-00315-CR, NO. 05-15-00316-CR, NO. 05-15-00317-CR,
NO. 05-15-00318-CR, NO. 05-15-00319-CR, NO. 05-15-00320-CR,
NO. 05-15-00321-CR, NO. 05-15-00322-CR, NO. 05-15-00323-CR,
NO. 05-15-00324-CR, NO. 05-15-00325-CR, NO. 05-15-00326-CR,
NO. 05-15-00327-CR, NO. 05-15-00328-CR, NO. 05-15-00329-CR,
NO. 05-15-00330-CR, NO. 05-15-00331-CR

## IN THE COURT OF APPEALS
## FOR THE FIFTH JUDICIAL DISTRICT
## OF TEXAS AT DALLAS

**STATE OF TEXAS,**

*Appellant,*

vs.

**FARHAD NAYEB,**

*Appellee.*

## APPENDIX TO THE APPELLANT'S BRIEF

1.   Order dated March 12, 2014 of County Court at Law No. 2.

2.   Order dated February 19, 2015 of County Court at Law No. 2

3.   City of Melissa, Texas Comprehensive Zoning Ordinance, Ordinance No. 92-08, as amended.

# TAB 1

Cause No. 002-82535-2013, 002-82536-2013, 002-82537-2013, 002-82538-2013, 002-82539-2013, 002-82540-2013, 002-82541-2013, 002-82545-2013, 002-82546-2013, 002-82551-2013, 002-82553-2013, 002-82554-2013, 002-82555-2013, 002-82557-2013, 002-82560-2013, 002-82563-2013, 002-82564-2013, 002-82565-2013, 002-84704-2013, 002-84810-2013, 002-84811-2013, 002-84812-2013, 002-84813-2013, 002-84814-2013, 002-84815-2013, 002-84816-2013, 002-84823-2013, 002-84824-2013, 002-84825-2013, 002-84826-2013, 002-84827-2013, 002-84828-2013, 002-84829-2013, 002-84830-2013, 002-84831-2013, 002-84832-2013, 002-84833-2013, 002-84834-2013, 002-84835-2013, 002-84836-2013, 002-84837-2013, 002-84838-2013, 002-84839-2013, 002-84840-2013, 002-84841-2013, 002-84842-2013, 002-84843-2013, 002-84844-2013, 002-84845-2013, 002-84846-2013, 002-84847-2013, 002-84848-2013, 002-84849-2013 and 002-84850-201

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE COUNTY COURT |
| | § | |
| V. | § | AT LAW NO. 2 |
| | § | |
| FARHAD NAYEB | § | COLLIN COUNTY, TEXAS |

## ORDER

On this day came to be heard the State's Notice of Void Judgment and Motion to Reconsider. The defendant appeared through counsel of record Thomas Keen and the State appeared through Assistant Criminal District Attorney John Rolater. After hearing the argument of the parties and considering the evidence and argument previously heard in hearings in this matter, the Court enters the following orders:

The Judgment of Acquittal previously entered by the Court on February 20, 2014, is void and is hereby set aside.

Order                                                                                                    1

The City of Melissa Zoning Ordinance No. 92-08 is unconstitutionally vague because it does not give fair notice to citizens accused of violating the ordinance by cashing checks and/or transmitting money allegedly contrary to the permitted uses of a premises covered by the ordinance.

Entered this the 12th day of March, 2014.

_____
Barnett Walker, Judge Presiding

Approved as to form only:

_____
Thomas Keen, Attorney for the Defendant

_____
John R. Rolater, Jr.
Assistant Criminal District Attorney

Order                                                                                        2

# TAB 2

**Cause No. 002-82535-2013**

| STATE OF TEXAS | § | IN THE COUNTY COURT |
| --- | --- | --- |
| | § | |
| V. | § | AT LAW NO. 2 |
| | § | |
| FARHAD NAYEB | § | COLLIN COUNTY, TEXAS |

**ORDER DISMISSING COMPLAINT**

The Court, having previously determined that City of Melissa Zoning Ordinance No. 92-08 is unconstitutionally vague because it does not give fair notice to citizens accused of violating the ordinance by cashing checks and/or transmitting money allegedly contrary to the permitted uses of a premises covered by the ordinance, hereby orders that the Complaint be, and it is hereby, DISMISSED. *See Ex parte Lo*, 424 S.W.3d 10, 27 (Tex. Crim. App. 2013).

Entered this the 19 day of February, 2015.

_____
Barnett Walker, Judge Presiding

Order Dismissing Complaint                                    1

**TAB 3**

# ARTICLE 12.300 - ZONING ORDINANCE ADOPTED [61]

[61] **Editor's note**— Ord. No. 92-08, ßß 1—36, adopted Aug. 25, 1992, was not specifically amendatory of the Code, and inclusion as Article 12.300 was at the city's discretion. Formerly, the Zoning Ordinance was maintained in the office of the City Secretary, as amended from time to time.

## CITY OF MELISSA, TEXAS

## ORDINANCE NO. 92-08

AN ORDINANCE REPLACING IN ITS ENTIRETY THE EXISTING ZONING ORDINANCE OF THE CITY OF MELISSA, TEXAS; ESTABLISHING NEW ZONING DISTRICTS; ADOPTING A NEW ZONING MAP; REGULATING THE SIZE AND USE OF BUILDINGS AND LOTS THAT MAY BE OCCUPIED; REQUIRING CERTIFICATES OF OCCUPANCY FOR ALL USES; PROVIDING OFF-STREET PARKING AND LOADING REQUIREMENTS; REGULATING ACCESSORY BUILDINGS; REGULATING SIGNS; PROVIDING FOR SPECIFIC USE PERMITS; PROVIDING FOR AMENDMENTS TO THIS ZONING ORDINANCE AND CLASSIFYING NEW AND UNLISTED USES; PROVIDING FOR NONCONFORMING LOTS AND STRUCTURES; PROVIDING FOR A GENERAL PENALTY FOR VIOLATIONS NOT TO EXCEED TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE; PROVIDING FOR A SAVINGS CLAUSE; AND PROVIDING AN EFFECTIVE DATE.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF MELISSA, TEXAS:

## SECTION 1

## TITLE

That this ordinance, together with all subsequent amendments thereto, shall hereby referred to as the "Revised Zoning Ordinance of the City of Melissa, Texas."

## SECTION 2

## PURPOSE

Zoning regulations and districts are herein established in accordance with a comprehensive plan for the purpose of promoting the health, safety, morals and general welfare of the City. They are designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent the overcrowding of land, to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. They have been established with reasonable consideration, among other things, for the character of each district, and its peculiar suitability for the particular uses specified; and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the City.

## SECTION 3


EXHIBIT
A-1

## ZONING DISTRICTS ESTABLISHED

The City of Melissa, Texas, is hereby divided into zoning districts as listed in this section.

| Abbreviation | General Description |
|---|---|
| A | Agricultural District: This district provides for the continuance of farming, ranching, and gardening activities on land now utilized for these purposes. When land in the "A" category is needed for development purposes, it is anticipated the zoning will be changed to the appropriate zoning categories to provide for orderly growth and development in accordance with the Comprehensive Plan. Once land in this category has been zoned into another zoning district, the intent of this ordinance is that such land shall not be changed back to an Agriculture District category by any subsequent request for a change. |
| SF-1 | Single-Family Residential District 1: This district will permit a 20,000 square foot minimum residential lot creating a rural and estate type setting. |
| SF-2 | Single-Family Residential District 2: The SF-2 category provides for a low density, single family residential development of a relatively spacious character together with such public and semi-public uses as may be necessary and compatible with residential neighborhoods. The minimum residential lot in this district is 10,000 square feet. |
| SF-3 | Single-Family Residential District 3: The SF-3 category provides for a low density single-family and two-family residential development and permits smaller type housing. The minimum residential lot in this district is 6,000 square feet. |
| MF | Multi-Family Dwelling District: The MF district permits higher density development of multiple-family dwellings not permitted in the more traditional single family districts. The density in this district shall not exceed fifteen (15) units per acre. |
| MH | Manufactured Home Park District: The MH district is intended to accommodate manufactured home development within the city. A minimum of twenty (20) acres is required for any manufactured home park. |
| C-1 | Restricted Commercial District: The C-1 district is intended to accommodate limited retail, commercial, and office uses that are usually found in central business districts. |
| C-2 | General Commercial District: The C-2 district permits retail, commercial, and office uses which require considerable space for display, sales or open storage, or by the nature of the use is generally not compatible with uses in the C-1 District. |
| I-1 | Light Industrial District: The Light Industrial District is intended to accommodate light industrial uses and those commercial uses requiring outside storage and display. The regulations are designed to provide for a mixture commercial and light industrial or manufacturing uses with proper standards to encourage attractive work areas for citizens. |
| I-2 | Heavy Industrial District: The Heavy Industrial District is intended to accommodate a wide range of industrial uses, some of which may generate objectionable or hazardous conditions and therefore are not compatible with other land uses. Permitted uses include manufacturing, processing, assembling, warehousing, and distribution. This district can also accommodate commercial uses which have outside storage and display and which support industrial facilities. |
| PD | Planned Development District: The Planned Development District provides a zoning category for the planning and development of larger tracts of land or tracts of land with unique characteristics for a single or combination of uses requiring flexibility and variety |

| | |
|---|---|
| | in design to achieve orderly development with due respect to the protection of surrounding property. |
| FP | Flood Plain District: Zoning districts located in flood hazard areas which are subject to periodic inundation may be preceded by the prefix FP, indicating a subdistrict. Areas designated as a Flood Plain District may be used only for those uses listed in the provisions of Section 19 until the area or any portion thereof located in FP subdistrict has been approved by the City Council for development in accordance with Article 3.600 of the Melissa Code of Ordinances. Approval shall only be given after engineering studies determine that the area or any portion thereof is suitable for uses in the district and building construction or development would not create an obstruction to drainage nor a hazard to life or property and that such construction is not contrary to the public interest. |

## SECTION 4

### ZONING DISTRICT MAP

4.1 The boundaries of the zoning districts as established herein are delineated upon the zoning map of the City of Melissa, Texas, said map being hereby adopted as a part of this ordinance as fully as if the same were set forth herein in detail.

4.2 Two (2) original, official and identical copies of the zoning map are hereby adopted bearing the signature of the Mayor and attestation of the City Secretary and shall be filed and maintained as follows:

(a) One copy shall be filed with the City Secretary, to be retained as the original record and shall not be changed in any manner.

(b) One copy shall be displayed for public view in the city hall and shall be maintained up-to-date by posting thereon all changes and subsequent amendments. This zoning map shall be referenced when issuing building permits, certificates of occupancy and for enforcing this zoning ordinance.

(c) Reproductions for information purposes may from time to time be made of the official zoning maps. The map may be updated as individual zoning requests are approved.

## SECTION 5

### ZONING DISTRICT BOUNDARIES

5.1 The district boundary lines shown on the zoning map are usually along streets, alleys, property lines or extensions thereof. Where uncertainty exists as to the boundaries of districts as shown on the official zoning map, the following rules shall apply.

5.2 Boundaries indicated as approximately following streets, highways or alleys shall be construed to follow the centerline of such street, highway or alley.

5.3 Boundaries indicated as approximately following platted lot lines shall be construed as following such lines.

5.4 Boundaries indicated as approximately following city limits shall be construed as following city limits.

5.5 Boundaries indicated as following railroad or utility lines shall be construed to be the centerline of the right-of-way or if no centerline is established, the boundary shall be interpreted to be midway between the right-of-way lines.

5.6 Boundaries indicated as approximately following the streams, drainageways, or other bodies of water shall be construed to follow the centerlines of such streets, drainageway, or other body.

5.7 Boundaries indicated as parallel to or extensions of features indicated in subsections 5.1 through 5.6 above shall be so construed. Distances not specifically indicated on the original Zoning Map shall be determined from the graphic scale on the map.

5.8 Whenever the street, alley, or other public way is vacated by official action of the City Council, or whatever street or alley area is franchised for building purposes, the zoning district line adjoining each side of such street, alley or other public way shall be automatically extended to the centerline of such vacated street, alley or way, and all areas so involved shall then and henceforth be subject to all regulations of the extended districts.

5.9 Where physical features of the ground are at variance with information shown on the official zoning district map, or if there arises a question as to how a parcel of property is zoned and such question cannot be resolved by the application of subsections 5-1 through 5-8, or the zoning of property is invalidated by a final judgment of a court of competent jurisdiction, the property shall be considered as classified "A", Agricultural District, temporarily until other zoning is given.

## SECTION 6

## TEMPORARY ZONING ANNEXED TERRITORY

6.1 All territory hereafter annexed to the City of Melissa shall be temporarily classified as Agricultural District, until permanent zoning is established by the City Council. The procedure for establishing permanent zoning on annexed territory shall conform to the procedures established by law for the adoption of original zoning regulations.

6.2 In an area temporarily classified as Agricultural District:

(a) No person shall use, erect, construct and/or proceed or continue with the erection or construction of any building or structure or cause the same to be done in any newly annexed territory to the City of Melissa without first applying for and obtaining a building permit or certificate of occupancy from the Building Inspector or the City Council as may be required.

(b) No permit for the construction of a building or use of land shall be issued by the Building Inspector other than a permit which will allow the construction of a building permitted in the Agricultural District, unless and until such territory has been classified in a zoning district other than the Agricultural District, by the City Council in the manner prescribed by law.

## SECTION 7

## COMPLIANCE REQUIRED

All land, buildings, structures or appurtenances thereon located within the City of Melissa, Texas, which are

hereafter occupied, used, erected, altered, removed, placed, demolished or converted shall be occupied, used, erected, altered, removed, placed, demolished or converted in conformance with the zoning regulations prescribed for the zoning district in which such land or building is located as hereinafter provided.

## SECTION 8

### "A" AGRICULTURAL DISTRICT

8.1 *General Purpose and Description.* This district is intended to apply to land situated on the fringe of an urban area and used for agricultural purposes, which may become developed as an urban area in the future. Generally, the land in an Agricultural District may be appropriate for development; therefore, the agricultural activities conducted in the Agricultural District should not be detrimental to urban land uses. The types of uses and the area and intensity of use permitted in this district are intended to encourage and protect agricultural uses until urbanization is warranted and the appropriate change in district classification is made.

8.2 *Permitted Uses.* Uses permitted in the Agricultural District include those listed in Schedule of Uses found in Section 20 hereof and are subject to the following conditions:

(a)   All general and special agricultural, farming, ranching, stables and related accessory buildings, stock and poultry raising, dairy, and other related uses are permitted so long as they do not cause a hazard to health by reason of unsanitary conditions, are not offensive by reason of odors, dust, fumes, noise or vibrations to persons of ordinary sensibilities, and are not otherwise detrimental to the public safety and welfare.

8.3 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

8.4 *Parking Regulations.* Two (2) covered spaces behind the front yard line for each single family dwelling unit shall be required. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

## SECTION 9

### "SF-1" SINGLE FAMILY RESIDENTIAL DISTRICT-1

9.1 *General Purpose and Description.* This district is intended to provide for larger lots with associated large single family residential dwellings and accessory structures. Such districts will usually be located in relatively remote areas, separated from heavy traffic and major thoroughfares. This district is also appropriate in areas of environmental sensitivity and/or uneven topography and as a buffer between areas expected to remain in agricultural use for an extended period of time and areas expected to experience residential development.

9.2 *Permitted Uses.* Uses permitted in the SF-1 District include those listed in Schedule of Uses found in Section 20 hereof and are subject to the following conditions:

(a)   A private stable used for the housing of a horse or horses owned by the resident shall be set back from adjacent property lines a minimum distance of one hundred feet (100'). An area of one and one-half (1.5) acre shall be required for each animal.

9.2 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

9.3 *Parking Regulations.* Not less than two (2) covered, enclosed off-street parking spaces shall be provided behind the front yard line for each single-family dwelling. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

## SECTION 10

## "SF-2" SINGLE FAMILY RESIDENTIAL DISTRICT-2

10.1 *General Purpose and Description.* This district is designed to provide for low density, traditional single family residential development. This district is appropriate as a buffer between higher density residential uses and agricultural and/or estate type residential areas.

10.2 *Permitted Uses.* Uses permitted in the SF-2 District include those listed in Schedule of Uses found in Section 20 hereof.

10.3 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

10.4 *Parking Regulations.* A minimum of two (2) covered, enclosed off-street parking spaces shall be provided behind the front yard line for each single-family dwelling. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

## SECTION 11

## "SF-3" SINGLE FAMILY RESIDENTIAL DISTRICT-3

11.1 *General Purpose and Description.* This district is designed to accommodate single family residential development of somewhat higher density than found in the SF-2 District and SF-1 District. This district is appropriate as a buffer between multi-family residential areas or some commercial areas and lower density single family residential areas.

11.2 *Permitted Uses.* Uses permitted in the SF-3 District include those listed in Schedule of Uses found in Section 20 hereof.

11.3 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

11.4 *Parking Regulations.* A minimum of one (1) covered, enclosed off-street parking space and one (1) other paved parking space shall be provided for each single-family dwelling unit located behind the front yard line. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

## SECTION 12

## "MF" MULTI-FAMILY RESIDENTIAL DISTRICT

12.1 *General Purpose and Description.* The Multi-Family Residential District is established to meet the needs

for medium to high density residential development where such areas are suitable for higher impact development and higher traffic volume. Attached residential dwellings are permitted in this district but not more than fifteen (15) dwelling units per acre shall be allowed.

12.2 *Permitted Uses.* Uses permitted in the MF District include those listed in Schedule of Uses found in Section 20 hereof.

12.3 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21 as may be applicable.

12.4 *Parking Regulations.* Two and one-half (2½) off-street parking spaces shall be provided for each dwelling unit. Required parking may not be provided within the required front yard. Such off-street parking shall also be in accordance with Sections 20 and 22.

12.5 *Refuse Facilities.* Every dwelling unit shall be located within two hundred fifty (250) feet of a refuse facility, measured along the designated pedestrian and vehicular travel way. There shall be available at all times at least six (6) cubic yards of refuse container per thirty (30) multi-family dwelling units. For complexes with less than thirty (30) units, no less than four (4) cubic yards of refuse container shall be provided. Each refuse facility shall be screened from view on three sides from persons standing at ground level on the site or immediately adjoining property, by an opaque fence or wall of wood or masonry not less than six (6) feet nor more than eight (8) feet in height or by an enclosure within a building. Refuse containers shall be provided and maintained in a manner to satisfy public health and sanitary regulations. Each refuse facility shall be located so as to provide safe and convenient pickup by refuse collection agencies.

12.6 Border fencing of wood or masonry of not less than six (6) feet in height shall be installed by the builder at the time of construction of any multi-family complex, along the property line on any perimeter not abutting a public street or right-of-way. This fence shall be maintained throughout the existence of the multi-family unit by the owner.

12.7 Each unit in any multi-story design, regardless of density, shall be provided with two (2) points of entry and exit with each providing separate access to places of safety in the event of fire or other emergency.

SECTION 13

MANUFACTURED HOME PARK DISTRICT

13.1 *General Purpose and Description.* This district is designed to accommodate manufactured home development. No manufactured home shall be permitted to be located within the City of Melissa unless located in an authorized manufactured home park. No mobile home constructed prior to June 15, 1976 shall be permitted to be located within the city limits. The minimum size of any manufactured home park shall be twenty (20) acres.

13.2 *Permitted Uses.* Uses permitted in the MH District include those listed in Schedule of Uses found in Section 20 hereof. Only one (1) manufactured home shall be permitted on each lot or space.

13.3 *Area and Height Regulations and Minimum Dwelling Size.* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and

accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

13.4 *Parking Regulations.* A minimum of two (2) off-street parking spaces shall be provided for each manufactured home lot. In addition, an additional one hundred and fifty (150) square feet of parking area shall be provided in common area for the storage of boats and visitor parking for each two manufactured home lots. Such off-street parking shall also be in accordance with Sections 20 and 22.

13.5 *Design and Construction Standards.*

(a)   Streets. Internal streets, signage, street lights shall be privately owned, built, and maintained unless dedicated to and accepted by the city. Streets rights-of-way widths shall be a minimum of fifty feet (50') and the pavement width shall be not less than thirty-one feet (31') with curb and gutter. Dead end streets shall not be longer than six hundred feet (66') and shall have a permanent paved turnaround of eighty feet (80'). No partial or half streets shall be permitted except with formal approval by the City Council. All streets shall be constructed with six inch (6") reinforced concrete pavement with integral curb and gutter which meets the approval and standards of the City Council.

(b)   Driveways, Parking Areas, and Walkways. All lots shall be provided with a reinforced concrete walkway from the manufactured home to the driveway which is at least four feet (4') in width. Each lot shall also be provided with adequate driveway and parking area to accommodate at least two vehicles and which shall be paved with six inch (6") reinforced concrete. The driveway shall provide access from the street to the back of the front building line. All driveways, parking areas, and walkways shall be constructed in accordance with the latest edition of the Standard Specifications for Public Works Construction published be North Central Texas Council of Governments.

(c)   Electrical and Telephone Service. All electrical wiring and telephone cabling in the manufactured home park shall be underground.

(d)   Water Supply. Each lot shall be supplied water by public water supply system and each lot shall separately metered. All water lines shall conform to the city's plumbing code and water construction standards and the State Board of Insurance and Texas Department of Health minimum standards for water systems.

(e)   Sewer Disposal. Each lot shall be connected to a public sewer system constructed in accordance with the city's plumbing code and sewer construction standards and the Texas Department of Health minimum standards for sewer systems. Each manufactured home space shall be provided with a sewer riser pipe a minimum of four inches (4") in diameter. When the lot is unoccupied or vacant, the sewer riser pipe shall be capped off by the owner or manager of the manufactured home park.

(f)   Drainage. The manufactured home park shall provide for adequate drainage as provided for in the city's subdivision standards. All drainage facilities shall be constructed in accordance with the latest edition of the Standard Specifications for Public Works Construction published be North Central Texas Council of Governments.

(g)   Fire Protection. All service buildings (office, laundry facilities, shops, etc.) shall be provided with at least one fire extinguisher.

(h)   Gas Supply. Gas piping shall be installed underground in accordance with the city's plumbing code and construction standards and the gas supplier's standards. Gas outlets shall be capped when the lot is vacant. Natural gas shall be supplied except that liquefied petroleum gas system may be

installed in the nearest available natural gas supply main is located more than one thousand (1,000) feet from the park and is permitted by the City Council.

(i)     Extensions and Add-Ons. No structural extension shall be attached to a manufactured home in violation of the spacing and clearance requirements. A building permit shall be required for any extension or add-on structure. All extensions or add-on structures must be constructed in accordance with the city's building codes and ordinances. All extensions and add-on structures shall be dismantled and removed when the adjoining manufactured home is removed from the lot.

(j)     Solid Waste Disposal. Each lot shall subscribe to a solid waste collection service in accordance with the city's policies and regulations.

(k)     Anchoring and Skirting Requirements. Each manufactured home within the park shall be installed and anchored in accordance with the Texas Department of Labor and Standards rules and regulations. Also, each manufactured home within the park shall be installed with a painted metal or wood skirting around the perimeter of the dwelling which shall be installed within thirty (30) days of placement of the manufactured home. The failure to install this skirting shall be deemed an offense against the city.

(l)     Operational and Maintenance Requirements. All manufactured homes shall comply with the following operational and maintenance requirements:

(1)     The owner or manager of the manufactured home park shall keep an up-to-date register of the park residents, including the manufactured home registration data, the make, model, length, width, year of manufacture, and identification number of each manufactured home.

(2)     The owner or manager of the manufactured home park shall be responsible for the keeping the manufactured home park in a clean, safe and sanitary condition, free of accumulations of debris, trash, and high weeds and grass. The owner or manager shall also keep all streets and sidewalks in good and safe condition. Whenever the owner or manager is notified by the city, or other appropriate authority, that unsafe or unsanitary conditions exist, he or she shall abate the condition or nuisance within the allotted time as provided in the notice to him or her or he or she shall be guilty of a misdemeanor offense.

(3)     The owner or manager of the manufactured home park shall be responsible for insuring that park residents meet the applicable anchoring and skirting requirements as outlined in paragraph (k) above. Such requirements shall be incorporated in all lease or rental agreements and stipulate that failure to do so will result in the eviction of the resident and his property from the park. Failure of the owner or manager to require compliance with such anchoring and skirting requirements after due notice by the city or failure to start eviction proceedings shall be unlawful.

SECTION 14

"C-1" RESTRICTED COMMERCIAL DISTRICT

14.1 *General Purpose and Description:* The C-1 District is intended for office facilities, neighborhood shopping facilities and retail and commercial facilities of a service character. The C-1 District is established to accommodate such uses compatible with central business district area.

14.2 *Permitted Uses:* Uses permitted in the C-1 District include those listed in Schedule of Uses found in



Section 20 hereof and are subject to the following conditions:

(a)   The business shall be conducted wholly within an enclosed building;

(b)   Required yards shall not be used for display, sale or storage of merchandise or for the storage of vehicles, equipment, containers or waste material;

(c)   All merchandise shall be sold at retail on the premises; and

(d)   Such use shall not be objectionable because of odor, excessive light, smoke, dust, noise, vibration or similar nuisance to a person of ordinary sensibilities.

14.3 *Area and Height Regulations and Minimum Dwelling Size:* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

14.4 *Parking Regulations:* Off-street parking requirements shall be in accordance with the parking schedule found in Section 20. Such off-street parking shall also be in accordance with Section 22 as may be applicable.

## SECTION 15

## "C-2" GENERAL COMMERCIAL DISTRICT

15.1 *General Purpose and Description:* The C-2 District is intended to provide a zoning category similar to the C-1 District, except that additional uses are permitted which may or may not generally be carried on completely within a building or structure, and an expanded range of service and repair uses is permitted.

15.2 *Use Regulations:* Uses permitted in the C-2 District include those listed in Schedule of Uses found in Section 20.

15.3 *Area and Height Regulations and Minimum Dwelling Size:* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

15.4 *Parking Requirements:* Off-street parking requirements shall be in accordance with the parking schedule found in Section 20. Such off-street parking shall also be in accordance with Section 22 as may be applicable.

## SECTION 16

## "I-1" LIGHT INDUSTRIAL DISTRICT

16.1 *General Purpose and Description:* The purpose of this district is to provide for light industrial uses and those commercial uses requiring outside storage and display. The regulations are designed to provide for a mixture of commercial uses and light industrial or manufacturing uses with proper standards to encourage attractive working areas for citizens.

16.2 *Use Regulations:* Uses permitted in the I-1 District include those listed in Schedule of Uses found in Section 20 hereof and are subject to the following conditions:

(a)   All business, servicing, or processing, except for off-street parking, off-street loading, display of

merchandise for sale to the public, and establishments of the "drive-in" type, shall be conducted within completely enclosed areas.

(b)   All storage within one hundred feet (100') of a residence district, except for motor vehicles in operable condition, shall be within completely enclosed buildings or effectively screened with screening not less than six feet (6') nor more than eight feet (8') in height, provided no storage located within fifty feet (50') of such screening shall exceed the maximum height of such screening.

(c)   Permitted uses in the I-1 District shall not disseminate dust, fumes, gas, noxious odor, smoke, glare, or other atmospheric influence.

(d)   Permitted uses in the I-1 District shall produce no noise exceeding in intensity, at the boundary of the property, the average intensity of noise of street traffic.

(e)   Permitted uses in the I-1 District shall not create fire hazards on surrounding property.

16.3 *Area and Height Regulations and Minimum Dwelling Size:* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

16.4 *Parking Regulations:* The minimum off-street parking requirements for manufacturing and industrial uses shall be one (1) parking space for each two (2) employees or one (1) space for each one thousand (1,000) square feet of gross floor area, whichever is greater. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

SECTION 17

### "I-2" HEAVY INDUSTRIAL DISTRICT

17.1 *General Purpose and Description:* The I-2 District provides for a wide range of industrial activities, some of which may generate objectionable or hazardous conditions and therefore are not compatible with other land uses. Permitted uses include manufacturing, processing, assembling, warehousing, and distribution. This district can also accommodates some commercial uses which have outside storage and displays.

17.2 *Use Regulations:* Uses permitted in the I-2 District include those listed in Schedule of Uses found in Section 20 hereof and are subject to the following conditions:

(a)   All business, servicing, or processing, except for off-street parking, off-street loading, display or merchandise for sale to the public, and establishments of the "drive-in" type, shall be conducted within completely enclosed buildings unless otherwise indicated.

(b)   All storage within one hundred feet (100') of a residential district, except for motor vehicles in operable condition, shall be within completely enclosed buildings or effectively, screened with screening not less than six feet (6') nor more than eight feet (8') in height, provided no storage located within fifty feet (50') of such screening shall exceed the maximum height of such screening.

(c)   Such facilities for the manufacturing, fabrication, processing or assembly of products, provided that such facilities are not detrimental to the public health, safety or general welfare, and further provided that the following performance standards and city ordinances are met:



(1)  *Smoke:* No operation shall be conducted unless it conforms to the standards established by any applicable state and federal health rules and regulations pertaining to smoke emission;

(2)  *Particulate Matter:* No operation shall be conducted unless it conforms to the standards established by applicable state and federal health rules and regulations pertaining to emission of particulate matter;

(3)  *Dust, Odor, Gas, Fumes, Glare, or Vibration:* No emission of these matters shall result in a concentration at or beyond the property line which is detrimental to the public health, safety or general welfare or which causes injury or damage to property; said emissions shall in all cases conform to the standards established by applicable state and federal health rules and regulations pertaining to said emissions;

(4)  *Radiation Hazards and Electrical Disturbances:* No operation shall be conducted unless it conforms to the standards established by applicable state and federal health rules and regulations pertaining to radiation control;

(5)  *Noise:* No operation shall be conducted in a manner so that any noise produced is objectionable due to intermittence, beat frequency or shrillness. Sound levels of noise at the property line shall not exceed 75 DB(A) permitted for a maximum of fifteen (15) minutes in any one (1) hour; said operation shall in all cases conform to the standards established by applicable state and federal health rules and regulations and to other city ordinances pertaining to noise; and

(6)  *Water Pollution:* No water pollution shall be emitted by the manufacturing or other processing. In a case in which potential hazards exist, it shall be necessary to install safeguards acceptable to the appropriate state and national health and environmental protection agencies prior to issuance of a certificate of occupancy. The applicant shall have the burden of establishing that said safeguards are acceptable to said agency or agencies.

(d)  Other manufacturing and industrial uses which do not meet the general definition for manufacturing processes may be permitted by the City Council after public hearing and review of the particular operational characteristics of each such use and other pertinent data affecting the community's general welfare. Approval of uses under this subsection shall be made in accordance with Section 28.

17.3 *Area and Height Regulations and Minimum Dwelling Size:* The requirements regulating the minimum lot size, minimum yard sizes, maximum building height, maximum percent of lot coverage by buildings and accessory uses, and the minimum dwelling size shall conform with the schedule found in Section 21.

17.4 *Parking Regulations:* The minimum off-street parking requirements for manufacturing and industrial uses shall be one (1) parking space for each two (2) employees or one (1) space for each one thousand (1,000) square feet of gross floor area, whichever is greater. Such off-street parking shall also be in accordance with Sections 20 and 22 as may be applicable.

SECTION 18

"PD" PLANNED DEVELOPMENT DISTRICT

18.1 *General Purpose and Description:* The Planned Development District "PD" prefix is intended to provide for combining and mixing of uses allowed in various districts with appropriate regulations and to permit



flexibility in the use and design of land and buildings in situations where modification of specific provisions of this ordinance is not contrary to its intent and purpose or significantly inconsistent with the planning on which it is based and will not be harmful to the community. A "PD" District may be used to permit new and innovative concepts in land utilization.

While great flexibility is given to provide special restrictions which will allow development not otherwise permitted, procedures are established herein to insure against misuse of the increased flexibility.

18.2 *Permitted Uses:* Any use specified in the ordinance granting a Planned Development district shall be permitted in that district. The size, location, appearance and method of operation may be specified to the extent necessary to insure compliance with the purpose of this ordinance.

18.3 *Development Standards:*

(a)   Development standards for each separate PD District shall be set forth in the ordinance granting the PD District and may include but shall not be limited to: uses, density, lot area, lot width, lot depth, yard depths and widths, building height, building elevations, coverage, floor area ratio, parking, access, screening, landscaping, accessory buildings, signs, lighting, management associations, and other requirements as the City Council and Planning and Zoning Commission may deem appropriate.

(b)   In the PD District, the particular district(s) to which uses specified in the PD are most similar shall be stated in the granting ordinance. All PD applications shall list all requested variances from the standard requirements set forth throughout this ordinance (applications without this list will be considered incomplete).

(c)   The ordinance granting a PD District shall include a statement as to the purpose and intent of the PD granted wherein. A specific list is required of variances in each district or districts and a general statement for citing the reason for the PD request.

(d)   The PD District shall conform to all other sections of the ordinance unless specifically exempted in the granting ordinance.

(e)   The minimum acreage for a PD District shall be three (3) acres.

18.4 In establishing a PD District in accordance with this section, the City Council shall approve and file as part of the amending ordinance appropriate plans and standards for each PD District. During the review and public hearing process, the Planning and Zoning Commission and City Council shall require a conceptual plan and a development plan (or detailed site plan).

(a)   *Conceptual Plan:* This plan shall be submitted by the applicant. The plan shall show the applicant's intent for the use of the land within the proposed planned development district in a graphic manner and shall be supported by written documentation of proposals and standards for development.

(1)   A conceptual plan for residential land use shall show general use, thoroughfares and preliminary lotting arrangements. For residential development which does not propose platted lots, the conceptual plan shall set forth the size, type and location of buildings and building sites, access, density, building height, fire lanes, screening, parking areas, landscaped areas and other pertinent development data.

(2)   A conceptual plan for uses other than residential uses shall set forth the land use proposals



in a manner to adequately illustrate the type and nature of the proposed development. Data which may be submitted by the applicant, or required by the Planning and Zoning Commission or City Council, may include but is not limited to the types of use(s), topography and boundary of PD area, physical features of the site, existing streets, alleys and easements, location of future public facilities, building height and location, parking ratios and other information to adequately describe the proposed development and to provide data for approval which is to be used in drafting the final development plan.

(3)    Changes of detail which do not alter the basic relationship of the proposed development to adjacent property and which do not alter the uses permitted or increase the density, building height or coverage of the site and which do not decrease the off-street parking ratio, reduce the yards provided at the boundary of the site, or significantly alter the landscape plans as indicated on the approved conceptual plan may be authorized by the Building Inspector or his or her designated representative. If an agreement cannot be reached regarding whether or not a detail site plan conforms to the original concept plan the Planning and Zoning Commission shall review the request and render judgment as to the conformity.

(b)    *Development Plan or Detailed Site Plan:* This plan shall set forth the final plans for development of the PD District and shall conform to the data presented and approved on the conceptual plan. Approval of the development plan shall be the basis for issuance of a building permit. For any district SF-1, SF-2, and SF-3 District, a final plat shall qualify as the development plan. The development plan may be submitted for the total area of the PD or for any section or part as approved on the conceptual plan. The development plan must be approved by the Planning and Zoning Commission and City Council. A public hearing on approval of the development plan shall be required at the Council and Commission level, unless such a hearing is waived pursuant to paragraph (c) hereinafter at the time of conceptual plan approval in the original amending ordinance. The development plan shall include:

(1)    A site inventory analysis including a scale drawing showing existing vegetation, natural water courses, creeks or bodies of water and an analysis of planned changes in such natural features as a result of the development. This should include a delineation of any flood prone areas.

(2)    A scale drawing showing any proposed public or private streets and alleys; building sites or lots; and areas reserved as parks, parkways, playgrounds, utility easements, school sites, street widening and street changes; the points of ingress and egress from existing streets; general location and description of existing and proposed utility services, including size of water and sewer mains; the location and width for all curb cuts and the land area of all abutting sites and the zoning classification thereof on an accurate survey of the tract with the topographical contour interval of not more than five (5) feet.

(3)    A site plan for proposed building complexes showing the location of separate buildings, and between buildings and property lines, street lines and alley lines. Also to be included on the site plan is a plan showing the arrangement and provision of off-street parking.

(4)    A landscape plan showing screening walls, ornamental planting, wooded areas and trees to be planted.

(5)    An architectural plan showing elevations and signage style to be used throughout the development in all districts except single-family and duplex may be required by the Planning and Zoning Commission or City Council if deemed appropriate. Any or all of the required

information may be incorporated on a single drawing if such drawing is clear and can be evaluated by the Building Inspector or his designated representative.

(c)    All development plans may have supplemental data describing standards, schedules or other data pertinent to the development of the PD District which is to be included in the text of the amending ordinance. The procedure for establishing a PD District shall follow the procedure for zoning amendments as set forth in Section 33. This procedure is expanded as follows for approval of conceptual and development plans.

(1)    Separate public hearings shall be held by the Planning and Zoning Commission and City Council for the approval of the conceptual plan and the development plan or any section of the development plan, unless such requirement is waived by the City Council upon a determination that a single public hearing is adequate. A single public hearing is adequate when:

(i)    The applicant submits adequate data with the request for the PD District to fulfill the requirements for both plans; or

(ii)    Information on the concept plan is sufficient to determine the appropriate use of the land and the detail site plan will not deviate substantially from it; and

(iii)    The requirement is waived at the time the amending ordinance is approved. If the requirement is waived the conditions shall be specifically stated in the amending ordinance.

(2)    The ordinance establishing the PD District shall not be approved until the conceptual plan is approved.

(i)    The development plan may be approved in sections. When the plan is approved in sections, the separate approvals by the Planning and Zoning Commission and City Council for the initial and subsequent sections will be required.

(ii)    An initial development plan shall be submitted for approval within six (6) months from the approval of the conceptual plan or some portion of the conceptual plan. If the development plan is not submitted within six (6) months, the conceptual plan is subject to reapproval by the Planning and Zoning Commission and City Council. If the entire project is not completed within two (2) years, the Planning and Zoning Commission and the City Council may review the original conceptual plan to ensure its continued validity.

(iii)    Regardless of whether the public hearing is waived for the development plan, approval by the Planning and Zoning Commission and City Council is still required.

18.5 When a PD District is being considered, a written report may be requested of the applicant discussing the impact on planning, engineering, water utilities, electric, sanitation, building inspection, tax, police, fire and traffic. Written comments from the applicable public school district, and from private utilities may be submitted to the Planning and Zoning Commission prior to the Commission making any recommendations to the City Council.

18.6 All PD Districts approved in accordance with the provisions of this ordinance in its original form, or by subsequent amendment thereto, shall be referenced on the zoning district map, and a list of such PD Districts, together with the category of uses permitted therein, shall be maintained in the office of the City Secretary.

18.7 *Planned Development Ordinances Continued:* Prior to adoption of this ordinance, if the City Council has established various PD Districts, they are to be continued in full force and effect. The establishing ordinances or parts of ordinances approved prior to this ordinance shall be carried forth in full force and effect and are the conditions, restrictions, regulations and requirements which apply to the respective PD Districts shown on the zoning map at the date of adoption of this ordinance.

## SECTION 19

## "FP" FLOOD PLAIN DISTRICT

19.1 *General Purpose and Description:* To provide for the appropriate use of land which has a history of inundation or is determined to be subject to flood hazard, and to promote the general welfare and provide protection from flooding portions of certain districts are designated with a flood plain prefix, FP. Areas designated on the zoning district map by an FP prefix shall be subject to the following provisions:

19.2 *Permitted Uses:* The permitted uses in that portion of any district having a flood plain (FP) prefix shall be limited to the following:

(a) Agricultural activities including the ordinary cultivation or grazing of land and legal types of animal husbandry but excluding construction of barns or other outbuildings.

(b) Off-street parking incidental to any adjacent main use permitted in the district.

(c) Electrical substation.

(d) All types of local utilities including those requiring specific use permits.

(e) Parks, community centers, playgrounds, public golf courses (no structures), and other recreational areas.

(f) Private open space as part of a planned residential development.

(g) Structures, installations and facilities installed, operated and maintained by public agencies for flood control purposes.

(h) Bridle trail, bicycle or nature trail.

19.3 No building or structure shall be erected in that portion of any district designated with a flood plain (FP) prefix until and unless such building or structure has been approved by the City Council after engineering studies have been made, and it is ascertained that such building or structure is not subject to damage by flooding and would not constitute an encroachment, hazard, or obstacle to the movement of flood waters and that such construction would not endanger the value and safety of other property or the public health and welfare.

## SECTION 19A

## H/O HISTORIC OVERLAY DISTRICT

A Historic Overlay District may be established in accordance with this Section 19A.

19A-1 Purpose of the HO District. The purpose of the Historic Overlay District is to protect, enhance, and perpetuate the districts and landmarks of historical and cultural importance to promote the economic,

cultural, educational, and general welfare of the public. Within the city, several areas and structures represent the unique confluence of time and place that shaped the identify of generations of citizens and produced significant historic, architectural, and cultural resources that constitute their heritage.

The designation of a Historic Overlay District is intended to:

•Protect and enhance the district and landmarks that represent distinctive elements of Melissa's historic, architectural, and cultural heritage

•Foster civic pride in the accomplishments of the past

•Protect and enhance Melissa's attractiveness to visitors and the support and stimulus thereby provided to the economy

•Ensure the harmonious, orderly, and efficient growth and development of the city

•Promote economic prosperity and welfare of the community by encouraging the most appropriate use of such property within the city

(Ord. No. 98-07, adopted 7-14-98, Sec. 1)

19A-2 Use Regulations. A building or premise shall be used only for the following purposes:

(1)   Any use permitted in the underlying zoning classification district.

(2)   Wood or similar siding for use up to 100% of exterior construction when authorized by a specific use permit under Section 26.

(Ord. No. 98-07, adopted 7-14-98, Sec. 1)

19A-3 Specific Use Permit Conditions. In granting specific use permits, the City Council shall take into consideration the historic character of the overlay district as follows:

(1)   In authorizing wood or similar siding up to 100% of exterior construction instead of masonry construction, the City Council shall make such approval conditioned upon color selection, architectural style and signage which are compatible with surrounding properties and which are characteristic of the City of Melissa in the late nineteenth century or first half of the twentieth century.

(Ord. No. 98-07, adopted 7-14-98, Sec. 1)

19A-4 Standards of Construction. Wood or clapboard siding shall consist of or closely resemble painted horizontal clapboard, horizontal shiplap, vertical tongue-in-groove or vertical board and batten siding. Materials other than wood would be required to consist of masonite, metal, or vinyl. Metal and vinyl siding shall have a baked on enamel surface or other factory finish that requires no additional coat(s) of paint at the time of installation.

(Ord. No. 98-07, adopted 7-14-98, Sec. 1)

19A-5 District Boundaries. The properties within the Historic Overlay District boundaries shall be given the "HO" prefix on the zoning map and shall be subject to the provisions of this section.

(Ord. No. 98-07, adopted 7-14-98, Sec. 1)

## SECTION 20

### SCHEDULE OF USES AND PARKING REQUIREMENTS

20.1 Land and buildings in each of the following classified districts may be used for any of the following listed uses but no land shall hereinafter be used and no building or structure shall hereinafter be occupied, used, erected, altered, removed, placed, demolished or converted which is arranged or designed to be used for other than those uses specified for the district in which it is located as set forth by the following schedule of uses:

| X | Designates use permitted in district |
|---|---|
|   | Designates use prohibited in district |
| S | Use permitted with specific approval by City |

NOTE: Gross floor area is abbreviated as g.f.a.

| Residential Use: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Apartment | | | | | X | | | | |
| Child Day Care Home | X | X | X | X | X | X | S | S | |
| Community Center (private) | S | S | S | S | X | X | | | |
| Condominium | | | | | X | | | | |
| Duplex Dwelling | | | | X | X | | | | |
| Group Day Care Home | S | S | S | S | S | S | S | S | |
| Group Home | X | X | X | X | X | X | S | S | |
| Guest House or Quarters | X | X | X | X | X | X | S | S | |
| Halfway House | S | S | S | S | S | S | S | S | |
| Industrialized Housing | X | X | X | X | X | X | S | S | |
| Manufactured Home | | | | | | X | | | |
| Manufactured Home Park | | | | | | X | | | |
| Quadraplex Dwelling | | | | | X | | | | |
| Rooming (Boarding) | | | | | S | | S | X | S |

| House | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Single Family Dwelling-detached | X | X | X | X | X | X | S | S | |
| Swimming Pool (private) | X | X | X | X | X | X | X | X | X |
| Temporary Construction Office | S | S | S | S | S | S | S | S | X |
| Tennis Court (private) | X | X | X | X | X | X | X | X | X |
| Townhouse | | | | | X | | | | |
| Triplex Dwelling | | | | | X | | | | |

| Agriculture/Ranch Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Animal Feed Lot | S | | | | | | | | |
| Dairy | X | | | | | | | | |
| Farm | X | S | | | | | | | |
| Greenhouse | X | S | S | S | S | S | S | S | |
| Orchard | X | S | | | | | | | |
| Ranch | X | S | | | | | | | |
| Rodeo Ground, Arena | S | | | | | | | S | S |
| Stable, Private | X | S | | | | | | | |
| Stable, Public | X | | | | | | | | |

| Utility Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Electric Substations | X | S | S | S | S | S | S | S | X |
| Gas Line (6" or larger) | S | S | S | S | S | S | S | X | X |
| Gas Regulating/Gate Station | S | S | S | S | S | S | S | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Microwave Tower | X | S | S | S | S | S | S | X | X |
| Radio and Television Tower | X | S | S | S | S | S | S | X | X |
| Railroad Freight Terminal | | | | | | | | | X |
| Railroad Yard | | | | | | | | | X |
| Recycling Facility | | | | | | | | S | X |
| Refuse Transfer Station | | | | | | | | S | S |
| Sewer Lift Station | X | S | S | S | S | S | S | S | X |
| Telephone Exchange | X | S | S | S | X | X | X | X | X |
| Wastewater Treatment Plant | S | | | | | | S | S | S |
| Water Pump Station | X | S | S | S | S | S | X | X | X |
| Water Storage Tank | X | S | S | S | S | S | X | X | X |
| Water Treatment Plant | X | S | S | S | S | S | X | X | X |

| Gov't &amp; Institutional Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Athletic Field or Stadium | S | S | S | S | S | S | X | X | X |
| Church or Rectory | X | X | X | X | X | X | X | X | X |
| College or University | S | S | S | S | S | S | X | X | X |
| Community/Recreation Center | X | X | X | X | X | X | X | X | |
| Convalescent Center | | | | | | | X | X | |
| Fire Station | X | S | S | S | S | S | X | X | X |
| Hospital | | | | | | | | X | X |
| Library | X | X | X | X | X | X | X | X | X |
| Museum or Art Gallery | | | | | | | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Park or Playground | X | X | X | X | X | X | X | X | X |
| Police Station | S | S | S | S | S | S | X | X | X |
| Post Office | | | | | | | X | X | X |
| Prison or Penitentiary | S | | | | | | | | S |
| Sanitarium | | | | | | | | X | X |
| School (nursery or kindergarten) | S | S | S | S | S | S | X | X | X |
| School (trade or business) | | | | | | | S | X | X |
| School (elementary or middle) | X | X | X | X | X | X | X | X | X |
| School (high school) | X | X | X | X | X | X | X | X | X |
| Government Office | | | | | | | X | X | X |
| Swimming Pool (public) | S | S | S | S | S | S | X | X | X |
| Tennis Court (public) | S | S | S | S | S | S | X | X | X |

| Commercial Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Alcoholic Beverage Sales (Wet Areas Only) | | | | | | | | X | |
| Amusement Park | | | | | | | | X | X |
| Animal Hospital | X | | | | | | X | X | X |
| Animal Shelter | X | | | | | | | X | X |
| Antique Shop | | | | | | | X | X | |
| Apparel Store | | | | | | | X | X | |
| Appliance Rental Store | | | | | | | X | X | X |
| Appliance Repair Shop | | | | | | | | X | X |
| Appliance Store (retail) | | | | | | | X | X | |
| Art Supply Store | | | | | | | X | X | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Athletic or Fitness Club | | | | | | | X | X | X |
| Audio and Video Store (retail) | | | | | | | X | X | |
| Auto Paint &amp; Body Shop | | | | | | | | X | X |
| Auto Rental | | | | | | | S | X | X |
| Auto Repair Garage | | | | | | | | X | X |
| Auto Sales Lot | | | | | | | | X | X |
| Bakery (retail) | | | | | | | X | X | |
| Bank or Financial Institution | | | | | | | X | X | S |
| Barber or Beauty Shop | S | S | S | S | S | S | X | X | S |
| Beer/wine sales (off-premise, wet areas only) | | | | | | | | X | |
| Bicycle Sales &amp; Repair | | | | | | | X | X | |
| Boat Sales | | | | | | | | X | X |
| Bowling Alley | | | | | | | S | X | X |
| Building Materials Yard | | | | | | | | X | X |
| Bus Terminal | | | | | | | X | X | X |
| Business Office | | | | | | | X | X | X |
| Cabinet Shop | | | | | | | S | X | X |
| Camera Store (retail) | | | | | | | X | X | |
| Car Wash | | | | | | | S | X | X |
| Carnival or Circus | | | | | | | S | S | S |
| Carpet Store (retail) | | | | | | | X | X | |
| Child Care Center | | | | | | | X | X | X |
| Computer Store (retail/service) | | | | | | | X | X | |
| Contractor's Building (temporary) | X | X | X | X | X | X | X | X | X |
| Dental Clinic or Office | | | | | | | X | X | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Department Store | | | | | | | X | X | |
| Electrical Supply Store | | | | | | | | X | X |
| Electronics Store (retail) | | | | | | | X | X | |
| Farm Implement Sales | | | | | | | | X | X |
| Feed Store | | | | | | | | X | X |
| Florist Shop | | | | | | | X | X | |
| Flea Market (outside) | | | | | | | | X | X |
| Fraternity/Sorority Lodge | | | | | | | X | X | |
| Furniture Store (retail) | | | | | | | X | X | |
| Game Hall | | | | | | | S | X | X |
| Gift or Novelty Shop | | | | | | | X | X | |
| Go-Cart Track | | | | | | | | X | X |
| Golf Course | X | S | S | S | S | S | | X | X |
| Golf Course (miniature) | | | | | | | | X | X |
| Golf Driving Range | S | | | | | | | X | X |
| Grainery or Gin | X | | | | | | | | X |
| Grocery Store | | | | | | | X | X | |
| Gun Shooting Range (indoor) | S | | | | | | | S | X |
| Gunsmith Shop | | | | | | | X | X | |
| Hardware Store | | | | | | | X | X | X |
| Heavy Equipment Sales | | | | | | | | X | X |
| Hobby Shop | | | | | | | X | X | |
| Hotel or Motel | | | | | | | S | X | X |
| Jewelry Store | | | | | | | X | X | |
| Kennel | S | S | S | S | | S | S | X | X |
| Laboratory, Medical or Dental | | | | | | | S | X | X |
| Laundry or Dry Cleaners | | | | | | | X | X | X |
| Lawnmower Sales &amp; | S | S | S | S | S | S | S | X | X |

| Service | | | | | | | | X | |
|---|---|---|---|---|---|---|---|---|---|
| Liquor sales (off-premise, wet areas only) | | | | | | | | X | |
| Lithographic Shop | | | | | | | X | X | X |
| Locksmith Shop | | | | | | | X | X | X |
| Meat Market | | | | | | | X | X | X |
| Medical Clinic or Office | | | | | | | X | X | X |
| Mini-warehouse | | | | | | | S | X | X |
| Manufactured Home Sales Lot | | | | | | | | X | X |
| Massage Establishment | | | | | | | | S | S |
| Mortuary or Funeral Home | | | | | | | S | X | X |
| Motorcycle Sales | | | | | | | | X | X |
| Movie Theater (drive-in) | | | | | | | | X | X |
| Movie Theater (indoor) | | | | | | | X | X | X |
| Musical Instrument Store | | | | | | | X | X | |
| Newspaper Office | | | | | | | X | X | |
| Newsstand | | | | | | | X | X | |
| Nightclub | | | | | | | | X | X |
| Office Supply Store | | | | | | | X | X | S |
| Optical Clinic or Office | | | | | | | X | X | |
| Optical Dispensary Store | | | | | | | X | X | |
| Paint Sales Store (retail) | | | | | | | X | X | |
| Pawnshop | | | | | | | S | X | X |
| Pet Grooming Shop | | | | | | | X | X | |
| Pet Shop | | | | | | | X | X | |
| Pharmacy or Drug Store | | | | | | | X | X | |
| Picture Framing | | | | | | | X | X | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Shop | | | | | | | | | |
| Plant Nursery | S | | | | | | | X | X |
| Plumbing Shop (retail) | | | | | | | X | X | |
| Pool or Billiard Hall | | | | | | | S | X | |
| Printing Shop | | | | | | | X | X | |
| Private Club (serving alcohol) | | | | | | | X | X | X |
| Professional Offices | | | | | | | X | X | X |
| Recording Studio | | | | | | | X | X | X |
| Recreation Center | | | | | | | X | X | |
| Restaurant or Cafe (inside) | | | | | | | X | X | X |
| Restaurant, (drive-in) | | | | | | | X | X | |
| Second Hand Store | | | | | | | X | X | |
| Service Station | | | | | | | S | X | X |
| Sexually Oriented Business | | | | | | | | S | S |
| Shoe or Boot Store | | | | | | | X | X | |
| Shopping Center or Mall | | | | | | | | X | X |
| Sign Shop | | | | | | | | X | X |
| Skating Rink | | | | | | | S | X | X |
| Sporting Goods Store | | | | | | | X | X | |
| Tanning Salon | | | | | | | X | X | |
| Taxidermist | | | | | | | | X | X |
| Tire Sales &amp; Repair | | | | | | | | X | X |
| Tool Rental | | | | | | | | X | X |
| Travel Agency | | | | | | | X | X | |
| Truck Rental | | | | | | | | X | X |
| Truck Repair | | | | | | | | X | X |
| Truck Sales | | | | | | | | X | X |
| Truck Wash | | | | | | | | X | X |
| Upholstery Shop | | | | | | | | X | X |
| Washateria | | | | | | | | X | X |

| (self-service) | | | | | | | | | |
|----------------|--|--|--|--|--|--|--|--|--|

| Industrial Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|------------------|---|------|------|------|----|----|-----|-----|-----|
| Airport | | | | | | | | S | S |
| Ammonia Manufacturing | | | | | | | | | |
| Apparel Manufacturing | | | | | | | | | X |
| Appliance Manufacturing | | | | | | | | | X |
| Artificial Limb Manufacturing | | | | | | | | | X |
| Asphalt Batching Plant | | | | | | | | | S |
| Auto Salvage Yard | | | | | | | | | |
| Bakery, Commercial | | | | | | | | X | X |
| Bleach Manufacturing | | | | | | | | | |
| Bookbinding &amp; Publishing | | | | | | | | S | X |
| Bottling Plant | | | | | | | | S | X |
| Box Manufacturing | | | | | | | | | S |
| Brewery | | | | | | | | | S |
| Brick or Tile Manufacturing | | | | | | | | | |
| Canning Operation | | | | | | | | | |
| Carpet Manufacturing | | | | | | | | | |
| Cartage Operation | | | | | | | | S | X |
| Chlorine Manufacturing | | | | | | | | | |
| Cold Storage Plant | | | | | | | | | X |
| Concrete Batching Plant | | | | | | | | S | X |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concrete Product Casting Plant | | | | | | | | |
| Contractor Yard (outside storage) | | | | | | | | X | X |
| Cotton Gin | | | | | | | | |
| Creamery | | | | | | | | | S |
| Creosote Manufacturing | | | | | | | | |
| Distribution Center | | | | | | | | S | X |
| Distillation Plant | | | | | | | | |
| Dying Plant | | | | | | | | |
| Electroplating | | | | | | | | | S |
| Envelope Manufacturing | | | | | | | | | S |
| Explosives Manufacturing | | | | | | | | |
| Fertilizer Manufacturing | | | | | | | | |
| Fiberglass Manufacturing | | | | | | | | |
| Fireworks Manufacturing | | | | | | | | |
| Food Processing | | | | | | | | | S |
| Foundry | | | | | | | | |
| Freight Terminal, Motor | | | | | | | | | X |
| Freight Terminal, Railroad | | | | | | | | | X |
| Furniture Manufacturing | | | | | | | | | S |
| Glass Manufacturing | | | | | | | | | S |
| Glue Manufacturing | | | | | | | | |
| Gypsum Manufacturing | | | | | | | | |
| Heliport or Helistop | | | | | | | | S | S |
| Ice Cream Plant | | | | | | | | | S |
| Ice Plant | | | | | | | | | X |
| Incinerator | | | | | | | | S | S |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Insecticide Processing | | | | | | | | |
| Junkyard | | | | | | | | |
| Laundry Plant | | | | | | | | S |
| Light Fabrication Plant | | | | | | | | X |
| Livestock Auction Barn | S | | | | | | | S | S |
| Machine Shop | | | | | | | | S |
| Marble Manufacturing | | | | | | | | |
| Mattress Manufacturing | | | | | | | | S |
| Meat Processing Plant | | | | | | | | S |
| Metal Fabrication | | | | | | | | S |
| Metal Stamping and Extrusion | | | | | | | | S |
| Mining, Extraction Operation | | | | | | | | |
| Monument Works | | | | | | | | X |
| Packaging Operation | | | | | | | | S | X |
| Paint Manufacturing | | | | | | | | |
| Pallet Manufacturing | | | | | | | | X |
| Paper Mill | | | | | | | | |
| Pesticide Processing | | | | | | | | |
| Petroleum Products (wholesale) | | | | | | | | X |
| Petroleum Refinery &amp; Storage | | | | | | | | |
| Pharmaceutical Manufacturing | | | | | | | | S |
| Plastic Product Manufacturing | | | | | | | | |
| Pottery Manufacturing | | | | | | | | X |
| Poultry | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Processing Plant | | | | | | | | | |
| Radio Transmitting Station | | | | | | | | S | X |
| Rendering Plant | | | | | | | | | |
| Smelter Plant | | | | | | | | | |
| Tanning Plant | | | | | | | | | |
| Television Transmitting Station | | | | | | | | S | X |
| Textile Manufacturing | | | | | | | | | |
| Tire Manufacturing | | | | | | | | | |
| Tire Recapping Plant | | | | | | | | | S |
| Vehicle Conversion Facility | | | | | | | | X | X |
| Warehouse | | | | | | | | S | X |
| Welding Shop | | | | | | | | S | X |
| Wrecking Yard | | | | | | | | | |

| Commercial Uses: | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Accessory Building | X | X | X | X | X | X | X | X | X |
| Home Occupation | S | S | S | S | S | S | S | S | |
| Temporary Construction Office | S | S | S | S | S | S | S | S | X |
| Temporary Building | S | S | S | S | S | S | S | S | S |

20.2 In instances where a proposed land use is not included in the Schedule of Uses and interpretation is required regarding the appropriate classification of an unlisted form of land use, the City Council shall make such determination concerning the classification of such use. The City Council shall consider the nature and described performance of the proposed use and its compatibility with the uses permitted in the

various districts and determine the zoning district or districts within which such use should be permitted.

(Ord. No. 05-16, adopted 1-25-05, Sec. 2; Ord. No. 06-41, adopted 9-26-06, Sec. 2)

## SECTION 21

## SCHEDULE OF DISTRICT REGULATIONS

In addition to the schedule of regulations below, also see the special and additional regulations in Section 23 of this zoning ordinance.

|  | A | SF-1 | SF-2 | SF-3 | MF | MH | C-1 | C-2 | I-1 |
|---|---|---|---|---|---|---|---|---|---|
| Lot Area (sq. ft.) | 2 acres | 20,000 | 10,000 | 6,000 | (b) | 6,000 | none | none | none |
| Minimum Lot Width (ft.) | 150 | 100 | 80 | 60 | 80 | 50 | none | none | none |
| Minimum Lot Depth (ft.) | 200 | 120 | 120 | 100 | 150 | 120 | none | none | none |
| Front Yard Setback (ft.) | 50 | 30 | 25 | 25 | 25 | 25 | (d) | 20 | 20 |
| Side Yard Setback (ft.)/interior lot | (a) | 15 | 10 | 7.5 | 15 | 7.5 | (d) | 10 | (e) |
| Side Yard Setback (ft.)/corner lot | (a) | 25 | 20 | 20 | 25 | 20 | (d) | 25 | (f) |
| Rear Yard Setback (ft.) | 25 | 25 | 25 | 25 | 20 | 10 | (d) | 20 | (f) |
| Maximum Height (stories or ft.) | 2.5 | 3 | 2.5 | 2.5 | 3 | 1.5 | 100' | 100' | none |
| Maximum Lot Coverage (%) | 15 | 40 | 40 | 40 | 40 | 40 | 50 | 50 | 50 |
| Minimum Dwelling Size (sq. ft.)* | 1,100 | 1,800 | 1,500 | 1,000 | (c) | 720 | none | none | none |
| Maximum Density Per Acre | n/a | 2 | 4 | 7 | 15 | 7 | n/a | n/a | n/a |

*The minimum floor area of any dwelling shall be exclusive of garages, breezeways, and porches.

(a)   The minimum side yard on each side of the lot shall have a width of not less than 15% of the width of the lot or 50 feet, whichever is less.

(b)   The minimum lot area for multi-family dwellings shall have a minimum of 3,000 square feet per dwelling unit.

(c)   The minimum dwelling size for each multi-family dwelling unit shall be 600 square feet.

(d)   None required for buildings in existence at the time of passage of this ordinance. However; when new construction of buildings in this district occur, then yard setbacks shall be at least 10 feet from

the property line.

(e)   The minimum side yard setback shall be at least 10 feet from the property line except where a permitted use abuts a residential district boundary line, the minimum yard setback shall be a minimum of 20 feet.

(f)   The minimum side or rear yard setback shall be at least 20 feet from the property line except where a permitted use abuts a residential district boundary line, the minimum yard setback shall be a minimum of 50 feet.

(Ord. No. 04-02, adopted 3-10-04, Sec. 2)

## SECTION 22

### OFF-STREET PARKING AND LOADING REQUIREMENTS

22.1 *Purpose:* The purpose of this article is to, among other things, establish limitations on the number of vehicles parked or stored, the types of vehicles parked or stored and the manner in which vehicles are parked or stored: to secure health, safety and welfare of the general public; to regulate, control and limit public nuisances and other conditions and circumstances as set forth in this article that adversely affect the community appearance and orderly development; to lessen congestion in the streets; to facilitate the adequate provisions of transportation; and to encourage the most appropriate use of land. Minimum off-street parking and loading shall be provided as set forth in Section 20 and the following provisions. Uses not listed in Section 20 shall provide required off-street parking according to the most similar use listed in the Schedule of Uses, as determined by the City Council.

22.2 *Definitions.* For the purposes of this Section 22, the following terms, phrases, words and their derivation shall have the meaning given below:

(a)   *Vehicle.* Any and every device in, upon or by which a person or property is or may be transported, drawn or moved upon a street, highway, waterway or airway and shall include, but is not limited to, any automobile, bus, motor home, truck, tractor, farm machinery, motorcycle, scooter, moped, all-terrain vehicle, boat, aircraft, recreational vehicle, golf cart, go-cart, trailer (boat, utility, car, stock, etc.), fifth wheel trailer, camper, camper shell, wheeled towing frame, semi tractor, semi tractor trailer, truck bed mounted on a chassis and mobile home. This definition does not include non-motorized bicycles, small engine lawn mowers and devices of similar scale.

(b)   *Special Vehicle.* A vehicle designed and used primarily for recreational uses. A special vehicle shall include, but is not limited to, the following: motor home, camper, camper shell, boat on or off of a trailer, recreational vehicle, fifth wheel trailer or any similar vehicle.

(c)   *Utility Vehicle.* A vehicle designed and used primarily for utilitarian uses. A utility vehicle shall include, but is not limited to, the following: trailer, tractor, truck-tractor, farm machinery, boat trailer without a boat, truck bed mounted on a chassis, wheeled towing frame, utility trailer, boxed trailer, flat bed trailer, stock trailer, car carrier, panel truck or other similar vehicle.

(d)   *Storage.* The continuous parking of a vehicle for more than seventy-two (72) hours.

(e)   *Shielded.* The view of the vehicle is obstructed by a fence or other structure or vegetation that completely conceals the vehicle from public view.



(f)  *Front yard.* An open, unoccupied space on a lot facing a street and extending from the front of the lot to the front of the principal building, between the side lot lines.

(g)  *Rear yard.* A space unoccupied by the principal structure extending for the full width of the lot between a principal structure and the rear lot line.

(h)  *Side yard.* An open unoccupied space on the same lot with the building, situated between the building and the side line of the lot, and extending from the front yard to the rear yard.

22.3 *General Provisions.*

(a)  Improved parking surfaces shall be maintained in good and safe condition and be free of holes, cracks, spalling, or other failures that may effect, among other things, the use, drainage from the property, drainage on adjoining property or the longevity of the material.

(b)  No vehicle, except mobile homes intended as permanent residences in manufactured home districts or recreational vehicles in a designated recreational vehicle park, may be used for housekeeping, living, or sleeping quarters. No vehicle may be used for the storage of trash or debris or for storage of personal property for which the vehicle was not designed. However, upon a request from the property owner or tenant of a property, the City building official may, once during a calendar year, permit the use of a special vehicle on a residential lot for a period not to exceed two (2) weeks in a calendar year.

22.4 *Special Off-Street Parking Provisions for Residential Districts and Residential Properties in Other Districts Except Agricultural Districts.*

(a)  All required parking spaces shall be located behind the required front setback line.

(b)  Required off-street parking shall be provided on the same lot as the use it is to serve.

(c)  No unshielded parking or storage shall be allowed except on a paved reinforced concrete or asphalt parking space.

(d)  Restrictions (not applicable to vehicles parked or stored in a completely enclosed building):

(1)  The total number of vehicles that may be stored or parked on a lot shall not exceed five (5), unless the occupant can establish that the number of vehicles does not exceed the number of licensed drivers who reside at the premises by more than two (2).

(2)  All vehicles must be maintained in an operable condition and comply with Article 7.700 of this Code and V.T.C.A., Transportation Code ß 683.001 et seq., Abandoned and Junk Vehicles, as amended.

(3)  All vehicles must have and comply with the required current federal and state licensing and registration.

(4)  Vehicular access to unshielded improved parking surfaces shall be provided by means of a continuous full width paved reinforced concrete or asphalt driveway surface.

(5)  Special vehicles: In addition to the above general restrictions, special vehicles shall be parked and/or stored on a paved reinforced concrete or asphalt parking surface. The storage of

special vehicles in the front yard shall be prohibited.

(6)   Utility vehicles: In addition to the above general restrictions:

a.   The storage of utility vehicles in the front yard shall be prohibited.

b.   The unshielded parking or storage of tractors, tractor trailers, farm machinery, or other vehicles designed primarily for nonresidential purposes, such as, among others, construction equipment designed for hauling or moving of materials, is prohibited.

22.5 *Deed Restrictions and Covenants.* In certain residential developments that have deed restrictions or other restrictive covenants on file for the benefit of the neighborhood that are more restrictive than the provisions of this article, the provisions of said deed restrictions or covenants shall prevail.

22.6 *Off-Street Loading Space All Districts.*

(a)   All retail, commercial and industrial structures having three thousand (3,000) square feet or more of gross floor area, either in the building or lot, shall provide and maintain off-street facilities for the loading and unloading of merchandise and goods. At least one (1) additional space is required for each additional twenty thousand (20,000) square feet of gross floor area. A loading space shall consist of an area of a minimum of ten (10) by twenty-five (25) feet. All drives and approaches shall provide adequate space and clearances to allow for the maneuvering of trucks off-street.

(b)   Kindergartens, child care centers, nursery schools, and similar child training and care establishments shall provide reinforced concrete or asphalt paved off-street loading and unloading space on a private drive to accommodate one (1) motor vehicle for each ten (10) students or children cared for by the establishment.

(c)   Loading docks and areas shall be located within the building or on the lot adjacent to a public alley or private service drive.

22.7 *Schedule of Parking Requirements Based on Use.* At the time any building or structure is erected or structurally altered, off-street parking spaces shall be provided in accordance with the parking schedule in Section 20 and the applicable parking regulations specified in each district.

22.8 *Rules for Computing Number of Parking Spaces.* In computing the number of off-street parking spaces required for each of the above uses, the following rules shall govern:

(a)   *"Floor area"* shall mean the gross floor area of the specific use. *"Site area"* shall mean square feet of the property site.

(b)   Where fractional spaces result, the parking spaces required shall be constructed to be the nearest whole number.

(c)   The parking space requirement for a use not specifically mentioned herein shall be the same as required for a use of similar nature as determined by the City Council.

(d)   In the case of mixed uses, the parking spaces required shall equal the sum of the requirements of the various uses computed separately.

(e)   Handicapped parking spaces shall be in accordance with State and Federal requirements.

22.9 *Location of Parking Spaces.* All parking spaces required herein shall be located on the same lot with the building or use served, except as follows:

(a)   Where an increase in the number of spaces is required by a change or enlargement of use or where such spaces are provided collectively or used jointly by two (2) or more buildings or establishments, the required spaces may be located not more than three hundred (300) feet from the buildings served.

(b)   Not more than fifty (50) percent of the parking spaces required for theaters, bowling alleys, skating rinks, restaurants, or similar uses and not more than eighty (80) percent of the parking spaces required for a church or school auditorium or similar uses may be provided and used jointly by similar uses not normally open, used or operated during the same hours as those listed; provided, however, that a written agreement thereto is properly executed and filed as specified below. In any case where the required parking spaces are not located on the same lot with the building or use served, or where such spaces are collectively or jointly provided and used, a written agreement thereby assuring their retention for such purposes, shall be properly drawn and executed by the parties concerned, executed by the parties concerned, approved as to form by the City Attorney and shall be filed with the application for a building permit.

22.10 *Identification of Parking Spaces.* Except for single-family and duplex residential uses, parking spaces shall be permanently and clearly identified by stripes, buttons, tiles, curbs, barriers, or other approved methods. Nonpermanent markings, such as paint, shall be regularly maintained to ensure continuous clear identification of the spaces. Handicapped parking shall be in accordance with the State of Texas requirements.

22.11 *Use of Parking Spaces All Districts.* Required off-street parking and loading spaces shall be used only for these respective purposes. Except for occasional "garage sales" or "sidewalk sales," required off-street parking and loading spaces shall not be used for display of items for sale.

22.12 *Temporary Nonconforming Status.* Any legally existing parking or storage application rendered nonconforming by this Ordinance at the time of its adoption may continue as specified below:

(a)   Existing usage of sanctioned nonconforming parking surfaces may continue in non-conforming status until such time as new construction or repair/renovation exceeds fifty percent (50%) of the existing parking surface.

(b)   Storage of vehicles rendered nonconforming by this Ordinance at the time of its adoption may continue until December 31, 2003. After that date, nonconforming storage shall be deemed in violation of this Ordinance, as amended, and the property owner may be cited for such violation and be subject to the provisions of paragraph 22.13.

(c)   Upon any new construction of principal building(s) or parking areas or changes in property usage or ownership, a nonconforming status shall terminate and compliance with this Ordinance, as amended, shall be required.

22.13 *Violations:* Any person violating any of the provisions of this article or any amendment thereto shall be deemed guilty of a misdemeanor, and upon conviction in Municipal Court shall be subject to a fine not to exceed the sum of $200.00 for each offense. Each and every day such violation continues shall constitute a separate offense.

(Ord. No. 22-57, adopted 12-10-02, Sec. 2)

## SECTION 23

## SPECIAL AND ADDITIONAL REGULATIONS

23.1 *Lot Regulations:*

(a)  Lot Area: The minimum residential lot area for the various districts shall be in accordance with the regulations for each district, except that a lot having less area than herein required which was an official "lot of record" prior to the adoption of this ordinance may be used for a single-family dwelling and no lot existing at the time of passage of this ordinance shall be reduced in area below the minimum requirements set forth in the respective district.

(b)  Location of Dwellings and Buildings: Only one (1) main building for one-family and duplex use with permitted accessory buildings may be located upon a lot or unplatted tract. Every means of access shall have a minimum width of twenty-five (25) feet. Where a lot is used for retail and dwelling purposes, more than one (1) main building may be located upon the lot but only when such buildings conform to all the open space, parking and density requirements applicable to the uses and districts. Whenever two or more main buildings, or portions thereof, are placed upon a single lot or tract and such buildings do not face upon a public street, the same may be permitted when the site plan for such development is recommended by the Planning and Zoning Commission and approved by the City Council so as to comply with the normal requirements for platting. No parking area, storage area, or required open space for one building shall be computed as being the open space, yard, or area requirements for any other dwelling or other use.

23.2 *Front Yards:*

(a)  On corner lots, the front yard setback shall be observed along the frontage of both intersecting streets (unless shown specifically otherwise on a final plat).

(b)  Where the frontage on one side of a street between two intersecting streets is divided by two or more zoning districts, the front yard shall comply with the requirements of the most restrictive district for the entire frontage.

(c)  Where a building line has been established by a plat approved by the City Council or by ordinance and such line requires a greater or lesser front yard setback than is prescribed by this ordinance for the district in which the building line is located, the required front yard shall comply with the building line so established by such ordinance or plat provided no such building line shall be less than twenty (20) feet (except as approved by "PD").

(d)  The front yard shall be measured from the property line to the front face of the building, covered porch, covered terrace or attached accessory buildings. Eaves and roof extensions or a porch without posts or columns may project into the required front yard for a distance not to exceed four (4) feet and subsurface structures, platforms or slabs may not project into the front yard to a height greater than thirty (30) inches above the average grade of the yard.

(e)  Where lots have double frontage, running through from one street to another, a required front yard shall be provided on both streets unless a building line for accessory buildings has been established along one frontage on the plat or by ordinance, in which event only one required front yard need be observed.

(f)   Visual clearance shall be provided in all zoning districts so that no fence, wall, architectural screen, earth mounding or landscaping obstructs the vision of a motor vehicle driver approaching any street, alley or driveway intersection.

On any corner lot for which front and side yards are required herein, no wall, fence, structure, sign, tree, or other planting or slope terrace or embankment may be maintained higher than three (3) feet above the street grade so as to cause danger or hazard to traffic by obstructing the view of the intersection from a point thirty (30) feet back from the right-of-way corner.

(g)   Gasoline service station pump islands may not be located nearer than eighteen (18) feet to the front property line. An unenclosed canopy for a gasoline filling station may extend beyond the front building line but shall never be closer than ten (10) feet to the property line.

(h)   Where a future right-of-way line has been established for future widening or opening of a street or thoroughfare upon which a lot abuts, the front or side yard shall be measured from the future right-of-way line.

23.3 *Side Yards:*

(a)   Every part of a required side yard shall be open and unobstructed except for: (1) accessory buildings as permitted herein; (2) the ordinary projections of window sills, belt courses, cornices, and other architectural features not more than twelve (12) inches into the required side yard; and (3) roof eaves projecting not more than thirty-six (36) inches into the required side yard. Balconies shall not project into the required side yard.

(b)   For multi-family structures in the MF and PD Districts, a minimum side yard, or space between adjoining buildings, shall be thirty (30) feet between building walls when such walls have openings for windows and access, and twenty (20) feet when no openings exist.

(c)   When a non-residentially zoned lot or tract abuts upon a zoning district boundary line dividing that lot or tract from a residentially zoned lot or tract, a minimum side yard of ten (10) feet shall be provided on the nonresidential property. An opaque wood fence or masonry wall having a minimum height of six (6) feet above the average grade of the residential property shall be constructed on non-residential property adjacent to the common side (or rear) property line.

23.4 *Rear Yards:* The required rear yard shall be open and unobstructed from a point thirty (30) inches above the average elevation of the graded rear yard, except for accessory buildings as permitted herein. Eaves, covered porches, and roof extensions without structural support in the rear yard may extend into the rear yard a distance not to exceed four (4) feet. Balconies shall not project into the required rear yard.

23.5 *Swimming Pools:* It is the purpose of the following provisions to recognize an outdoor swimming pool as a potential attractive nuisance and to promote the safety and enjoyment of property rights be establishing rules and regulations governing the location and improvement of swimming pools whether privately, publicly or commercially owned or operated.

(a)   Permits and Approvals: No swimming pool shall be constructed or used until a swimming pool building permit and a certificate of occupancy have been issued therefor. No building permit and no final certificate of occupancy shall be issued unless the proposed sanitary facilities and water supply comply with applicable local and State Health Department regulations.

(b)   Requirements: A swimming pool may be constructed and operated when:

(1)    the pool is not located in any required front or side yard abutting a street;

(2)    a wall or fence, not less than three and one-half (3-Ω) feet in height, with self-enclosing and self-latching gates at all entrances, completely encloses either the pool area or the surrounding yard area and which children cannot crawl through;

(3)    all lighting of the pool is shielded or directed to face away from adjoining residence. If lights are not individually shielded they shall be so placed, or the enclosing wall or fence shall be so designed, that direct rays from the lights shall not be visible from adjacent properties;

(4)    no broadcasting system is used for the purpose of advertising the operation of the pool or for the attraction of persons to the premises. This shall not prevent a public address system necessary or useful to the supervision of the pool and the safety of swimmers; and

23.6 *Temporary Construction Buildings:* Temporary buildings for uses incidental to construction work on the premises shall be permitted in any zoning district but shall be immediately removed upon the completion or abandonment of the construction work. The Building Inspector shall determine the appropriate time period the construction buildings may be used on the site.

23.7 *Type of Exterior Construction.*

At least 80 percent of the exterior walls of the first floor of all structures shall be of masonry construction exclusive of doors, windows, and the area above the top plate line. Each story above the first floor of a straight wall structure shall be at least 80 percent masonry exclusive of doors, windows, and the area above the top plate lines.

Masonry construction in all districts shall be exterior walls constructed of brick, rock, stone, stucco, tilt wall materials, concrete, concrete block, or other approved masonry materials and shall be constructed in accordance with the Melissa Building Code, but in no case shall brick be less than three inches in thickness when applied as a veneer nor shall it be less than the thickness required by the Melissa Building Code when serving as a structural masonry wall; and in no case shall stone, concrete, concrete blocks or tilt wall materials, or other approved masonry materials other than brick be less than 3.58 inches in thickness when applied as a veneer nor shall it be less than the thickness required by the Melissa Building Code when serving as a structural masonry wall.

Homes and structures in the Historical Overlay District are eligible for a Special Use Permit to use wood or similar construction instead of masonry construction if such construction would make the home or structure more compatible with the preservation of that Historical Overlay District.

23.8 *Types of Roofing Materials.* Roofing material in all districts shall consist of architectural asphalt shingles, including laminated shingles and "shadowed" three-tab shingles, clay and concrete tile, metal shingles, mineral-surfaced row roofing, slate and slate-type shingles, wood shingles, wood shakes or metal roof panels and shall be constructed in accordance with the Melissa Building Code. Should architectural shingles be used as roofing material, said shingles shall be accompanied with a minimum twenty-five (25) year warranty. Under no circumstance shall three-tab shingles be used as roofing material.

(Ord. No. 98-08, adopted 7-14-98, Sec. 1; Ord. No. 12-05, adopted 11-15-11, Sec. 2)

SECTION 24

ACCESSORY BUILDING REGULATIONS

24.1 In a single-family residential or multi-family district, an accessory building is a subordinate building exceeding one hundred twenty (120) square feet of floor area, attached to or detached from the main building, without separate bath or kitchen facilities, not used for commercial purposes and not rented.

24.2 In other districts, an accessory building is a subordinate building, the use of which is incidental to and used only in conjunction with the main building.

24.3 No accessory building shall be greater in height than the main structure.

24.4 *Area Regulations for Accessory Buildings in Single and Multi-Family Districts:*

(a)   Size of Yards:

(1)   *Front Yard:* Attached front accessory buildings shall have a front yard not less than the main building or as specified in the particular district. Detached accessory buildings shall be located in the area defined as the rear yard.

(2)   *Side Yard:* There shall be a side yard not less than five (5) feet from any side lot line, alley line, or easement line; except that adjacent to a side street, the side yard shall never be less than ten (10) feet.

(3)   *Rear Yard:* There shall be a rear yard not less than five (5) feet from any lot line, alley line, or easement line. Carports, garages, or other accessory buildings, located within the rear portion of a lot as heretofore described shall not be located closer than fifteen (15) feet to the main building nor nearer than five (5) feet to any side lot line.

(4)   No accessory building or structure shall obstruct traffic vision in a triangle formed by legs of forty (40) feet extending horizontally in each direction from the property corner.

24.5 *Outbuildings:* As used herein, an "outbuilding" is defined as a structure situated on property zoned for residential use, primarily intended to be used for minor storage purposes, but not for the storage of automobiles or human or animal habitation. The erection, installation, construction or use of an outbuilding shall be subject to the regulations as set forth herein.

(a)   No outbuilding shall be larger than one hundred ninety-two (192) square feet, the dimensions of which must not exceed twelve feet (12') by sixteen feet (16') in width and length.

(b)   An outbuilding shall not exceed the height of the main structure. The roof of the outbuilding shall not exceed the roof pitch or height of the primary structure.

(c)   No more than one outbuilding shall be erected, placed, installed or constructed on any lot.

(d)   Outbuildings may be of metal, wood or masonry construction. An outbuilding must be of a neutral color such as white, tan or brown; provided however, the outbuilding may be the same color of the primary structure situated on the property which the outbuilding is located. All exterior surfaces must be painted or coated with a protective material so as to prevent decay, rust or deterioration due to weather and environment. The floor of an outbuilding may be comprised of concrete slab or other similar foundation or cinder block, wood slat or other similar nonpermanent material or composition. The outbuilding may contain electrical, water and any other utility connection necessary to serve the outbuilding with said utility(ies). Unless an outbuilding is constructed and/or situated on a concrete slab foundation, skirting of the outbuilding is required.



(e) Outbuildings must be situated on property in compliance with all front, side and rear yard setback requirements in the applicable zoning district. An outbuilding shall be located on a lot such that the entire structure is situated within the rear yard.

(Ord. No. 22-26, adopted 10-9-01, Sec. 2)

## SECTION 25

## RESERVED FOR FUTURE USE

## SECTION 26

## "SUP" SPECIFIC USE PERMIT

26.1 *General Provisions:* The City Council by an affirmative vote may, after public hearing and proper notice to all parties affected, and after recommendations from the Planning and Zoning Commission that the uses are in general conformance with the Comprehensive Plan and general objectives of the City and containing such requirements and safe guards as are necessary to protect adjoining property, authorize application and shall be accompanied by a site plan drawn to scale and showing the general arrangement of the project, together with essential requirements such as off-street parking facilities; size, height, construction materials, and locations of buildings and the uses to be permitted; location and instruction of signs; means of ingress and egress to public streets; the type of visual screening such as walls, plantings and fences; and the relationship of the intended use to all existing properties and land uses in all directions to a minimum distance of two hundred (200) feet. The Planning Commission or City Council may require additional information or drawings (such as building floor plans), operating data and expert evaluation or testimony concerning the location, function and characteristics of any building or use proposed.

26.2 *Specific Use Permit Regulations:*

(a) In recommending that a Specific Use Permit for the premises under consideration be granted, the Planning and Zoning Commission shall determine that such uses are harmonious and adaptable to building structures and uses of abutting property and other property in the vicinity of the premises under consideration, and shall make recommendations as to requirements for the paving of streets, alleys and sidewalks, means of ingress and egress to public streets, provisions for drainage, adequate off-street parking, protective screening and open space, area or security lighting, heights of structures, and compatibility of buildings. The Planning and Zoning Commission and City Council shall consider the following criteria in determining the validity of the Specific Use Permit request:

1. The use shall be harmonious and compatible with its surrounding existing uses or proposed uses;

2. The activities requested by the applicant shall be normally associated with the requested use;

3. The nature of the use shall be reasonable; and

4. Any negative impact on the surrounding area shall be mitigated.

(b) In granting a Specific Use Permit, the City Council may impose conditions which shall be complied with by the owner or grantee before a certificate of occupancy may be issued by the building official for use of the building on such property pursuant to such Specific Use Permit and such

conditions precedent to the granting of the certificate of occupancy. Any special conditions shall be set forth in writing by the City Council prior to issuance of the Certificate of Occupancy.

(c) No Specific Use Permit shall be granted unless the applicant, owner and grantee of the Specific Use Permit shall be willing to accept and agree to be bound by and comply with the written requirements of the Specific Use Permit, as attached to the site plan drawing (or drawings) and approved by the Planning and Zoning Commission and City Council.

(d) If required, a building permit shall be applied for and secured within six (6) months from the time of granting the Specific Use Permit, provided however, that the City Council may authorize an extension of this time upon recommendation by the Planning and Zoning Commission. After six (6) months from the date of approval has elapsed, the Planning and Zoning Commission and City Council may review the site plan for continued validity. If the site plan is determined invalid, the property owner(s) must submit a new or revised site plan for approval prior to any construction or application for building permit for the area designated for the Specific Use Permit.

(e) A building, premise, or land used under a Specific Use Permit may be enlarged, modified, structurally altered, or otherwise changed provided the changes do not:

1. Increase the height of structures, including antenna support structures.

2. Increase building square footage from its size at the time the original Specific Use Permit was granted by greater than ten (10) percent;

3. Reduce the distance between a building or noise-generating activity on the property and an adjacent, off-site residential use. This provision shall not apply should the property and the residential use be separated by a major thoroughfare depicted on the City's Thoroughfare Plan; or

4. Reduce the amount of open space as indicated on the previously approved zoning exhibit.

All other enlargements, modifications, structural alterations, or changes shall require the approval of a new Specific Use Permit. Antennas may be placed on a tower with an existing Specific Use Permit without approval of a separate Specific Use Permit subject to approval of a final plat and site plan for the property.

(f) The Board of Adjustment shall not have jurisdiction to hear, review, reverse, or modify any decision, determination, or ruling with respect to the specific land use designated by any Specific Use Permit.

(g) When the City Council authorizes the granting of a Specific Use Permit, except in cases where a Specific Use Permit is granted for a temporary building in accordance with this Ordinance, the Zoning Map shall be amended according to its legend to indicate that the affected area has conditional and limited uses, and said amendment is to indicate the appropriate zoning district for the approved use and prefixed by an "S" designation. Specific Use Permits granted shall be indicated by numerical designation on the Zoning District Map.

(h) Upon holding a properly notified public hearing, the City Council may amend, change, or rescind a Specific Use Permit if:

1. There is a violation and conviction of any of the provisions of this Ordinance or any

ordinance of the City that occurs on the property for which the Specific Use Permit is granted.

2.    The building, premise, or land used under a Specific Use Permit is enlarged, modified, structurally altered, or otherwise significantly changed without approval of a separate Specific Use Permit for such enlargement, modification, structural alteration, or change.

3.    Violation of any provision of the terms or conditions of a Specific Use Permit.

4.    Ad valorem taxes on the property are delinquent by more than six (6) months.

5.    The Specific Use Permit was obtained by fraud or with deception.

26.3 *Specific Use Permit for Temporary Buildings*:

(a)    Temporary buildings are permitted by right for houses of worship, public schools (kindergarten through twelfth grade only), and other government agencies and/or political subdivisions of the State of Texas, subject to the conditions below. Temporary buildings are permitted by Specific Use Permit for private enterprises subject to the conditions below.

(b)    A permit to erect a temporary building may be issued for an initial period of up to three (3) years provided the applicant submits:

1.    An application with documented evidence of an immediate need for space to the Building Official, who shall evaluate each application for a temporary building based on the following criteria:

a.    Capacity of the existing permanent building(s), which is located or planned to be located on the same property for which the temporary building permit is being sought, compared to the enrollment, employment and/or number of people attending the existing permanent building(s) at one (1) time;

b.    Total enrollment, employment and/or membership size;

c.    Documentation of growth records depicting the number of people in the congregation, school and/or office;

d.    Whether the facility is a start-up or new facility;

e.    Indication of alternative options that were explored before a temporary building application was considered;

f.    Acts of nature; and/or

g.    Any other evidence which is reasonably related to the immediate need for additional space;

2.    A preliminary site plan to the Planning Department, providing for a permanent solution to the immediate need for a new temporary building(s) showing the permanent building(s), the temporary building(s) and the required parking, which is subject to the review and approval of the Planning and Zoning Commission; and

3.    A site plan for the temporary building(s) to the Planning Department, which is subject to

the review and approval of the Planning and Zoning Commission.

(c)   The temporary building(s) shall be removed within thirty (30) days of the date:

1.   A Certificate of Occupancy is issued for the permanent building; or

2.   The permit for the temporary building expires, whichever occurs first.

(d)   A request for a single extension, not to exceed twelve (12) months, ("Single Extension") of the temporary building permit may be granted by the Planning and Zoning Commission provided the applicant:

1.   Has an approved and valid preliminary site plan for the permanent building(s) and an approved and valid site plan for the temporary building(s);

2.   Has a specific plan of how an additional year would allow the applicant to construct the permanent building(s) by providing:

a.   Evidence of numeric growth, beyond that which was specifically anticipated by the applicant;

b.   Membership, enrollment and/or employment growth records;

c.   Evidence that alternative options were explored before an extension of the temporary building permit was requested; and

d.   Any other criteria reasonably deemed appropriate by the Planning and Zoning Commission.

(e)   The applicant may challenge a decision of the Building Official or Planning and Zoning Commission by appealing, in writing, to the City Council within fourteen (14) days of a decision of the Building Official or the Planning and Zoning Commission. The City Council's decision is final.

(f)   Three (3) or more members of the City Council may appeal the decision of the Planning and Zoning Commission by submitting a written notice of appeal to the Planning Department. The City Council shall consider and act on whether it will appeal the Commission's decision no later than fourteen (14) days from the date of such decision or at its first regular meeting (for which there is time to post an agenda as required by law) that occurs after the Commission meeting at which the decision was made, whichever is later. Written notice of the City Council's vote to appeal shall be submitted to the Planning Department within seven (7) days of the City Council's vote. The City Council shall consider the appeal at a public meeting no later than forty-five (45) days after the date on which the notice of appeal is submitted to the Planning Department. The City Council may affirm, modify or reverse the decision of the Planning and Zoning Commission.

(g)   If the applicant desires an extension after being granted the Single Extension, the applicant may request the City Council to grant such an extension provided the applicant submits to the City Council:

1.   The information required under subsection (d)(2) above;

2.   A detailed financial summary, including without limitation, the reasons for not complying with the terms of the Single Extension; and

3.    Any other criteria that the City Council deems necessary to ensure that any further extension granted:

a.    Is not contrary to the public interest; and

b.    Does not impair the City's ability to carry out the administration of all applicable ordinances, rules and regulations of the City.

(Ord. No. 06-41, adopted 9-26-06, Sec. 3; Ord. No. 12-20, adopted 3-27-12, Sec. 2)

## SECTION 27

## PLATTING PROPERTY NOT PERMANENTLY ZONED

27.1 The Planning and Zoning Commission shall not approve any plat of any subdivision within the city limits until the area covered by the proposed plat shall have been permanently zoned by the City Council.

27.2 The Planning and Zoning Commission shall not approve any plat or any subdivision within any area where a petition or ordinance for annexation or a recommendation for annexation to the City is pending before the City Council unless and until such annexation shall have been approved by the City Council.

27.3 In the event the Planning and Zoning Commission holds a hearing on proposed annexation, it may, at its discretion, hold a contemporaneous hearing upon the permanent zoning that is to be applied to the area or tract to be annexed. The Commission may make a recommendation on both matters to the City Council and the City Council may, at its discretion, act contemporaneously on the matters of permanent zoning and annexation.

## SECTION 27-A

## LANDSCAPE REGULATIONS AND TREE PRESERVATION

A.    *General Provisions.*

1.    *Purpose.*

(a)    Establish rules and regulations governing the protection and preservation of desired native or established trees within Melissa.

(b)    Encourage the protection of healthy and desirable trees and provide for the replacement and/or replanting of trees that are necessarily removed during construction, development or redevelopment.

(c)    Provide for the preservation and protection of desired larger native or established trees, which provide a valuable amenity to the urban environment and which, once destroyed, can only be replaced after generations, if at all.

(d)    Provide for shade, windbreaks, beauty and the cooling of air.

(e)    Provide for open space and more efficient drainage of land, thereby, reducing the effects of soil erosion and the need for additional drainage facilities.

(f)    Prevent the clear-cutting of land containing trees of six (6) inches caliper or larger. The



illegal cutting of each tree six (6) inches caliper or larger shall constitute a separate offense of this Ordinance.

2. *Definitions.*

(a) *"Residential Use or District"* shall mean SF-1, SF-2, SF-3 Single Family Residential Districts, MF Multi Family Dwelling Districts and MH Manufactured Home Park Districts.

(b) *"Non-Residential Use or Districts"* shall mean C-1 and C-2 Commercial Districts, I-1 and I-2 Industrial Districts.

(c) *"PD Planned Development Districts", "Planned Development District"* or *"PD(s)"* shall be Residential or Non-Residential depending on the permitted uses in the Planned Development District.

(d) *"Developed"* or *"Development"* shall mean any manmade change to improved or unimproved real estate, including but not limited to, buildings and/or other structures, paving, drainage, utilities, storage and/or agricultural activities.

(e) *"Redeveloped"* or *"Redevelopment"* shall mean any zoning change and/or manmade change or alteration to a design and/or layout of an existing development(s) including but not limited to, repair, expansion and/or removal and replacement of existing building and/or structure, paving, drainage, utilities, storage and/or agricultural activities. Property rendered non-conforming due to rezoning is exempt until such time as there is a change in ownership or usage.

(f) *"Developer"* shall mean any person, firm, corporation or entity responsible for the development or redevelopment of property.

3. *Applicability.*

(a) Requirements of this Ordinance shall apply to all property within the corporate limits of Melissa developed or redeveloped after the passage of this Ordinance. No site developed prior to the effective date of this Ordinance shall be required to conform to the landscaping requirements of this Ordinance unless the site is being redeveloped. Such property must, however comply with ordinances existing at the time of its development. Once a "Certificate of Occupancy" is issued for single family, manufactured or duplex home sites, the property becomes exempt from the developmental landscaping provisions of this Ordinance, but must continue to meet the landscaping maintenance and tree preservation provisions set forth herein.

(b) Trees less than three (3) inches caliper are exempt from the tree preservation requirements of this Ordinance.

B. *Landscape Requirements.*

1. *Non-Residential Districts.* These standards shall apply to all Non-Residential Use or Districts. Any area within a planned development district containing landscaping standards shall be regulated by the more restrictive standards.

(a) The minimum landscaping area for nonresidential districts shall be not less than ten (10) percent of the pavement area on the site. Landscaping shall include the following items as detailed in paragraphs (B)(1)(b), (c), (d) and (e) below:

(1)    Landscaping along street rights-of-way;

(2)    Interior parking lot landscaping;

(3)    Landscaping for corner lots; and

(4)    Landscaping/screening for parking lots adjacent to residential areas.

In the event that the total landscape area provided, per the requirements of paragraphs (B)(1)(b), (c), (d) and (e), is less than ten (10) percent of the pavement area of the site, additional landscaping shall be provided to meet the ten (10) percent requirement.

Example:

1.    If (B)(1)(a)(1)—(4) above equal fifteen (15) percent of pavement, then requirement for ten (10) percent of pavement is satisfied.

2.    If (B)(1)(a)(1)—(4) above equal eight (8) percent of pavement, then additional landscaping is required to equal ten (10) percent.

(b)    Landscaping Along Street Rights-of-Way. All commercial, industrial and other non-residential districts shall comply with the following street scope requirements:

(1)    A landscaped edge shall be provided adjacent to all streets. The landscaped edge shall be a minimum width of ten (10) feet, exclusive of street rights-of-way. Within the landscaped edge, a minimum of one (1) shade tree (three (30 inches caliper minimum) or an approved ornamental tree shall be planted per five hundred (500) square feet of landscaped area. The ten-foot landscaped edge may be reduced in the Restricted Commercial (C-1) District to no less than two (2) feet where lots are less than two (2) acres. In such case, a minimum of one (1) shade tree (three (3) inches caliper minimum) or an approved ornamental tree shall be planted for every fifty (50) feet of frontage on any public street.

(2)    Where parking lots and drives abut the landscaped edge, ten (10) shrubs (five-gallon minimum) shall be placed per five hundred (500) square feet of landscaped edge. The number of required shrubs shall be calculated solely on the area of the required landscape edge. A berm may be placed within the landscaped edge in lieu of the required shrubs; however, a headlight screen must be accommodated if required. The berm must be forty-two (42) inches above the average grade of the street and parking lot curbs. The slope of the berm shall not exceed a 3 to 1 grade.

(3)    If the parking lot is located fifty (50) feet or more from the street right-of-way line, no shrubs or berms will be required unless required for a headlight screen.

(4)    The applicant is also encouraged to plant a variety of ornamental trees and flowers in addition to the required plantings. Any permeable surface not occupied by trees, shrubs, planting beds, signs or other permitted fixtures shall be planted with turf or other living ground cover.

(5)    The required width of landscaped edge may be reduced during plan review when public improvements are necessary.



(c)   Interior Parking Lot Landscaping. Any non-residential parking area which contains more than twenty (20) parking spaces shall provide interior landscaping in addition to the required landscaped edge.

(1)   Interior landscaping shall include all areas within the paved boundaries of the parking lot as well as planting islands, curbed areas, corner lots, parking spaces and all interior driveways and aisles, except those with no parking spaces located on either side. Landscaped areas outside of the parking lot may not be used to meet the interior landscaping requirement.

(2)   There shall be eight (8) square feet of interior landscaping for each parking space (one hundred eighty (180) square feet) or fraction thereof.

(3)   There shall be a minimum of one (1) shade tree (three (3) inches caliper minimum) or an approved ornamental tree for every twenty (20) parking spaces unless approved by the City Council until the Director of Community Development is in place.

(4)   All landscaped areas shall be protected by a raised six-inch concrete curb. Pavement shall not be placed in closer than the normal mature drip line of the tree, at time of installation, unless a city-approved root barrier is utilized.

(5)   Where an existing parking area is altered or expanded to increase the number of spaces to more than twenty (20), interior landscaping shall be provided on the new portion of the lot in accordance with the above standards.

(6)   The requirements listed above shall not apply to structured parking garages.

(d)   Landscaping For Corner Lots. Corner lots at the intersection of two (2) major or larger thoroughfares shall comply with the following landscaping requirements in addition to the required plantings for the landscaped edge and interior parking lot landscaping:

(1)   A minimum fifteen-foot wide landscaped edge shall be located along the street right-of-way beginning at the corner and extending one hundred seventy-five (175) feet or to the closest driveway. Beyond this point, the landscaped edge may be gradually reduced (over a distance of twenty-five (25) feet to ten (10) feet in width.

(2)   Where the City Council (until the Community Development Department has been established) determines there is a need for a right-turn lane at a location, the landscaped edge may be reduced to a minimum of seven and one-half (7½) feet (See Thoroughfare Design Standards in the Subdivision Ordinance, as it exits or may be amended).

(3)   A minimum landscaped area of approximately nine hundred (900) square feet shall be located at the intersection corner of the lot. This landscaped area shall be provided within the area measured a minimum distance of forty (40) feet from the projected corner of the intersection on both sides of the lot. No trees may be planted in this area.

(e)   Landscaping/Screening for Parking Lots Adjacent to Residential Areas. Where parking is within fifty (50) feet of residentially zoned property and is not screened from view by a screening wall, a continuous screen of shrubs (five-gallon minimum) must be placed adjacent to the parking. The required landscaping shall comply with the following regulations:

(1)   The required shrubs shall create a minimum forty-two-inch high screen at time of installation.

(2)   Drought and freeze-resistant shrubs shall be used, including but not limited to:

Burford Holly

Chinese Holly

Eleagnus

Juniper (several varieties)

Nellie R. Stevens

Wax Myrtles

Yaupon Holly

Other plants may be used with Melissa staff approval.

(f)   All materials must meet the American Association of Nurseryman, Inc. "American Standard for Nursery Stock" (latest edition).

2.   Multi-Family Districts.

(a)   A landscaped edge shall be provided adjacent to all streets. The landscaped edge shall be a minimum width of ten (10) feet, exclusive of street rights-of-way. Within the landscaped edge, one (1) shade tree, three (3) inches caliper, shall be planted per five hundred (500) square feet of landscaped edge. The number of required trees shall be calculated solely on the areas of the required landscaped edge.

(b)   Where parking lots and drives abut the landscaped edge, ten (10) shrubs (five (5) gallon minimum) shall be planted per five hundred (500) square feet of landscaped edge. The number of required trees shall be calculated solely on the area of the required landscaped edge. A berm may be placed within the landscaped edge in lieu of the required shrubs; however, a headlight screen must be accommodated if necessary. The berm must be forty-two (42) inches above the average grade of the street and parking lot curbs. The slope of the berm shall not exceed a 3 to 1 grade.

(c)   The applicant is also encouraged to plant a variety of ornamental trees and seasonal color in addition to the required plantings. Any permanent surface not occupied by trees, shrubs, planting beds, signs or other permitted textures shall be planted with turf or other living ground cover.

(d)   If the parking lot is located fifty (50) feet or more from the street right-of-way line, no shrubs or berms will be required unless required for a headlight screen.

(e)   The required width of landscaped edge may be reduced during plan review when public improvements are necessary.

(f)   Parking areas shall be landscaped in addition to the required landscaped edge. Eight (8)

square feet of landscaping for each parking space shall be provided within the paved boundaries, including one (1) shade tree (three (3) inches caliper minimum) or an approved ornamental tree per ten (10) parking spaces.

(g)    All landscaped areas shall be protected by a raised six-inch concrete curb. Pavement shall not be placed closer than the normal mature drip line of the tree unless a Melissa staff approved root barrier is utilized.

(h)    One (1) shade tree (three (3) inches caliper minimum) or an approved ornamental tree per one thousand (1,000) square feet of required open space shall be provided.

(i)    All materials must meet the American Association of Nurseryman, Inc. "American Standard for Nursery Stock" (latest edition)

3.    *Single Family Residential Districts, MH and Duplexes.* Any development that has 11.9 units per acre or less shall fall under this classification. Any area within a planned development district containing landscaping standards shall be regulated by the more restrictive standards. Residential lots in all zoning districts shall have a minimum of fifty (50) percent of the required front yard and required side yard adjacent to a side street devoted to landscaping.

(a)    A minimum of two (2) trees (three (3) inches caliper minimum) or approved ornamental trees, either existing or planted, is required in the combined front yard and side yard adjacent to a side street for each dwelling unit.

(b)    All required trees must be planted prior to request for final building inspection of the dwelling unit. Planting of other landscape materials may be deferred, however, up to one hundred eighty (180) days in case of incompatible climatic conditions. In this case, a conditional "Certificate of Occupancy" may, in Melissa's sole discretion, be issued.

(c)    All materials must meet the American Association of Nurseryman, Inc. "American Standard for Nursery Stock" (latest edition).

(d)    Landscaping in harmony with the surrounding area adequate to minimize the visual monotony and barrenness shall be provided in the form of at least three (3) five-gallon or six (6) three-gallon shrubs.

(e)    Turf, Sod or Ground Cover (living, growing material), not to exceed twelve (12) inches in height, which may be combined with aesthetic xeriscape landscaping which prevents soil erosion, shall be provided.

(f)    Shrubs used in landscaping shall be in harmony with the surrounding area.

4.    *Non-residential, SF, duplex, MH and MF districts within PDs* are subject to the respective restrictions described above.

C.    *Landscape Maintenance Requirements.* The following requirements are intended for all Single-Family, Multi-Family, Commercial and Industrial Districts. These requirements also apply for those areas which have a PD prefix and have an aforementioned zoning.

1.    All plant materials shall be maintained in a healthy and growing condition and must be replaced with plant material of similar variety and size if damaged, destroyed or removed.

2.    Landscaped areas shall be kept free of trash, litter, weeds and other such materials or plants not a part of the landscaping.

3.    An automatic irrigation system must be installed in all required landscaped areas in commercial properties along thoroughfares.

4.    Any person, developer or entity desiring to install and maintain landscaping materials and irrigation facilities within the city right-of-way must first enter into and execute a "Median Right-of-Way Landscape and Irrigation Agreement."

5.    Landscape plans shall be submitted, reviewed and approved by Melissa for entryways to residential subdivisions or commercial properties within city rights-of-way. This requirement also applies to amenity features within city rights-of-way.

6.    Diameters of existing trees are measured at four (4) feet above grade. If the tree is on a slope, measure from the high side of the slope. In addition, measure above unusual swells in the trunk.

(a)    To determine the diameter of a multi-trunk tree, measure all the trunks; add the total diameter of the largest trunk to one-half ($\Omega$) the diameter of each additional trunk. A multi-trunked tree is differentiated from individual trees growing from a common root stock if there is a visible connection between the trunks above ground.

(b)    Diameter measurements must be accurate to the nearest one-half ($\Omega$) inch. This data is used in determination of tree significance and replacement value (if necessary).

(c)    Trees may be measured with a caliper, cruise stick, standard tape measure or diameter tape, all of which are available at forestry suppliers. Calipers are accurate, but difficult to handle. Cruise sticks are less accurate, but efficient for quick measurements. Standard tape measures are accurate, but require transposing from circumference to diameter. Diameter tapes are accurate and have the advantage of giving readings in diameter inches. End hooks and automatic recoiling on some models provide maximum efficiency.

D.    *Landscape/Irrigation Plans.*

1.    Landscape and irrigation plans shall be submitted with all nonresidential, multi-family and retirement housing development submissions. Landscape/irrigation plans shall ensure proper location of vegetation within public rights-of-way, preserve visibility triangles, maintain the overall integrity and intent of living screens and promote ornamental planting within Melissa.

2.    Submission of landscape/irrigation plans for areas which include public rights-of-way, parks and greenbelts shall be made to the City Council until the following Departments are in place: Department of Community Development for review by Community Development, Public Works and Parks and Recreation. All other submissions shall be made to the City Council until the Community Development, Public Works and Parks and Recreation Departments are in place. The applicant shall be provided a landscape review checklist. Melissa staff shall evaluate the appropriateness of landscape and irrigation plans and may approve them or approve them subject to stipulations.

3.    Landscape and irrigation "As Built" plans shall be submitted to Melissa for areas which include public rights-of-way, parks and greenbelts drawn to a suitable scale before a "Certificate of Occupancy" is issued.

E.    Landscape Buffers. There shall be a twenty-five-foot root irrigated landscape buffer immediately adjacent to U.S. 75, SH 121 and SH 5 in which no building, structure or parking shall be permitted.

F.    *Tree Preservation and Protection.*

1.    The purpose of the following paragraphs is to establish incentives for the preservation of existing, healthy and protected trees within Melissa and to provide guidelines for the protection of trees.

2.    Applicability. The terms and provisions of the following paragraphs relating to tree preservation and protection apply to real property as follows.

(a)    All vacant and undeveloped properties are the responsibility of the owner(s).

(b)    All property to be developed and redeveloped, including without limitation, any additions or alterations, is the responsibility of the developer or owner.

(c)    Streets in residential developments, including, without limitation, associated landscaping, are the responsibility of the developer until accepted by Melissa or a property and/or home owners association.

3.    Preliminary Development Plans. A general survey of natural vegetation showing tree groupings and anticipated tree losses shall be submitted with all preliminary site plans.

4.    Final Development Plans. The landscape plan that is required with site plans and preliminary plat submissions shall also include the approximate location, size (caliper and height), condition and common name of each tree to be preserved if the applicant is requesting tree credits.

5.    Tree Preservation Credits. For every healthy protected tree (six (6) inches caliper or larger) located outside of the flood plain that is preserved, the developer shall be given credit, according to the following chart. When interior parking lot landscaping is also required, only those trees preserved in the parking area shall be considered for credit for the parking area, according to the following:

(a)    Trees six (6) inches to twelve (12) inches caliper: One (1) inch credit for each one (1) inch preserved.

(b)    Trees twelve and one-tenths (12.1) inches to twenty-four (24) inches caliper: one and one-half (1Ω") inches credit for each one (1) inch preserved.

(c)    Trees over twenty-four (24) inches caliper: Two (2) inches credit for each one (1) inch preserved.

6.    Only trees having been protected in accordance with the guidelines for tree protection (See paragraph (F)(13) below) shall be considered for credit. No locus, horse apple or similar tree shall be preserved for credit.

7.    Tree credits may be applied at a maximum rate of one-third (1/3) for residential and one-half (Ω) for non-residential toward landscape and/or tree replacement.

8.    Healthy unprotected trees, over twelve (12) inches in size, located outside the flood plain, may be considered for tree credits only when individually field inspected and approved by a designated

representative of Melissa.

9.     Determination of credits shall be made by the Melissa engineering staff until Community Development staff is in place and upon completion of site improvements. Field conditions may, in Melissa's sole discretion, warrant submittal of a revised landscape plan to determine the number of tree credits. Review may include, but not be limited to, a field inspection of the site, and the plan may be referred to other departments or consultants for review and recommendation(s).

10.   Certain native and non-native trees are considered unprotected and will be considered exempt from the requirements of this Ordinance, except that a Tree Removal Permit, required herein, must be issued prior to removal. The following are considered unprotected trees:

| | |
|---|---|
| Arizona Ash | Franxinus velutina |
| Bois D' Arc (Native) | Maclura pomifera |
| Chinese Tallow | Sapium sebiferum |
| Cottonwood (Native) | Populus deltoids |
| Hackberry (Native) | Celtis occidentalis |
| Honey Locust (Native) | Gleditsia triacanthos |
| Lombardy Poplar | Populus nigra italica |
| Mimosa | Albizzia julibrissie |
| Mulberry | Morus alba |
| Siberian Elm | Ulmus pumila |
| Silver Maple | Acer saccharinum |
| Sycamore | Plantanus occidentalis |
| Weeping Willow | Salix babylonica |
| Western Red Cedar | Thuja plicata |
| Mesquite | Prosopis pubescens |

11.   Other significantly-sized, unprotected trees will be considered for tree credits. These trees must be located outside of the floodplain, be over twelve (12) inches caliper in size and be individually field inspected by a designated representative of Melissa.

12.   New and Unlisted Unprotected Trees. It is recognized that other unprotected native and non-native trees, not commonly found in this area, will be discovered on land to be developed or redeveloped in Melissa. In order to provide for such changes and contingencies, a determination as to the appropriate classification of any new or unlisted unprotected tree shall be made as follows:

(a)   The City Council, until the Director of Community Development is in place, shall refer the question of any new or unlisted unprotected tree to the Planning and Zoning Commission requesting an interpretation as to the classification into which such tree should be placed. The referral of the interpretation question shall be accompanied by a statement of facts listing the overall characteristics of the tree to include whether it is a native tree, ability to resist drought, ability to resist disease, ability to resist destruction by pests common in this area, ability to resist freezing weather, expected life, unprotected features such as thorns or discharge of nuisance by-products and overall aesthetics.



(b) The Planning and Zoning Commission shall consider the combination of characteristics of the tree as compared with the characteristics of the trees currently listed as "unprotected" and determine whether the tree should be added to the list.

(c) The Planning and Zoning Commission shall transmit its findings and recommendations to the City Council as to the classification of the tree as "unprotected" or "protected". The City Council shall, by resolution, approve or disapprove of the recommendation(s).

13. Guidelines for Tree Protection. Developers shall adhere to the following tree protection guidelines on all construction sites as applicable:

(a) Prior to construction or development, the developer shall clearly mark all trees to be preserved.

(b) The developer shall erect a temporary fence around each tree or group of trees to prohibit the placement of debris, parking of vehicles or fill within the normal mature drip line of any tree.

(c) During the construction stage of development, the developer shall prohibit cleaning of equipment or materials under the canopy of any tree or group of trees to remain. In addition, the developer shall not allow the disposal of any waste material such as, among other things, paint, oil, solvents, asphalt, concrete, mortar, etc. under the canopy of any tree or groups of trees to remain.

(d) No attachments or wires of any kind, other than those of a protective nature, may be attached to any tree.

(e) Major changes of grade one (1) inch or greater will require additional measures to maintain proper oxygen and water exchange with the roots. With major grade changes, a retaining wall or tree well of rock or brick must be constructed around the tree no closer than one-half ($\Omega$) the distance between the trunk and the normal mature drip line. The top of the retaining wall must be constructed at the new grade. Grade changes one (1) inch or greater may be made with Melissa staff approval.

(f) If a patio, sidewalk, drive or parking lot must be placed within the normal mature drip line of an existing tree, material such as porous (turf) pavement that will allow the passage of water and oxygen must be used.

(g) Fence row trees that exist primarily in nearly a straight line along older or existing property lines that generally, but not always, run parallel to a fence. Fence row trees six (6) inches caliper or greater in residential developments shall be preserved by providing a fifteen-foot protected area centered seven and one-half (7$\Omega$") feet on each side of the centerline, on and parallel to the fence row trees. No utility, trench (including irrigation trenches), alley paving or permanent structure shall be allowed within the area. Removal of trees six (6) inches caliper or larger is allowed where an alley has back-to-back residential lots and access is needed to one side of the area. These trees shall be identified and removal of such will not require replacement. All trees saved twelve (12) inches caliper and larger shall be considered for tree credit purposes. Fences that are installed within this area, which do not interfere with the existing trees, may be allowed. Fences proposed to be located in the area shall have the design and layout submitted to Melissa for review and approval.

14. The first floor of parking garages is the only area that should be used to determine landscaping requirements as established herein.

15. No tree six (6) inches caliper or larger shall be cut down without obtaining a Tree Removal Permit as required herein.

G. *Tree Removal Permits.*

1. Trees three (3) inches caliper or greater shall not be removed without issuance of a Tree Removal Permit. The City Administrator, or his/her designee, must approve the removal thereof. A no-fee permit may, in Melissa's sole discretion, be issued when a tree(s):

(a) Is/are injured, dying, diseased or infested with harmful insects;

(b) Is/are in danger of falling, interfere with utility service or create unsafe vision clearance;

(c) In any manner, create(s) a hazardous or dangerous condition, as solely determined by Melissa, so as to endanger the public health, welfare or safety; or

(d) Is/are located on real property having an Agriculture-Open Space zoned district classification or has/have an agriculture exemption for taxation purposes.

2. Under no circumstances shall the clear-cutting of trees on any real property within Melissa be allowed prior to the issuance of a Tree Removal Permit for said property. Any tree removed will be subject to the guidelines and requirements of this Ordinance.

3. Application for Tree Removal Permit. Tree Removal Permits for the removal of trees shall be obtained by making application to Melissa, on a form provided by Melissa, and shall be subject to the following procedures:

(a) Review of Application for Tree Removal Permit. Upon receipt of a proper application for a Tree Removal Permit, accompanied by an administrative fee of twenty-five dollars ($25.00) per permit application (unless exempt from the fee), the City Administrator, or his/her designee, shall review the application and may conduct field inspections of the development and/or refer the permit application to other departments for review and recommendation(s), as deemed necessary and appropriate solely by the City Administrator, or his/her designee.

(b) The application for a Tree Removal Permit, if required, shall be considered an integral part of the application for development plan approval, and no development plan for any development subject to the terms and provisions of this paragraph G shall be approved without said Tree Removal Permit.

4. Once a Tree Removal Permit has been issued, the trees indicated to be cut down shall be completely removed from the site within ninety (90) days, including all portions of the tree(s) down to and including the trunk to below the finished or proposed finished grade on the site. All replacement trees, transplanted trees or escrow funds sufficient to comply with the requirements of this Ordinance shall be in place prior to the issuance of a "Certificate of Occupancy" or acceptance of any public improvements on the subject property by Melissa.

H. *Penalties for Unauthorized Removal of Trees.* If any tree is removed from any real property, including injury to a tree resulting from the owner's failure to follow required tree protection guidelines, that results

in or may reasonably be expected to result in the death of the subject tree(s), the property owner shall be determined to be in violation of this Ordinance.

I.     Replacement of Trees. In the event it is necessary to remove a tree six (6) inches caliper or larger, the developer, builder or property owner shall be required to replace the tree to be removed with comparable or better spacious trees somewhere within the planned development or subdivision (See paragraphs (F)(5)—(11) for tree preservation credits). The City Council (until the Community Development Department is in place) may allow the trees to be located to other areas in Melissa if it is deemed necessary solely by Melissa staff, and space is available. Otherwise, the developer, builder or owner shall be required to escrow funds sufficient to meet the requirements of this Ordinance.

1.     A sufficient number of trees shall be planted to equal, in caliper, the caliper of the tree removed. Said replacement trees shall be a minimum of three (3) inches caliper when planted.

2.     Trees planted to satisfy landscape requirements that are indicated herein, and successfully transplanted trees, shall count toward the tree replacement requirements, inch for inch. Transplanted trees must successfully survive one (1) full year after planting to count as a preserved tree.

3.     Protected trees six (6) inches caliper or larger located in the Restricted Commercial District (C-1) will be replaced at the following rate:

(a)     Trees twenty-four (24) inches caliper or greater—One hundred (100) percent replacement required.

(b)     Trees less than twenty-four (24) inches caliper—Fifty (50) percent replacement required.

4.     Credits may be applied as stated in paragraphs (F)(5)—(11) above.

J.     *Recommended Trees For New Plantings.* The following is a list of recommended high quality, long-living trees which are considered suitable for local soil conditions and climate. Other species may be acceptable with approval from the City Council (until the Community Development Department is established). Required trees shall be a minimum of three (3) inches caliper immediately after planting.

1.     Overstory (Shade) Trees: Height Range 30—60 Feet

| American Elm | Ulmus americana |
| Bald Cypress | Taxodium disticum |
| Bur Oak | Quercus macrocarpa |
| Cedar Elm | Ulmus crassifolia |
| Chinese Pistacke | Pistacia chinesis |
| Chinquapin Oak | Quercus muehlenbergii |
| Eastern Red Cedar | Juniperus virginiana |
| Green Ash | Fraxinus pennsylvanica "Marshall Seedless" |
| Green Ash Cultivare | Fraxinus pennsylvania ssp. |
| Lacebark (Drake) Elm | Ulmus parvifolia "Drake" |
| Live Oak | Quercus virginiana |
| Pecan | Carya illinoinensis |
| Pistachio | Pistaola chinesis |

91

| Red Oak | Quercus shumardii |
| Shumard or Texas Red Oak | Quercus shumardi or texana |
| Sweet Gum | Liquidambar styraciflua |
| Western Soapberry | Sapindus drummondii |

2.    The following ornamental trees, with Melissa staff approval, may be substituted for the required shade trees. These ornamental trees shall have a minimum caliper of three (3) inches.

Accent (Ornamental) Trees: Height Range 10—20 Feet

| Afghan (Eldarica) Pine | Pinus eldarica |
| Chaste Tree | Vitex Agnus-castus |
| Crabapple | Malus augustufolia |
| Crape Myrtle | Lagerstroemia indica |
| Deciduous Holly | Ilex decidua |
| Desert Willow | Chilopsis linearis |
| Flowering Pear | Pyrus calleryana "Bradford", "Capital", "Aristocrat" |
| Japenese Black Pine | Pinus thunbergii |
| Mexican Buckeye | Ungnadia speciosa |
| Mexican Plum | Prunus mexicana |
| Purple Plum | Prunus cerasifera |
| Redbud | Cercis canadensis |
| Texas Sophora | Sophora affinis |
| Wax Myrtle | Myrica cerifera |
| Yaupon Holly | Ilex vomitaria |

K.    *Installation Practices (for areas to be dedicated to Melissa).*

1.    Grading. All areas receiving new turf or sod shall be fine graded, eliminating all rocks and debris larger than one (1) inch in diameter. If necessary, use additional fertile soil for top dressing to promote healthy growth and positive drainage.

2.    Bed Preparation. All beds shall be prepped with at least four (4) inches of amended or new soil. The beds must be crowned or sloped to create positive drainage. The beds shall be topped with two (2) inches of weed free mulch.

3.    Turf Requirements. All turf areas must be established prior to Melissa's acceptance. The turf must have ninety (90) percent coverage and be weed free.

4.    All site preparation, landscape and irrigation plans for areas to be turned over and/or dedicated to Melissa must be approved by the City Council, until the Parks and Recreation Department is in place.

5.   All trees must be back filled with the native soil, and a mild fertilizer must be added to the backfill. The soil must be free of rocks and debris. All trees must be staked outside of the rootball.

6.   Warranty. All required trees and plant materials shall be guaranteed for one (1) year. Sod and turf must be maintained by the developer, builder or owner, whichever is applicable, for at least one (1) year prior to Melissa's acceptance.

(Ord. No. 97-12, adopted 12-9-97, Sec. 1; Ord. No. 05-18, adopted 2-22-05, Sec. 2)

SECTION 28

CLASSIFICATION OF NEW AND UNLISTED USES

28.1 It is recognized that new types of land use will develop and forms of land use not anticipated may seek to locate in the city. In order to provide for such changes and contingencies, a determination as to the appropriate classification of any new or unlisted form of land use shall be made as follows:

(a)   The Building Inspector shall refer the question concerning any new or unlisted use to the Planning and Zoning Commission requesting an interpretation as to the zoning classification into which such use should be placed. The referral of the use interpretation question shall be accompanied by a statement of facts listing the nature of the use and whether it involves dwelling activity, sales, processing, type of product, storage and amount, and nature thereof, enclosed or open storage, anticipated employment, transportation requirements, the amount of noise, odor, fumes, dust, toxic material and vibration likely to be generated and the general requirements for public utilities such as water and sanitary sewer.

(b)   The Planning and Zoning Commission shall consider the nature and described performance of the proposed use and its compatibility with the uses permitted in the various districts, and determine the zoning district or districts within which such use should be permitted.

(c)   The Planning and Zoning Commission shall transmit its findings and recommendations to the City Council as to the classification proposed for any new or unlisted use. The City Council shall by resolution approve the recommendation of the Planning and Zoning Commission or make such determination concerning the classification of such use as is determined appropriate based upon its findings.

(d)   Standards for new and unlisted uses may be interpreted as those of a similar use. When determination of the minimum requirements cannot be readily ascertained, the same process outlined in paragraphs (a), (b), and (c) above shall be followed.

SECTION 29

CREATION OF BUILDING SITE

29.1 No permit for the construction of a building or buildings upon any tract or plot shall be issued until a building site, building tract, or building lot has been created by compliance with one of the following conditions:

(a)   The lot or tract if part of a plat of record, properly approved by the City Council, and filed in the Plat Records of Collin County, Texas.

(b)   The plot, tract or lot faces upon a dedicated street and was separately owned prior to the effective date of this ordinance or prior to annexation to the city, whichever is applicable, in which event a building permit for only one main building conforming to all the requirements of this ordinance may be issued on each such original separately owned parcel without first complying with paragraph (a) preceding.

(c)   The plot or tract is all or part of a site plan officially approved by the City Council and compliance has been made with provisions and improvements approved on such site plan for all utility and drainage easements, dedication of streets, alleys and other public improvements required to meet the standards established for the platting of land. Any and all plots, tract or lots must be provided access via a public street or drive.

## SECTION 30

## NONCONFORMING USES AND STRUCTURES

30.1 A nonconforming status shall exist when:

(a)   a use or structure which does not conform to the regulations prescribed in the district in which such use or structure is located was in existence and lawfully operating prior to the adoption of the previous zoning ordinance and has been operating since without discontinuance; or

(b)   on the effective date of this ordinance, the use or structure was (1) in existence and lawfully constructed, located and operating in accordance with the provisions of the previous zoning ordinance or (2) was a nonconforming use thereunder and does not now conform to the regulations herein prescribed for the district in which the use or structure is located.

30.2 No nonconforming use or structure may be expanded or increased beyond the lot or tract upon which such nonconforming use is located as of the effective date of this ordinance except to provide off-street loading or off-street parking space upon approval of the Zoning Board of Adjustment.

30.3 Repairs and normal maintenance may be made to a nonconforming building provided that no structural alterations or extensions shall be made except those required by law or ordinance, unless the building is changed to a conforming use.

30.4 Any nonconforming use may be changed to a conforming use and once such change is made, the use shall not thereafter be changed back to a nonconforming use.

30.5 Where a conforming use is located in a nonconforming structure, the use may be changed to another conforming use by securing a certificate of occupancy from the Building Inspector.

30.6 Whenever a nonconforming use is abandoned or discontinued, all nonconforming rights shall cease and the use of the premises shall thenceforth be in conformity with this ordinance. Discontinuance of a use or business or the vacancy of a building or premises occupied by a nonconforming use for a period of twelve (12) months shall be construed as conclusive proof of intent to abandon the nonconforming use. Also, should the owner or user intend to discontinue any nonconforming use, such nonconforming rights shall cease immediately.

30.7 If a nonconforming structure or a structure occupied by a nonconforming use is destroyed by fire, act of God or other cause, it may be rebuilt but the size and function of the nonconforming use shall not be expanded without a variance.

30.8 Amortization of Nonconforming Uses/Structures.

A.    Determination of Need for Expedited Compliance. Any person who resides or owns real property in Melissa may request that the City Council establish a compliance date for a nonconforming use and/or structure. Upon receiving such a request, the City Council shall determine whether there is a public necessity for expedited compliance with the zoning regulations. The following factors must be considered by the City Council in determining the public necessity for expedited compliance:

1.    The character of the surrounding neighborhood.

2.    The degree of incompatibility of the use and/or structure to the zoning district in which it is located.

3.    The effect of the nonconforming use and/or structure on the surrounding area and the effect of its cessation on that area.

If the City Council finds there is not a public necessity for expedited compliance with the zoning regulations, the City Council shall request Planning &amp; Zoning to initiate a public hearing in accordance with the Comprehensive Zoning Ordinance to determine the proper zoning of the property on which the use and/or structure is located.

B.    Determination of Amortization Period.

1.    The City Council shall, in accordance with the law, provide a compliance date for the nonconforming use and/or structure under a plan whereby the owner's actual investment in the structure(s), fixed equipment and other assets (excluding inventory and other assets that may be feasibly transferred to another site) on the property before the time that the use and/or structure became nonconforming can be amortized within a definite time period if:

a.    The City Council finds that there is a public necessity for expedited compliance with the zoning regulations;

b.    The City Council decides not to initiate a public hearing to rezone the property; or

c.    The final zoning decision of Planning and Zoning or the City Council does not render the use and/or structure conforming.

2.    The following factors must be considered by the City Council in determining a reasonable amortization period:

a.    The owner's capital investment in structures, fixed equipment, and other assets (excluding inventory and other assets that may be feasibly transferred to another site) on the property before the time the use and/or structure became nonconforming.

b.    Any costs that are directly attributable to the owner and the establishment of compliance date, including demolition expenses, relocation expenses, termination of leases, and discharge of mortgages.

c.    Any return on capital investment since inception of the use and/or use of the structure, including net income and depreciation.

d.    The anticipated actual recovery of capital investment, including net income and depreciation.

3.    If the owner did not have an investment in the use and/or structure before it became a nonconforming use and/or structure, the owner is not entitled to an amortization to recover any of the costs set forth in paragraph 30.8.B.2.

C.    Compliance Requirement. If the City Council establishes a compliance date for a nonconforming use and/or structure, the use and/or structure must cease operations on or before that date, and it may not operate and/or be occupied and/or used thereafter unless it becomes a conforming use and/or structure.

D.    For purposes of this Ordinance, 'owner' means the owner of the nonconforming use and/or structure at the time of the City Council's determination of a compliance date for the nonconforming use and/or structure.

(Ord. No. 03-20, adopted 9-9-03, Sec. 2; Ord. No. 05-16, adopted 1-25-05, Sec. 3)

SECTION 31

RULES OF CONSTRUCTION AND GENERAL DEFINITIONS

31.1 *General Rules of Construction:* The following rules of construction shall apply to the interpretation of words used in this ordinance:

(1)    Words used in the present tense include the future tense.

(2)    Words used in the singular number include the plural number.

(3)    Words in the plural number include the singular number.

(4)    The words "building" and "structure" are synonymous.

(5)    The words "lot", "plot" and "tract" are synonymous.

(6)    The word "shall" is mandatory and not discretionary.

31.2 *General Definitions:* Except to the extent a particular provision specifies otherwise, the following definitions shall apply throughout this ordinance:

(1)    *Accessory Building.* A building subordinate to and detached from the main building and used for purposes customarily incidental to the primary use of the premises.

(2)    *Accessory Use.* A subordinate use which is incidental to the main or primary use.

(3)    *Alley.* A public space or thoroughfare which affords only secondary means of access to property abutting thereon.

(4)    *Apartment.* A room or suite of rooms in a multi-family dwelling or apartment house designed or occupied as a place of residence by a single family, individual or group of individuals.

(5)    *Apartment House.* Any building or portion thereof, which is designed, built, rented, leased or let to be occupied as a home or place of residence by three or more families living in independent

dwelling units.

(6) *Appliance Repair.* A shop for the repair of household and home equipment, such as electrical appliances, lawn mowers, tools and similar items where all such items are stored within a building.

(7) *Area of the Lot.* The area shall be the net area of the lot or site and shall not include portions of streets and alleys.

(8) *Athletic Field* or *Stadium.* An athletic field or stadium owned and operated by a public agency for the general public including a baseball field, football field or stadium which may be lighted for nighttime play.

(9) *Basement.* A building story which is partly underground, but having at least one-half of its height above the average level of the adjoining ground. A basement shall not be counted as a story in computing building height.

(9A) *Beer/Wine Sales.* Retail sales to consumers for off-premise consumption only of beer, wine and/or vinous liquor, but not liquor, in accordance with any and all state and/or local laws, rules and regulations. "Beer", "wine", "vinous liquor" and "liquor" shall have such meanings as set forth in the Texas Alcoholic Beverage Code, as it exists or may be amended.

(10) *Block.* An area enclosed by streets and occupied by or intended for buildings; where this word is used as a term of measurement, it shall mean the distance along a side of a street between the nearest two streets which intersect said street on said side.

(11) *Board of Adjustment.* The Zoning Board of Adjustment of the City of Melissa, Texas.

(12) *Boarding (or Rooming) House.* A building, other than a hotel or multiple family dwelling, where lodging is provided for five (5) or more persons for compensation, and where facilities for food preparation are not provided in individual rooms.

(13) *Building.* Any structure built for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind. When subdivided in a manner sufficient to prevent the spread of fire, each portion so subdivided may be deemed a separate building.

(14) *Building Ends.* Those sides of a building having the least dimension as compared to the front or rear of a building. As used in the building spacing regulations for multiple-family dwelling, the term "building end" shall mean the most narrow side of a building regardless of whether it fronts upon a street, faces the rear of the lot or adjoins the side lot line or another building.

(15) *Building Height.* The vertical distance of a building measured from the average established grade at the street line on from the average natural front yard ground level, whichever is higher, to (1) the highest point of the roof's surface if a flat surface, (2) to the deck line of mansard roofs or (3) to the mean height level between eaves and edge for hip and gable roofs and, in any event, excluding chimneys, cooling towers, elevator bulkheads, penthouses, tanks, water towers, radio towers, ornamental cupolas, domes or spires, and parapet walls not exceeding ten (10) feet. If the street grade has not been officially established, the average front yard grade shall be used for a base level.

(16) *Building Inspector.* The official or person charged with the enforcement of the zoning and building codes of the City.

(17) *Building Line.* A line parallel or approximately parallel to the street line at a specified distance therefrom constituting the minimum distance from the street line that a building may be erected.

(18) *Building Material Sales.* The sale of new building materials and supplies indoors with related sales for hardware, carpet, plants, electrical and plumbing supplies all of which is oriented to the retail customer, rather than contractor or wholesale customer.

(19) *Cellar.* A building story with more than one-half its height below the average level of the adjoining ground. A cellar shall not be counted as a story in computing building height.

(20) *Certificate of Occupancy.* An official certificate issued by the City of Melissa through the enforcing official indicating conformance with or approved conditional waiver from the zoning regulations and authorizing legal use of the premises for which it is issued.

(21) *Child Care Center* or *Facility.* A facility that provides care or supervision for children who are not related by blood, marriage, or adoption to the owner or operator of the facility for less than 24 hours a day for more than twelve (12) children under the age of fourteen (14), whether or not the facility is operated for profit or charges for the services it offers.

(22) *Child Day Care Home.* A facility, sometimes referred to as a "Registered Family Home" that regularly provides care in the caretaker's own residence for not more than six (6) children under the age of fourteen (14) years of age, excluding the caretaker's own children. When more than six (6) children are kept in the home, it shall be considered as either a "Group Day Care Home" or "Child Care Center."

(23) *Clinic.* A group of offices for one or more physicians, surgeons, optometrists, or dentists to treat, examine or consult with patients who do not remain overnight.

(24) *Church* or *Rectory.* A place of assembly and worship by a recognized religion including without limitation synagogues, temples, churches, instruction rooms and the place of residence for ministers, priests, rabbis, teachers and directors on the premises.

(25) *City Council.* The governing body of the City of Melissa, Texas.

(26) *College* or *University.* An academic institution of higher learning, accredited or recognized by the State and covering a program or series of programs of academic study.

(27) *Community Center (Private).* A building or group of rooms designed and used as an integral part of a residential project by the tenants of such a project for a place of meeting, recreation or social activity and under the management and unified control of the operators of the project. A private community center shall not be operated as a place of public meetings or as a business nor shall the operation of such facility create noise, odor or similar conditions perceptible beyond the bounding property line of the project site.

(28) *Community Center (Public).* A building or group of rooms owned operated by a governmental body or non-profit association (Y.M.C.A., Y.W.C.A., etc.) for social and/or recreational purposes.

(29) *Condominium.* See "Townhouse."

(30) *Convalescent Center.* A place of residence used for or customarily occupied by persons recovering from illness where nursing care is provided.

(31) *Country Club (Private).* An area of twenty (20) acres or more containing a golf course and a clubhouse and available only to private specific membership; such a club may contain adjunct facilities such as private club, dining room, swimming pool, tennis courts and similar recreational or service facilities.

(32) *Court* or *Courtyard.* An open, unoccupied space, bounded on more than two sides by the walls of a building. An inner court is a court entirely surrounded by the exterior walls of a building. An outer court is a court having one side open to a street, alley, yard or other permanent space.

(33) *District.* A section of the city for which the regulations governing the area, height, or use of the land and buildings are uniform.

(34) *Duplex.* A detached building having separate accommodations for and occupied by not more than two families.

(35) *Dwelling Unit.* A building or portion of a building which is arranged, occupied, or intended to be occupied as living quarters and includes facilities for food preparation and sleeping.

(36) *Family.* Any number of individuals living together as a single housekeeping unit, in which not more than three (3) individuals are unrelated by blood, marriage or adoption.

(37) *Farm.* An area of five (5) acres or more which is used for growing of usual farm products (vegetables, grain, etc.) and for the raising thereon of the usual farm poultry and farm animals such as horses, cattle and sheep and including the necessary accessory uses for raising, treating and storing products raised on the premises, not including the commercial feeding of offal or garbage to swine or other animals and not including any type of agriculture or husbandry specifically prohibited by ordinance or law.

(38) *Floor Area.* The total square feet of floor space within the outside dimensions of a building including each floor level, but excluding cellars, carports, garages or porches.

(39) *Group Day Care Home.* A facility that regularly provides care in the caretaker's own residence for seven (7) to twelve (12) children under the age of fourteen (14) years, excluding the caretaker's own children.

(40) *Group Home.* A residential facility licensed by the Texas Department of Human Resources to house up to six (6) handicapped and/or mentally retarded persons and two (2) supervisors.

(41) *Guest House (detached).* A secondary structure on a lot or tract containing dwelling accommodations excluding kitchen facilities and separate utility services or meters and intended for the temporary occupancy by guests and not for rent or permanent occupancy.

(42) *Halfway House.* A residential facility providing shelter, supervision and residential rehabilitative services for persons who have been inmates of any county, state or federal correctional institution and released and require a group setting to facilitate the transition to a functional members of society.

(43) *Home Occupation.* A home occupation is an occupation customarily carried on in an existing structure of the property by not more than two (2) employees, one of whom must be the owner of the business being conducted at the location. A person who engages in a home occupation shall not use an advertising sign larger than two and one-half (2.5) square feet in size, said sign to be non-illuminated and attached to the structure in which the business is conducted. A person who engages in a home

occupation shall not display or store materials and/or equipment for sale or use outside of the structure in which the business is conducted. A person who engages in a home occupation may conduct outdoor activities other than storage of materials and/or equipment provided the activities are screened from adjacent properties and public easements and rights-of-way by a solid fence of at least six (6) feet in height, shall not involve the use of motorized equipment, and shall not generate loud and raucous noise that renders the enjoyment of life and property uncomfortable or interferes with public peace and comfort. The storage of firewood for public sale and the temporary outdoor display or holiday-related merchandise, such as Christmas trees, are specifically exempted from the outdoor storage, display, and fencing regulations of this ordinance. Temporary outdoor display of holiday-related merchandise shall be limited to a total thirty (30) day display period for any particular merchandise item(s).

(44) *Hospital.* A facility which mainly provides general inpatient medial care an treatment of sick and injured persons by the use of medical, diagnostic, and major surgical facilities and which is accredited by the State of Texas.

(45) *Industrial Housing.* A residential structure that is designed for the use and occupancy of one or more families, that is constructed in one or more modules or constructed using one or more modular components built at a location other than the permanent residential site, and that is designed to be used as a permanent residential structure when the modules or modular components are transported to the permanent residential site and are erected or installed on a permanent foundation system. The term includes the plumbing, heating, air conditioning, and electrical systems associated with the structure. The term does not include any residential structure that is in excess of two stories or thirty-five feet (35') in height as measured from the finished grade elevation at the building entrance to the peak of the roof. The term shall not mean nor apply to (i) housing constructed of sectional or panelized systems not utilizing modular components, or (ii) any ready-built home which is constructed so that the entire living area is contained in a single unit or section at a temporary location for the purpose of selling it and moving it to another location.

(46) *Kennel.* An establishment where the sale, boarding, raising, breeding, and/or training of animals is conducted for commercial purposes. This definition is not to preclude the raising of a single litter of animals per year by any resident.

(47) *Kindergarten* or *Nursery School.* An establishment where more than three (3) children are housed for care or training during the day or portion thereof.

(48) *Light Fabrication.* The fabrication, assembly or manufacture of products, including but not limited to jewelry, trimming decorations, and similar items, which does not involve generation of noise, odor, vibration, dust or hazard.

(48A)   *Liquor Sales.* Retail sales to consumers for off-premise consumption only of liquor, and may or may not also include retail sales to consumers for off-premise consumption only of beer, wine and/or vinous liquor, in accordance with any and all state and/or local laws, rules and regulations. "Beer", "wine", "vinous liquor" and "liquor" shall have such meanings as set forth in the Texas Alcoholic Beverage Code, as it exists or may be amended.

(49) *Living Unit.* The room or rooms occupied by a family and which includes cooking facilities.

(50) *Lot.* An area of land with fixed boundaries, used or intended to be used by one building and its accessory buildings and not divided by any street or alley.

(51) *Lot Coverage.* The percentage of the total area of a lot occupied by the roof or base (ground floor) of buildings located on the lot or the area, whichever is greater. Roof eaves, up to the extent of two (2) feet, shall be excluded when determining lot coverage.

(52) *Lot Depth.* The mean horizontal distance between the front and rear lot lines.

(53) *Lot Lines.* The lines bounding a lot as defined herein.

    (a)   *Front Lot Line.* That lot line adjacent to the street right-of-way which separates the lot from the street. In the case of a corner lot, only one lot line shall be designated as the front lot line.

    (b)   *Rear Lot Line.* That lot line opposite the front lot line of said lot not intersecting with the front lot line.

    (c)   *Side Lot Line.* Any lot line which intersects a front lot line of said lot.

(54) *Lot of Record.* A lot which is part of a subdivision, a plat of which has been recorded in the office of the County Clerk of Collin County; or a parcel of land, the deed for which is recorded in the office of the County Clerk of Collin County prior to the adoption of this ordinance.

(55) *Lot* or *Building Site.* Land occupied or to be occupied by a building and its accessory building, and including such open spaces as are required under this ordinance, and having its principal frontage upon a public street or officially approved place.

(56) *Lot Width.* The width of a lot at the front building line.

(57) *Main Building.* The building or buildings on a lot which are occupied by the primary use.

(58) *Manufactured Home.* A structure that was constructed on or after June 15, 1976, transportable in one or more sections, which, in the traveling mode, is eight body feet (8') or more in width or forty body feet (40') or more in length, or, when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities. The term does not include recreational vehicles.

(59) *Manufactured Home Park.* A parcel of land which is owned by an individual, a firm, trust, partnership or corporation which has been zoned, developed and intended to be used for the rental of individual lots to tenants with manufactured homes.

(60) *Mobile Home.* A structure that was constructed before June 15, 1986, transportable in one or more sections, which, in the traveling mode, is eight body feet (8') or more in width or forty body feet (40') or more in length, or, when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities. The term does not include recreational vehicles.

(61) *Motel* or *Hotel.* A building or group of buildings designed for and occupied as a temporary abiding place of individuals and providing customary hotel services such as linen, maid service, telephone and upkeep of furniture.

(62) *Multiple-Family Dwelling.* Any building or portion thereof which is designed, built, rented, leased or let to be occupied as three or more dwelling units or apartments or which is occupied as a home or place of residence by three or more families living in independent dwelling units and which is not

located on individually platted lots.

(63) *Nonconforming Use.* A building, structure or use of land lawfully occupied at the time of the effective date of this ordinance or amendments thereto and which does not conform to the use regulations of the district in which it is situated.

(64) *Nursing Home.* A place of residence and care for persons suffering from infirmities of age where care is provided on a prolonged or permanent basis.

(65) *Occupancy.* The use or intended use of the land or buildings by proprietors or tenants.

(66) *Off-Street Parking.* Parking spaces located on the lot or tract occupied by the main use and which is not located on any street or highway.

(67) *Open Space.* Area included in any side, rear or front yard or any unoccupied space on the lot that is open and unobstructed to the sky except for the ordinary projections of cornices, eaves, porches and plant material.

(68) *Orchard.* An area of land at least five (5) acres or more in size which is used for growing of fruit and nut trees and including the necessary accessory uses for growing, treating and storing the fruit and nut products raised on the premises.

(69) *Park* or *Playground.* An open recreation facility or park owned and operated by a public agency such as the City of Melissa or the School Board and available to the general public for neighborhood use but not involving lighted athletic fields for nighttime play.

(70) *Planning and Zoning Commission.* The agency appointed by the City Council as an advisory body authorized to provide recommendations to the council on matters relating to planning and zoning decisions to be considered by the council.

(71) *Plant Nursery.* Retail or wholesale sales of plant materials and supplies either enclosed in a building, lath house, or in the open and with related storage of equipment for landscape contracting.

(72) *Private Club.* A club room or suite of rooms or a building available to restricted membership for dining, entertainment or other common object or purpose and where alcoholic beverages are sold or provided to its members. All such private clubs shall be licensed and permitted by the Texas Alcoholic Beverage Commission.

(73) *Private Garage.* An accessory building housing vehicles owned and used by occupants of the main building; if occupied by vehicles of others, it is a storage space.

(74) *Ranch.* An area of five (5) acres or more which is used for the raising thereon of livestock such as horses, cattle and sheep not including the commercial feeding of offal or garbage to swine or other animals and not including any type of agriculture or husbandry specifically prohibited by ordinance or law.

(75) *Radio, Television or Microwave Towers.* Structures supporting antenna and satellite dishes for transmitting or receiving electromagnetic waves for audio and visual purposes, but excluding non-commercial antenna installations for home use of radio or television.

(76) *Residence.* Same as dwelling; when used with district, an area of residential regulations.

(77) *Restaurant* or *Cafeteria*. An establishment serving food to the general public in specific, designated dining areas within the immediate confines of the building and shall not include drive-in establishments where food is eaten in automobiles.

(78) *Restaurant (Drive-In Service)*. An establishment designed and constructed to serve food for consumption on the premises in an automobile and which establishment may or may not have on-premises dining room.

(79) *Rooming House*. A building, other than a hotel or apartment, where lodging is provided for five (5) or more persons for compensation, and where facilities for food preparation are not provided in individual rooms.

(80) *School, Business*. A business organized to operate for a profit and offering instruction and training in a service or art such as secretarial school, barber college, beauty school or commercial art school, but not including manual trade schools.

(81) *School, Private*. An academic institution other than a public or parochial elementary or secondary school, including private elementary and secondary schools and institutions of higher learning.

(82) *School, Public or Parochial*. A school and customary accessory uses under the sponsorship of a public or religious denomination having a curriculum generally equivalent to public, elementary or secondary schools, but not including private, trade or commercial schools.

(83) *School, Trade*. A business operating for profit and offering instruction and training in a trade such as welding, brick laying, machinery operation and other similar manual trades.

(84) *Seat*. As used in determining parking requirements for this ordinance, a seat shall mean such sitting space as needed or which is designed to be used for one person to sit down and occupy.

(85) *Second Hand Store*. An establishment offering for sale used merchandise, with the storage and display of such items wholly contained inside a building or structure.

(86) *Service Station*. A building and its immediate area where pumps, car wash bays, and other equipment are used primarily for the retail sale of gasoline, lubricants and automobile accessories, and conducting minor automobile maintenance.

(87) *Sign*. An outdoor advertising device that is a structure or that is attached to or painted on a building or that is leaned against a structure for display on premises. (See subsection 25.2 for specific definitions of types of signs.)

(88) *Single Family Dwelling (attached)*. A building located on a platted lot or separate building site which is designed for and occupied by not more than one (1) family and which is attached by one or more common wall(s) to another single family dwelling unit.

(89) *Single Family Dwelling (detached)*. A detached building located on a platted lot or separate building site which is designed for and occupied by not more than one (1) family.

(90) *Stable, Commercial*. A structure and its surrounding area of land used for the quartering horses which are boarded or rented to the public for compensation, but not including a private stable, sale barn, auction or similar trading activity.

(91) *Stable, Private.* An accessory building set back from adjacent property lines a minimum distance of one hundred (100) feet and used for quartering horses, not to exceed one (1) horse per one and one half (1.5) acre area of a farm or lot.

(92) *Street.* Any thoroughfare or public right-of-way, other than an alley, which provides vehicular access to adjacent land.

(93) *Street Right-of-Way Line.* A dividing line between a lot, tract or parcel of land and a contiguous street.

(94) *Story.* The height between the successive floors of a building of from the top floor to the roof. The standard height for a story is eleven (11) feet, six (6) inches.

(95) *Structural Alterations.* Any change in the supporting member of a building, such as a bearing wall, column, beams or girders.

(96) *Structure.* Same as Building.

(97) *Swimming Pool (public).* A swimming pool with accessory facilities, not part of the municipal or public recreational system and not a private swim club, but where the facilities are available to the general public for a fee.

(98) *Swimming Pool (private).* A swimming pool constructed for the exclusive use of the residents of a single family or multi-family dwelling and located within the required side or rear yards.

(99) *Telephone Exchange.* A switching or transmitting station owned by a public utility but not including business office facilities, storage or repair shops or yards.

(98) *Temporary Field* or *Construction Office.* Temporary office buildings and temporary building material storage areas to be used solely for construction purposes in connection with the property on which they are erected may be permitted for a specified period of time in accordance with a permit issued by the Building Inspector.

(98.1) *Temporary Building.* An industrialized or modular building or structure without a permanent foundation. Membrane structures shall not be considered a temporary building. See Section 26 ("SUP" Specific Use Permit) of this Ordinance for specific regulations relating to temporary buildings.

(99) *Tennis Court, Private.* A surface designed and constructed for playing the game of tennis along with all fencing, nets and related appurtenances but excluding lighting for night play in residential areas except as may be otherwise provided or restricted by the specific use permit.

(100) *Thoroughfare.* Same as Street.

(101) *Variance.* An adjustment in the application of the specific regulations of this zoning ordinance to a particular parcel of property which, because of special conditions or circumstances peculiar to the particular parcel, is necessary to prevent the property from being deprived of rights and privileges enjoyed by other parcels in the same vicinity and zoning district.

(102) *Wrecking* or *Auto Salvage Yard.* A yard or building where automobiles or parts of automobiles or machinery are stored, dismantled and/or offered for sale in the open as whole units,

as salvaged parts or as processed metal.

(103)     *Yard.* An open space, other than a court, on the lot in which a building is situated and which is not obstructed from a point forty (40) inches above the general ground level of the graded lot to the sky, except as provided for roof overhang and similar special architectural features and plant material.

(104)     *Yard, Front.* An open, unoccupied space on a lot facing a street extending across the front of a lot between the side lot lines and from the main building to the front lot line (or street right-of-way line) with the minimum horizontal distance between the front lot line (or street right-of-way line) and the main building line as specified for the district in which it is located.

(105)     *Yard, Rear.* An open, unoccupied space extending across the rear of a lot from one side lot line to the other side lot line and having a depth between the building, except for accessory buildings and outbuildings as herein permitted, and the rear lot line as specified in the district in which the lot is situated.

(106)     *Yard, Side.* An open, unoccupied space or spaces on one side or two sides of a main building and on the same lot with the building, situated between the building and a side line of the lot and extending through from the front yard to the rear yard. Any lot line not the rear line or front line shall be deemed a side line.

(107)     *Zoning Map.* The official certified map upon which the boundaries of the various zoning districts are drawn and which is an integral part of this zoning ordinance.

(Ord. No. 22-26, adopted 10-9-01, Sec. 3; Ord. No. 05-16, adopted 1-25-05, Sec. 4; Ord. No. 06-41, adopted 9-26-06, Sec. 4)

SECTION 32

CERTIFICATES OF OCCUPANCY

32.1 *Certificate of Occupancy Required:* No permanent structure constructed, remodeled, enlarged, or otherwise located within the city limits may be occupied prior to issuance of a certificate of occupancy by the Building Inspector. No change in the existing conforming use of a permanent structure or of land to a use of a different classification under this ordinance, and no change in the legally conforming use of a permanent structure or of land may take place prior to issuance of a certificate of occupancy by the Building Inspector.

32.2 *Procedure for Vacant Land or a Change in Use:* Written application for a certificate of occupancy for the use of vacant land, or for a change in the use of land or a building, or for a change in a nonconforming use, as herein provided, shall be made to said Building Inspector. If the proposed use is in conformity with the provisions of this ordinance, the certificate of occupancy therefor shall be issued within ten (10) days after the application for same has been made.

32.3 *Contents of Certificate of Occupancy:* Every certificate of occupancy shall state that the building or the proposed use of a building or land complies with all provisions of the building and zoning laws and ordinances of the city. A record of all certificates of occupancy shall be kept on file in the office of the Building Inspector or his or her agent and copies shall be furnished on request to any person having proprietary or tenancy interest in the building or land affected.

32.4 *Temporary Certificate:* Pending the issuance of a regular certificate, a temporary certificate of occupancy may be issued by the Building Inspector for a period not exceeding six (6) months during the completion of alterations or during partial occupancy of a building pending its completion. Issuance of a temporary certificate shall not be construed to alter the respective rights, duties, or obligations of the owner or of the City relating to the use occupancy of the premises or any other matter covered by this zoning ordinance.

32.5 *Application and Issuance of Certificates for Nonconforming Uses:* A certificate of occupancy shall also be required for all lawful nonconforming uses of land or buildings created by adoption of this zoning ordinance. It shall be the responsibility of the owner or lessee of building or land occupied by such nonconforming use to file an application with the Building Inspector for such certificate of occupancy. Upon receipt of the application by the Building Inspector, each owner or lessee shall be required to file an affidavit stating that such land or building was occupied by the nonconforming use and was in lawful use or lawfully existed as of the date of the adoption of this zoning ordinance. If the Building Inspector finds that such use did in fact lawfully exist at the time of adoption of this zoning ordinance, the Building Inspector shall then issue a certificate of occupancy for such lawful nonconforming use. Failure to apply for such certificate of occupancy for a nonconforming use within one (1) year from the date of adoption of this ordinance shall be evidence that said nonconforming use was either illegal or did not lawfully exist at the adoption date of this ordinance, unless the owner or lessee can otherwise prove the nonconforming use did exist at the time of adoption of this ordinance. Proof of verification can include utility records, tax records, affidavits from neighbors, etc.

SECTION 33

## ZONING CHANGES AND AMENDMENTS

33.1 *Declaration of Policy:* The City declares the enactment of these regulations governing the use and development of land, buildings, and structures to be a measure necessary to the orderly development of the community. Therefore, no change shall be made in these regulations or in the boundaries of the zoning districts except:

    (a)   To correct any error in the regulations or map.

    (b)   To recognize changed or changing conditions or circumstances in a particular locality.

    (c)   To recognize changes in technology, style of living, or manner of doing business.

    (d)   As an official amendment of the zoning ordinance.

33.2 *Authority to Amend Ordinance:* The City Council may from time to time, after receiving a final report thereon by the Planning and Zoning Commission and after public hearings required by law, amend, supplement, or change the regulations herein provided or the classification or boundaries of the zoning districts. Any amendment, supplement, or change to the text of the zoning ordinance and any change in the classification or boundaries of the zoning districts may be ordered for consideration by the City Council, may be initiated by the Planning and Zoning Commission, or may be requested by the owner of affected real property or the authorized representative of an owner of affected real property.

33.3 *Public Hearing and Notice:* Prior to making a report to the City Council, the Planning and Zoning Commission shall hold at least one public hearing on each application. Written notice of all public hearings on proposed changes in district classification or boundaries shall be sent to all owners of property, or to the



person rendering the same for city taxes, located within the area of application and within two hundred (200) feet of any property affected thereby, within not less than ten (10) days before such hearing is held. Such notice may be served by using the last known address as listed on the city tax roll and depositing the notice, postage paid, in the United States mail. Notice of hearings on proposed changes in the text of the Zoning Ordinance and on proposed changes in district classification or boundaries shall be published at least once not less than fifteen (15) days prior thereto in the official newspaper of the City.

33.4 *Commission Consideration and Report:* The Planning and Zoning Commission, after the public hearing is closed, shall prepare its report and recommendations on the proposed change stating its findings, its evaluation of the request and of the relationship of the request to the Comprehensive Plan. The Planning and Zoning Commission may defer its report for not more than ninety (90) days until it has had opportunity to consider other proposed changes which may have a direct bearing thereon. In making its determination, the Planning and Zoning Commission shall consider the following factors:

(a)    Whether the uses permitted by the proposed change will be appropriate in the immediate area concerned and their relationship to the general area and the City as a whole.

(b)    Whether the proposed change is in accord with any existing or proposed plans for providing public schools, streets, water supply, sanitary sewers and other utilities to the area and shall note the findings.

(c)    The amount of vacant land currently classified for similar development in the vicinity and elsewhere in the City, and any special circumstances which may make a substantial part of such vacant land unsuitable for development.

(d)    The recent rate at which land is being developed in the same zoning classification as the request, particularly in the vicinity of the proposed change.

(e)    The manner in which other areas designated for similar development will be, or are likely to be, affected if the proposed amendment is approved, and whether such designation for other areas should also be modified.

(f)    Any other factors which will substantially affect the public health, safety, morals or general welfare.

33.5 *Council Consideration:*

(a)    Proposal Recommended for Approval: Every proposal which is recommended favorably by the Planning and Zoning Commission shall be forwarded to the Council for a public hearing thereon. No ordinance change shall become effective until after the adoption of the ordinance and its publication as required by law.

(b)    Proposal Recommended for Denial: When the Planning and Zoning Commission determines that a proposal should be denied, it shall so report and recommend to the City Council and notify the applicant. When a proposed zoning request is heard by the City Council that has been denied by the Planning and Zoning Commission, a three-fourths (¾) majority vote by the City Council shall be required for approval. A request which has been denied by the Planning and Zoning Commission and/or City Council may be resubmitted at any time for reconsideration by the City along with a new filing fee which must accompany the request. The Planning and Zoning Commission and/or City Council may specifically deny any request with or without prejudice. If a request has been specifically

denied with prejudice, the request may not be resubmitted to the City for six (6) months from the original date of denial.

(c)  Council Hearing and Notice: Required notice of City Council hearing shall be given by publication in the official newspaper of the city, stating the time and place of such hearing, which shall be at least fifteen (15) days after the date of publication.

(d)  Three-Fourths Vote: A favorable vote of three-fourths (¾) of all members of the City Council shall be required to approve any change in zoning when written objections are received by owners of twenty (20) percent or more of the area of the lots or land covered by the proposed change or such area within two hundred (200) feet of the property which a zoning change is being contemplated. If a protest against such proposed amendment, supplement or change has been filed with the City Secretary, duly signed and acknowledged by the owners of twenty (20) percent or more of the area of the lots or land included in such a proposed change or the lots or land immediately adjoining the same and extending two hundred (200) feet therefrom (measured without regard to city streets or other public right of way), such zoning change or amendments shall not become effective except by a three-fourths (¾) vote of the City Council.

33.6 *Final Approval and Ordinance Adoption:* Following the hearing on the zoning request by the City Council, the applicant shall submit a metes and bounds description to the City within thirty (30) days for the preparation of the amending ordinance. The amending ordinance shall be approved within six (6) months of the zoning request.

## SECTION 34

### PRESERVING RIGHTS IN PENDING LITIGATION

By the passage of this ordinance, no presently illegal use shall be deemed to have been legalized unless such use specifically falls within a use district where the actual use is a conforming use. Otherwise, such uses shall remain nonconforming uses where recognized, or an illegal use, as the case may be. It is further the intent and declared purpose of this ordinance that no offense committed and no liability, penalty or forfeiture, either civil or criminal, incurred prior to the time the existing zoning ordinance was amended in its entirety by this ordinance, shall be discharged or affected by such repeal; but prosecution and suits for such offenses, liabilities, penalties, or forfeitures may be instituted or causes presently pending may be proceeded with in all respects as if such prior ordinance had not been amended.

## SECTION 35

### PENALTY FOR VIOLATIONS

Any person or corporation violating any of the provisions of this ordinance shall upon conviction be fined the sum of two thousand dollars ($2,000.00) per day; and each and every day that the provisions of this ordinance are violated shall constitute a separate and distinct offense. In addition to the said penalty provided for, the right is hereby conferred and extended upon any property owner owning property in any district where such property owner may be affected or invaded by a violation of the terms of the ordinance to bring suit in such court or courts having jurisdiction thereof and obtain such remedies as may be available at law and equity in the protection of the rights of such property owners.

## SECTION 36

### VALIDITY, SEVERANCE AND CONFLICTS

If any section, paragraph, subdivision, clause, phrase or provision of this ordinance shall be adjudged invalid or held unconstitutional, the same shall be served from and shall not affect the validity of this ordinance as a whole or any part or provision thereof other than the part so dedicated to be invalid or unconstitutional. It is intended that this ordinance entirely replace and supersede all provisions of the existing zoning ordinance, of the City of Melissa, Texas, as amended. To the extent any provision of this ordinance conflicts with other ordinances of the City of Melissa the terms of this ordinance shall control.

PASSED and APPROVED by the City Council of the City of Melissa, Texas on this the 25th day of August, 1992.

APPROVED:

_____

Mayor

ATTEST:

_____

City Secretary

(61) **State Law reference—** Zoning authority, V.T.C.A., Local Government Code, ch. 211 (Back)